IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
WEST VIRGINIA HIGHLANDS               )
CONSERVANCY, OHIO VALLEY              )
ENVIRONMENTAL COALITION,             )
and COAL RIVER MOUNTAIN WATCH        )
                                      )
            Plaintiffs,               )          Civil Action No. 07-0667 (JDB)
                                      )
        v.                            )
                                      )
STEPHEN L. JOHNSON, Administrator     )
U.S. ENVIRONMENTAL PROTECTION        )
AGENCY, and DIRK KEMPTHORNE,         )
Secretary, U.S. DEPARTMENT           )
OF THE INTERIOR                       )
                                      )
            Defendants.               )
_____)

**FEDERAL DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Federal defendants Stephen L. Johnson, in his official capacity as Administrator of the

U.S. Environmental Protection Agency ("EPA"), and Dirk Kempthorne, in his official capacity

as Secretary of the U.S. Department of the Interior ("DOI"), hereby move to dismiss plaintiffs'

Complaint for Declaratory and Injunctive Relief in its entirety pursuant to Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6).  Plaintiffs allege that the Administrator of EPA has failed to

perform nondiscretionary duties purportedly mandated by Sections 3001(b)(3)(C) and 8002(f)

and (p) of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901 et

seq., by failing: "(1) to conduct a study of coal mining wastes, (2) to publish the results of that

study, (3) to report the results of that study to Congress, and (4) to make a determination, within

1

6 months of the report of that study, whether the regulation of coal mining wastes as hazardous is warranted." Compl. ¶¶ 1-2. Plaintiffs further allege that the Secretary of the Interior violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), by purportedly failing to consult with EPA on the preparation of such a study. Compl. ¶ 3. This Court lacks subject matter jurisdiction to review plaintiffs' challenge because the challenge is time-barred by the general six-year statute of limitations applicable to every civil action commenced against the United States, 28 U.S.C. § 2401(a). Furthermore, plaintiffs characterize their claim against the Administrator of EPA as a failure to perform a nondiscretionary duty under RCRA and their claim against the Secretary of the Interior as an agency action unlawfully withheld or unreasonably delayed, when, in fact, plaintiffs are challenging EPA's reasonable interpretation of RCRA and the agency's determination to exclude certain wastes generated from the mining of coal from the studies EPA produced pursuant to RCRA 8002(f) and (p). Plaintiffs are attempting to cloak their challenge to the Administrator's permissible interpretation of a statute as a citizen suit alleging a failure to perform a nondiscretionary duty, a duty that EPA performed fully over 15 years ago. Accordingly, plaintiffs fail to state a claim against the Administrator of EPA or the Secretary of the Interior for which relief can be granted. In addition, to the extent that this Court determines that plaintiffs have stated a claim for which relief can be granted and that their claims are not barred by the statute of limitations, plaintiffs do not meet the requirements for standing to bring this action. Federal defendants, therefore, respectfully request that this Court dismiss plaintiffs' Complaint in its entirety.

# I.    BACKGROUND

## A.    The Resource Conservation and Recovery Act

Congress enacted the Resource Conservation and Recovery Act in 1976 to establish a comprehensive federal program to regulate the handling and disposal of solid wastes.  Pub.L.No. 94-580, 90 Stat. 2795.  Solid wastes that are not hazardous wastes are regulated primarily by the states pursuant to federal guidelines and regulations issued under Subtitle D of RCRA, 42 U.S.C. §§ 6941-6949a.  Hazardous wastes are subject to far more stringent federal regulations promulgated under Subtitle C, 42 U.S.C. §§ 6921-6939b.

Subtitle C established a comprehensive "cradle to grave" regulatory scheme governing the treatment, storage, and disposal of hazardous wastes.  Section 3001(a) directs EPA to promulgate regulations for identifying the characteristics of hazardous waste and for listing particular hazardous wastes which would be subject to regulation under Subtitle C.  In promulgating those regulations, EPA was directed to take into account criteria including "toxicity, persistence, and degradability in nature, potential for accumulation in tissue, and other related factors such as flammability, corrosiveness, and other hazardous characteristics."  42 U.S.C. § 6921(a).  Section 3004 of RCRA, 42 U.S.C. § 6924, directs EPA to promulgate standards required of facilities engaged in the treatment, storage, and disposal of hazardous waste.

Congress enacted Subtitle C to address the hazards of industrial and manufacturing processing wastes.  Recognizing that "information on the potential danger posed by mining waste is not sufficient to form the basis for legislative action," H.R.Rep. No. 1491, 94th Cong., 2d Sess. 15 *reprinted in* 1976, U.S.Code Cong. & Admin.News 6238, 6253, Congress included a

statutory provision directing EPA to conduct a detailed study of mining wastes to evaluate "the potential danger to human health and environmental vitality."  Id.; see 42 U.S.C. § 6982(f).  At the time Congress enacted this section, there was no provision in RCRA that deferred the regulation of mining waste under Subtitle C of RCRA until the study was complete.

On December 18, 1978, EPA proposed regulations to govern the management of hazardous wastes under RCRA Subtitle C.  43 Fed.Reg. 58,946 (1978).  EPA proposed to subject certain "special wastes" that are generated in "very large volumes" but thought to pose "relatively low" hazards, to less stringent regulatory requirements than other hazardous wastes because they were regarded as "not amenable to the control techniques" proposed for hazardous waste treatment, storage, and disposal.  Id. at 58,992.  Wastes from the "extraction, beneficiation, and processing of ores and minerals" were classified as "special wastes."  Id. at 59,016.  EPA noted that the agency had "very little information on the composition, characteristics, and the degree of hazard  posed by these wastes . . ."  Id. at 58,991.

On May 19, 1980, EPA promulgated final regulations identifying the characteristics of hazardous waste and listing specific hazardous wastes as subject to Subtitle C regulation.  The "special wastes" concept was not included in the final regulations because EPA had revised its criteria for defining hazardous wastes and because the promulgated management standards were more flexible than those originally proposed.  45 Fed.Reg. 33, 174 (1980).  The final regulations were to take effect on November 19, 1980.  Id. at 33,084.

**B.**     **The Bevill Amendment**

On October 21, 1980, just before the final hazardous waste regulations were to take effect, Congress passed the Solid Waste Disposal Act of 1980, Pub.L. 96-482, 94 Stat. 2334,

adding to RCRA new sections collectively known as the "Bevill Amendment." The Bevill

Amendment extended the deadline on the study of mining wastes required by section 8002(f) to

October 21, 1983, 42 U.S.C. § 6982(f), and added section 8002(p), which expanded the scope of

EPA's study of mining wastes to include "study on the adverse effects on human health and the

environment, if any, of the disposal and utilization of solid waste from the extraction,

beneficiation, and processing of ores and minerals, including phospate rock and overburden from

uranium mining." Id. at § 6982(p). The Bevill Amendment also added section 3001(b)(3)(A)(ii)

suspending regulation of "[s]olid waste from the extraction, beneficiation, and processing of ores

and minerals, including phosphate rock and overburden from the mining of uranium ore," under

Subtitle C until at least six months after the agency had completed and submitted the expanded

study to Congress. 42 U.S.C. § 6921(b)(3)(A)(ii). Within six months after submission of the

study required by sections 8002(f) and (p), and following public opportunity for comment, the

Bevill Amendment required EPA to determine whether regulation of wastes from the extraction,

beneficiation, and processing of ores and minerals under Subtitle C was warranted and publish a

regulatory determination in the Federal Register. Section 3001(b)(3)(C), 42 U.S.C. §

6921(b)(3(C). On November 19, 1980, EPA issued an amendment to its hazardous waste

regulations codifying the Bevill Amendment and excluding solid waste from the "extraction,

beneficiation and processing of ores and minerals" from regulation under Subtitle C. 45

Fed.Reg. 76,618 (1980).

 The agency missed the October 21, 1983 statutory deadline for completion of the study

required under sections 8002(f) and (p), and, on September 28, 1984, an environmental group

and two citizens groups brought suit against EPA, in part, for failure to complete the studies in

the time prescribed by the statute and for failure to make the regulatory determination required

by the Bevill Amendment.  Concerned Citizens of Adamstown v. EPA, Civ. No. 84-3041

(D.D.C. Aug. 21, 1985).  In the Adamstown case, EPA indicated that it intended to reinterpret

the mining waste exclusion to remove certain smelting and refining wastes from its scope.  If

those wastes were not included in the exclusion, then those wastes would not be included in

EPA's study of mining wastes.  EPA proposed to the Court two schedules: one for completing

the section 8002 studies of extraction and beneficiation wastes and submitting the report to

Congress addressing these wastes and one for proposing and promulgating reinterpretation of the

Bevill Amendment for mineral processing wastes.  The court awarded summary judgment to the

plaintiffs in Adamstown and ordered EPA to propose its reinterpretation of the mining waste

exclusion by September 30, 1985, to complete the studies mandated by sections 8002 (f) and (p)

of RCRA with respect to extraction and beneficiation wastes by December 31, 1985, and to take

final action on the proposed reinterpretation by September 30, 1986.

EPA published its proposed reinterpretation of the Bevill mining waste exclusion on

October 2, 1985, 50 Fed.Reg. 40,292 (1985), which proposed to narrow the scope of solid wastes

from processing ores and minerals such that the term "processing" would apply only to those

processing wastes that met the high volume, low hazard standard in EPA's 1978 proposed

regulations.  Id. at 40,294.  In addition, EPA completed its section 8002 study of mining wastes

and, on December 31, 1985, submitted a Report to Congress on Wastes from the Extraction and

Beneficiation of Metallic Ores, Phosphate Rock, Asbestos, Overburden from Uranium Mining

and Oil Shale ("1985 Report to Congress").  EPA/530-W-85-033 (Excerpts attached as Exhibit

A).  The report discussed extraction and beneficiation wastes but did not address processing

wastes, which were the subject of EPA's proposed reinterpretation of the Bevill Amendment.

At the conclusion of the public comment process, EPA published its "regulatory determination" concerning wastes from the extraction and beneficiation of ores and minerals on July 3, 1986.  51 Fed.Reg. 24, 496 (1986).  EPA determined that "regulation of mining waste under Subtitle C of [RCRA] is not warranted at this time."  Id.  EPA's determination was based on EPA's belief that "several aspects of EPA's current hazardous waste management standards are likely to be environmentally unnecessary, technically infeasible, or economically impractical when applied to mining waste."  Id.  In the determination, EPA indicated that the agency was "concerned about certain actual and potential mining waste problems, and therefore plans to develop a program for mining waste under Subtitle D of RCRA."  Id.  EPA's determination not to regulate mining wastes under Subtitle C was challenged in Environmental Defense Fund v. EPA, 852 F.2d 1309 (D.C. Cir. 1988).  The Court of Appeals in that case upheld EPA's determination not to regulate mining wastes under Subtitle C and found that, "EPA's interpretation of the Bevill Amendment as allowing the agency discretion to base its regulatory determination on a variety of factors is a permissible construction of the statute."  Id. at 1313.[1]

---

[1]In American Portland Cement Alliance v. EPA, 101 F.3d 772 (D.C. Cir. 1996), the Court of Appeals determined that a regulatory determination is not an action judicially reviewable under RCRA § 7006(a)(1).  101 F.3d at 779.  The Court of Appeals also held that a regulatory determination is not ripe for review under the Administrative Procedure Act, 5 U.S.C. § 704, where the regulatory process is not complete.  101 F.3d at 779.  The regulatory determination at issue in that case was EPA's rejection of full Subtitle C regulation for cement kiln dust and EPA's statement of its intent to tailor regulations under Subtitle C for cement kiln dust.  The Court of Appeals in APCA found that "[a]n announcement of an agency's intent to establish law and policy in the future is not the equivalent of the actual promulgation of a final regulation."  Id. at 777.  With the regulatory determination at issue here, however, EPA rejected any Subtitle C regulation for extraction and beneficiation of wastes.  EPA's rejection of any Subtitle C regulation for the extraction and beneficiation of wastes is a final agency action reviewable under the APA.  See Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (Agency action is "final"

7

On October 9, 1986, EPA withdrew its proposed reinterpretation of the Bevill

Amendment with respect to processing wastes.  51 Fed.Reg. 36, 233 (1986).  The agency

withdrew the reinterpretation because the terms "high volume" and "low hazard" had not been

quantified in the proposal, and the agency was unable to determine the status of additional

wastes nominated by commenters as "special wastes."  Id. at 26,235.  EPA's withdrawal of the

proposed reinterpretation of the Bevill Amendment with respect to processing wastes was

challenged by petitioners in Environmental Defense Fund v. EPA, 852 F.2d 1316 (D.C. Cir.

1988).  The Court in that case held that EPA's withdrawal of the proposed rule was arbitrary and

capricious, finding that Congress intended the term "processing" in the Bevill Amendment to

include only those wastes from processing ores and minerals that met the "special waste"

criteria.  Id. at 362-63.  As part of the Court's order in that case, EPA was required to complete

the section 8002 studies of any processing wastes remaining within the Bevill exclusion and

submit those studies to Congress by July 31, 1989.  The Court also ordered EPA to make its

regulatory determination with respect to those processing wastes within six months of the

submission of the report to Congress, as required by RCRA.  Id. at 364.

EPA completed the rulemaking process for amending the Bevill exclusion with respect to

processing wastes with final rules published on September 1, 1989, see 54 Fed.Ref. 36,592, and

January 23, 1990, see 55 Fed.Reg. 2,322.  EPA limited the Bevill exclusion for mineral

processing wastes to 20 specific mineral processing wastes and prepared its report on those 20

---

when it marks the "consummation of the agency's decisionmaking process" and is one "by
which rights or obligations have been determined, or from which legal consequences will flow."
(internal citations omitted)).  EPA's stated intent to develop a program for mining waste under
Subtitle D of RCRA does not change this analysis because it does not affect the agency's final
decision that regulation under Subtitle C was not warranted.

mineral processing wastes.  In July 1990, EPA submitted its report on mineral processing wastes

to Congress.  <u>See</u> Report to Congress on Special Wastes from Mineral Processing ("1990 Report

to Congress") (Excerpts attached as Exhibit B).  The agency issued its regulatory determination

on mineral processing wastes on June 13, 1991, <u>see</u> 56 Fed.Reg. 27,300, finding that regulation

under Subtitle C is inappropriate for all of the 20 mineral processing wastes and stating EPA's

intention to regulate the wastes under Subtitle D as part of the program being developed for

mining wastes from extraction and beneficiation or under other applicable statutes.

**C.**    **Coal Mining Waste under the Bevill Amendment**

When EPA amended the hazardous waste regulations in 1980 to codify the Bevill

Amendment exclusions, EPA interpreted the exclusion from regulation under Subtitle C of

RCRA to extend to "(1) solid waste from the extraction, beneficiation and processing of ores and

minerals (including coal), including phosphate rock and overburden from the mining of uranium

ore and (2) cement kiln dust wastes."  45 Fed.Reg. 76,618 (Nov. 18, 1980).  In the Federal

Register notice announcing the amendment to the regulations, EPA noted that the Bevill

Amendment included "special provisions (Sections 1006(c) and 3005(f)) designed to coordinate

regulation of coal mining waste with the requirements of the Surface Mining Control and

Reclamation Act[2], 30 U.S.C. § 1201 *et seq.*"  <u>Id.</u> at 76,619 (footnote added).  EPA believed that

---

[2]One year after the initial enactment of RCRA, Congress passed the Surface Mining Control and
Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. § 1201 <u>et seq.</u>, which established a
comprehensive environmental regulatory program for surface and underground coal mining
administered by the Secretary of the Interior through the Office of Surface Mining Reclamation
and Enforcement ("OSM").

the new provisions[3] presented problems of legal interpretation that had not been resolved as of the time its issuance of the amendment to the regulations but determined that "since coal is arguably a 'mineral or ore' under Section 3001(b)(3), wastes from the extraction, beneficiation and procession of coal are excluded from RCRA Subtitle C regulation." Id.

In the1985 Report to Congress, EPA addressed "wastes from the extraction and beneficiation of metallic ores (with special emphasis on copper, gold, iron, lead, silver, and zinc), uranium overburdern, and the nonmetals asbestos and phosphate rock." 1985 Report at ES-2. EPA selected those mining industry segments for study "because they generate large quantities of wastes that are potentially hazardous and because the Agency is solely responsible for regulating the waste from extraction and beneficiation of these ores and minerals." Id. EPA excluded from the study wastes generated by the clay, sand and gravel, and stone mining segments because EPA determined that wastes from those sources are "less likely to pose hazards than wastes from the industries included." Id. EPA also excluded from the study wastes from coal mining and beneficiation from the study "because both EPA and the Department of the Interior play a role in their regulation, and it is not clear whether Congress intended coal mining

---

[3]RCRA Section 1006(c) requires that the Administrator, no later than 90 days after October 21, 1980, "review any regulations applicable to the treatment, storage, or disposal of any coal mining wastes or overburden promulgated by the Secretary of the Interior under the Surface Mining and Reclamation Act" and transmit to the Secretary of the Interior any suggested revisions to regulations that are not consistent with the requirements of regulations promulgated under Subchapter C. 42 U.S.C. § 6905(c)(1). Section 1006 also mandates that the Secretary of the Interior shall have exclusive responsibility for carrying out any requirement of Subchapter C with respect to coal mining wastes or overburden for which a surface coal mining and reclamation permit is issued under SMCRA. Id. at § 6905(c)(2). Section 3005 states that regulations promulgated under RCRA Subchapter C "shall not be applicable to treatment, storage, or disposal of coal mining wastes and overburden" which are covered by a permit issued or approved under SMCRA. Id. at § 6925(f).

to be included within the scope of the studies conducted in response to Sections 8002(f) and (p)

of RCRA." Id. at ES-3.  The report further explains that EPA excluded from study those wastes

that are the primary responsibility of other regulatory agencies.  Id. at 1-8.  SMCRA applies to

coal mining reclamation activities, and "the Secretary of the Interior, with concurrence from the

Administrator of EPA, is responsible for promulgating regulations that effectuate the purposes of

Subtitle C of RCRA with respect to 'coal mining wastes or overburden for which a surface coal

mining and reclamation permit is issued or approved under [SMCRA].'" Id. at 1-9; see also 42

U.S.C. § 6905(c).

In the 1990 Report to Congress concerning waste from mineral processing, EPA included

in the study gasifier ash from coal gasification and process wastewater from coal gasification.

1990 Report to Congress at 1-2.  The regulatory determination for mineral processing wastes

included a finding that regulation under Subtitle C of RCRA would be inappropriate for gasifier

ash from coal gasification and process wastewater from coal gasification.  56 Fed.Reg. 27,301.

## II.   STANDARD OF REVIEW

A complaint is dismissed properly under Fed. R. Civ. P. 12(b)(1) for "lack of jurisdiction

over the subject matter." Henthorn v. Dept. of Navy, 29 F.3d 682, 684 (D.C. Cir. 1994)

(citations omitted).  In responding to a motion to dismiss under Rule 12(b)(1), as the party

seeking to invoke federal jurisdiction, the plaintiff bears the burden of establishing that the court

has jurisdiction.  Id.  The Court is not limited to the allegations of the complaint.  Herbert v.

National Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

While traditionally the courts have stated that dismissal is appropriate under Rule

12(b)(6) of the Federal Rules of Civil Procedure only if it appears certain that the plaintiffs can

prove no set of facts in support of their claim that would entitle them to relief, Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)), the Supreme Court recently announced that "this famous observation has now earned its retirement." Bell Atlantic Corp. V. Twombly, 127 S.Ct. 1955, 1969 (2007) (dismissing Sherman Act complaint where factual allegations of parallel conduct were as consistent with coincidence as conspiracy and did not provide "plausible grounds to infer an agreement."). The Court held that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65. Instead, the factual allegations in a complaint "must be enough to raise a right to relief above the speculative level" or to demonstrate "a plausible entitlement to relief." Id. at 1965. The mere prospect of unearthing sufficient evidence to preclude dismissal is not sufficient to survive a motion to dismiss. Id. In the context of a Rule 12(b)(6) motion, all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. Henthorn, 29 F.3d at 684 (citations omitted).

### III.    ARGUMENT

As shown below, plaintiffs' claims are time-barred by the general six-year statute of limitations. Moreover, defendants already have performed the mandatory duties required under the relevant provisions of RCRA. In addition, plaintiffs do not meet the standing requirements to bring this action. Accordingly, plaintiffs' Complaint should be dismissed.

**A.    Plaintiffs' Complaint should be dismissed for lack of subject matter jurisdiction because their claims are time-barred by the general six-year statute of limitations.**

Plaintiffs' claims that the EPA Administrator failed to perform non-discretionary duties under RCRA §§ 8002(f) and (p) and §3001(b)(3)(C) and that the Secretary of the Interior failed

to consult with EPA on the study of coal mining waste allegedly required by section 8002 are time-barred by the general six-year statute of limitations, and this Court lacks subject matter jurisdiction to hear those claims.  The study purportedly required under RCRA § 8002 was due for publication no later than October 21, 1983, and plaintiffs' causes of action accrued on that date.  Over twenty years have passed, and plaintiffs have alleged no reason for the delay in bringing their claims or made any showing why equitable principles should toll the statute of limitations.  Accordingly, and for the reasons below, plaintiffs' Complaint should be dismissed as time-barred.

      1.     <u>The statute of limitations operates as a limitation on the waiver of sovereign immunity in this case and must be strictly construed.</u>

The United States, as sovereign, is immune from suit unless Congress waives its immunity, and the terms of its waiver, as set forth expressly and specifically by Congress, define the parameters of a federal court's subject matter jurisdiction to entertain suits brought against the United States.  <u>See</u> <u>United States v. Sherwood</u>, 312 U.S. 584, 586 (1941).  The terms of waiver must be construed strictly, and any ambiguities must be resolved in favor of the sovereign.  <u>See e.g</u>, <u>Dept. of the Army v. Blue Fox, Inc.</u>, 525 U.S. 255, 261 (1999); <u>United States v. Nordic Village</u>, 503 U.S. 30, 33 (1992); <u>Soriano v. United States</u>, 352 U.S. 270, 276(1957).  Title 28, Section 2401 of the United States Code controls the time for commencing action against the United States.  <u>See</u> <u>Norwest Bank Minnesota Nat'l Ass'n v. FDIC</u>, 312 F.3d 447, 450-51 (D.C. Cir. 2002).  It provides in relevant part: "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  28 U.S.C. § 2401(a).  Unlike an ordinary statute of limitations, section 2401(a) is a jurisdictional condition attached to the government's waiver of sovereign immunity

and, as such, must be construed strictly.  See United States v. Mottaz, 476 U.S. 834, (1986);

Spannaus v. Department of Justice, 824 F.2d 52, 60 (D.C. Cir. 1987) ("§ 2401(a) is more than an

ordinary statute of limitations; it is a condition on the waiver of sovereign immunity, and we are

obliged to construe such waivers strictly").

The existence of a waiver of its sovereign immunity from suit is a prerequisite in any

claim against the United States.  "It is axiomatic that the United States may not be sued without

its consent and that the existence of consent is a prerequisite for jurisdiction."  United States v.

Mitchell, 463 U.S. 206, 212 (1983).  The Court must address the jurisdictional question before

reaching the merits.  Kalodner v. Abraham, 310 F.3d 767, 769 (D.C. Cir. 2003).  Because

consent to be sued is a jurisdictional prerequisite, and because Congress has the power to set the

bounds of that consent, such bounds limit the Court's jurisdiction.  Mottaz, 476 U.S. at 841;

Felter v. Norton, 412 F. Supp. 2d 118, 122 (D.D.C. 2006).  The statute of limitations is one of

those bounds, and the expiration of the statute of limitations is a bar to the Court's subject matter

jurisdiction.  Mottaz, 476 U.S. at 841.

2.    Plaintiffs failed to file their Complaint within six years of the accrual of their
      cause of action.

For purposes of section 2401(a), a cause of action "first accrues" as soon as the person

challenging the agency action can "institute and maintain a suit in court."  Spannaus, 824 F.2d at

56.  Plaintiffs here claim that EPA failed to perform the nondiscretionary duty mandated by

RCRA §§ 8002(f) and (p) to study solid wastes generated in the extraction, beneficiation, and

processing of coal, publish a report of that study, and submit that report to Congress and that the

Secretary of the Interior failed to consult with EPA on the study.  The statutory deadline for

publishing a report of the section 8002 mining waste studies was October 21, 1983.[4]  To the extent that the federal defendants failed to fulfill their duties under the sections 8002 (f) and (p) of the statute, plaintiffs' causes of action accrued on October 21, 1983, and well over twenty years have passed since that date of accrual.  Plaintiffs readily admit this fact in their Complaint. See Complaint ¶ 58 ("More than 20 years since the statutory deadline have passed and the Administrator has yet to perform the duties enumerated in the foregoing paragraphs with regard to the wastes generated by coal mining, beneficiation, and processing. . .").

The only elements necessary to plaintiffs' causes of action against the federal defendants are: (1) that EPA had a duty to publish the mining waste study under RCRA § 8002(f) and (p) by October 21, 1983; (2) that DOI had a duty to consult with EPA on the study; and (3) that EPA did not publish the study by that date.[5]  The facts necessary to support these allegations were fully available to plaintiffs as of October 21, 1983.  See Center for Biological Diversity v. Hamilton, 453 F. 3d 1331, 1335 (11th Cir. 2006) (holding that a deadline in the Endangered Species Act creates a cause of action "that accrues on the day following the deadline," and that this is a "fixed point in time at which the violation for the failure of the Secretary to act arises"); see also In re Barr Labs., 930 F.2d 72, 74 (D.C. Cir. 1991) (holding that failure to meet a

---

[4]RCRA § 8002(f) states that: "Not later than thirty-six months after October 21, 1980, the Administrator shall publish a report of [the mining waste] study. . . Such report shall be submitted to [Congress]."   42 U.S.C. § 6982(f).

[5]The deadline in the statute for making a regulatory determination on whether Subtitle C regulation is warranted is tied to the submission of the study report to Congress.  42 U.S.C. § 3001(b)(3)(C) ("Not later than six months after the date of submission of the applicable study. . . the Administrator shall, after public hearings and opportunity for comment, either determine to promulgate regulations under [Subtitle C] . . . or determine that such regulations are unwarranted.").

mandatory statutory deadline is unlawful, even if other factors make mandamus relief inappropriate at that time).

Because plaintiffs' cause of action against the federal defendants first accrued on October 21, 1983, plaintiffs were required to bring their causes of action by October 21, 1989.  The United States waived its sovereign immunity from suits for six years following the first accrual of the action, and no more.  "Six years is a long time, ample time within which to pursue an administrative appeal to completion or, *in instances of agency delay, to invoke the aid of the court*."  Spannaus, 824 F.2d at 56 (emphasis added).  In this instance, the remedy that Congress provided for EPA's alleged failure to fulfill its statutory duty was to permit any person to "invoke the aid of the court" at any time between October 21, 1983 and October 21, 1989.  In that "ample time," plaintiffs did nothing.[6]

> 3.    Equitable principles cannot extend the time for plaintiffs to file their claim.

In a claim between or against private parties, a number of equitable doctrines may extend the statute of limitations, extending the time for a party to file a complaint on a particular claim.

---

[6]The plaintiffs in Concerned Citizens of Adamstown v. EPA, Civ. No. 84-3041 (D.D.C. Aug. 21, 1985), however, did bring a lawsuit against EPA on September 28, 1984, in part, for failure to complete the mining waste studies in the time prescribed by section 8002(f) and for failure to make the regulatory determination required by section 3001(b)(3)(C) (i.e. the same mandatory duty that plaintiffs here claim EPA has not performed).  Plaintiffs here were not party to that lawsuit, but it is not clear that a second group can sue on behalf of the public to enforce a deadline that has already been subject to a citizen suit.  In any event, pursuant to the Court's order in that case and subsequent litigation concerning mineral processing wastes, EPA completed the required studies, submitted the reports on those studies to Congress and made the requisite regulatory determinations.  EPA fulfilled its statutory obligations under sections 8002(f) and (p) and submitted two reports to Congress: one in 1985 on mining wastes from extraction and beneficiation and one in 1990 on mineral processing wastes.  Moreover, EPA made the requisite regulatory determinations required by section 3001(b)(3)(C).  See 51 Fed.Reg. 24, 496; 56 Fed.Reg. 27,300.

Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95 (1990).[7]  Because section 2401 is a limitation on the waiver of sovereign immunity that must be strictly construed, many courts prior to 1990 had held that equitable principles therefore could not apply to extend the limitations period for actions against the United States beyond the six years specified in that statute.  See Chung v. Department of Justice, 333 F.3d 273, 276 (D.C. Cir. 2003) (citing Soriano v. United States, 352 U.S. 270, 276 (1957)).  This rule was modified by the Supreme Court in Irwin v. Department of Veterans Affairs, in which the Court considered whether the strict construction of the congressional waiver of sovereign immunity expressed in a statute of limitations necessarily required the exclusion of equitable principles.  The Court reasoned that "making the rule of equitable tolling applicable to suits against the Government, *in the same way that it is applicable to private suits*, amounts to little, if any, broadening of the congressional waiver."  498 U.S. at 95 (emphasis added).  Thus, although equitable arguments do not normally expand the Court's jurisdiction under a waiver of sovereign immunity, the Court held that the waiver could incorporate equitable principles if those principles also would be "applicable to suits against private defendants."  Id.  However, the Court warned that "no more favorable tolling doctrine may be employed against the Government than is employed in suits between private litigants." Id. at 96; see also United States v. Brockamp, 519 U.S. 347, 349-51 (1997).

Subsequent decisions have clarified the class of cases to which the rule of Irwin applies. In Chung v. U.S. Department of Justice, the D.C. Circuit applied the rule in Irwin to a claim for

---

[7]The list of "judicially recognized exceptions" to the statute of limitations that are encompassed within the term "equitable principles," as used in this Motion, includes: "waiver, estoppel, equitable tolling, fraudulent concealment, the discovery rule, and the continuing violations doctrine."  Felter v. Norton, 412 F. Supp. 2d 118, 122 (D.D.C. 2006) (citations omitted).

money damages against the United States for an alleged violation of the Privacy Act, 5 U.S.C.

§ 552a(b). The court held that equitable tolling would apply to extend the Privacy Act's waiver

of sovereign immunity for suits against the United States, even though the Privacy Act does not

create an analogous cause of action against private parties. Congress "expected the Government

to face equitable tolling in litigation because equitable tolling is a traditional feature of the

procedural landscape," and an action "to recover damages caused by the Government's

unwarranted disclosure of personal information" fits that traditional litigation paradigm. Chung,

333 F.3d at 276-77. The court distinguished such causes of action from litigation that is "so

peculiarly governmental that there is no basis for assuming customary ground rules apply." Id.

at 277. As an example, the court noted that "a petition for review of an informal agency

rulemaking would not likely meet the test" that determines when equitable principles are

permitted. Id. Accordingly, Irwin does not apply here where plaintiffs claim that the

Administrator of EPA has failed to perform a nondiscretionary duty under RCRA and that the

Secretary of the Interior has failed to consult with the Administrator on the study RCRA

allegedly requires. Plaintiffs' claims seek to compel the performance of purely governmental

functions. Such claims could not be brought against a private party.

       If the court concludes, contrary to the D.C. Circuit's suggestion in Chung, that an action

to compel performance of a nondiscretionary duty under a statute is susceptible to equitable

tolling of the statute of limitations, plaintiffs are not entitled to equitable tolling, and they have

alleged no facts in their Complaint to demonstrate such entitlement. Plaintiffs have failed to

pursue their claims for over twenty years and have made no attempt in their Complaint to explain

why their belated attempt to challenge EPA's and DOI's actions with respect to the mining waste

studies required by RCRA § 8002 should be allowed to go forward. Equitable principles that extend a statute of limitations are applied "only sparingly," for example, "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." Irwin, 498 U.S. at 96. Equitable tolling also may apply when "the plaintiff despite all due diligence is unable to obtain vital information bearing on the existence of his claim," or when "a plaintiff knows he has been injured, but is unaware that his injury may be the result of possible misconduct by the defendant." Chung, 333 F.3d at 278-79. None of these situations are present here.

To the contrary, plaintiffs knew or were able to learn of EPA's alleged failure to include waste from the extraction, beneficiation, and processing of coal in the mining waste studies required by section 8002 when the studies were published and the regulatory determinations with regard to Subtitle C applicability to those wastes were made. EPA was clear in both the 1985 and 1990 Reports to Congress which coal mining wastes were included and which were excluded from the study and the rationales for those decisions. 1985 Report to Congress, ES-3; 1990 Report to Congress, ES-2. At the very latest, plaintiffs were aware of EPA's interpretation of the scope of its requirements with respect to coal mining wastes when the regulatory determination on mineral processing wastes was published in the Federal Register on June 13, 1991. Plaintiffs here sat on their rights, and equitable tolling will not apply "where the claimant failed to exercise due diligence in preserving his legal rights," Irwin, 498 U.S. at 96. See also Felter, 412 F. Supp. 2d at 126 (refusing to apply equitable tolling because "[p]laintiffs have not presented any reason clarifying why they could not have filed this claim earlier.").

4.    <u>The same principles that bar equitable tolling also bar the use of the continuing violations doctrine in claims to compel regulatory action.</u>

Plaintiffs may argue that the EPA Administrator's alleged failure to meet its statutory deadline with respect to the section 8002 mining waste studies and the Secretary of the Interior's alleged failure to consult on the studies are "continuing violations." The continuing violations doctrine allows a court to consider an entire course of related conduct, where some wrongful acts occurred within the statute of limitations period and others occurred outside it. <u>See, e.g.</u>, <u>Felter</u>, 412 F. Supp. 2d at 125. However, this doctrine faces the same obstacle as the equitable tolling argument, when applied against EPA and DOI: strict construction of the waiver of sovereign immunity in 28 U.S.C. § 2401(a) does not allow the extension of the limitations period beyond the six years specified in the statute.

Although <u>Irwin</u> and <u>Chung</u> did not address continuing violations, their logic should extend to the continuing violation doctrine. Those cases barred the application of equitable tolling because Congress intended the six-year waiver of sovereign immunity to be extended only in those cases "where the injury to be redressed is of a type familiar to private litigation." <u>Chung</u>, 333 F.3d at 277. Like equitable tolling, this Court has considered the continuing violation doctrine to be an equitable doctrine. <u>See</u> <u>Felter</u>, 412 F. Supp. 2d at 122; <u>Simms v. United States Gov't Printing Office</u>, 87 F. Supp. 2d 7, 9 (D.D.C. 2000); <u>Keith v. Duffy</u>, 77 F. Supp. 2d 46, 49 (D.D.C. 1999). There is no reason to treat the two doctrines differently for purposes of <u>Irwin</u> analysis. In fact, this Court has treated the continuing violations doctrine as identical to the equitable tolling rule for purposes of <u>Irwin</u>. In <u>Felter v. Norton</u>, this Court concluded that "where the statute of limitations has been deemed jurisdictional, it has acted as an absolute bar and cannot be overcome by the application of judicially recognized exceptions,"

such as "the continuing violations doctrine."  412 F. Supp. 2d at 122.  As a result, the Court first

conducted its sovereign immunity analysis, dismissed those claims which were not "of a type

familiar to private litigation" (quoting <u>Chung</u>), and applied the continuing violations doctrine

only to the remaining claims.  <u>Id.</u> at 124-26.

The Eleventh Circuit, the only Court of Appeals to have decided this issue squarely,

agreed that sovereign immunity prevented it from extending the continuing violation doctrine to

suits to compel the performance of an agency's duty to regulate according to a statutory

deadline.  <u>See</u> <u>Center for Biological Diversity</u>, 453 F.3d at 1335.  The Endangered Species Act

imposes statutory deadlines for the Secretary of the Interior to designate "critical habitat" for

listed species and contains a citizen suit provision permitting actions to enforce that duty.  <u>See</u> 16

U.S.C. §§ 1533(b)(6), § 1540(g)(1)(C).  The Eleventh Circuit held that applying the continuing

violation doctrine to an action brought more than six years after the statutory deadline for

designating critical habitat was inconsistent with a strict construction of waivers of sovereign

immunity.  <u>Center for Biological Diversity</u>, 453 F.3d at 1335.

The consequences of finding that the continuing violation doctrine applies to cases

seeking to compel regulation would be directly contrary to the purposes of 28 U.S.C. § 2401(a).

If failure to meet a statutory deadline were a continuing violation, then a plaintiff effectively

would be able to sue forever, since no alternative statute exists to provide agencies with repose –

a result which the Court should avoid.  <u>See</u> <u>Klehr v. A.O. Smith Co.</u>, 521 U.S. 179, 187 (1984)

(describing a rule that would permit a series of violations to continue indefinitely as beyond what

"Congress could have contemplated" and in conflict with "a basic objective – repose").

Congress imposes many deadlines on federal agencies, makes those deadlines enforceable

through citizen suit provisions or through the APA, and Congress is well aware throughout this process of the default limitations period in section 2401(a).  To apply the continuing violations doctrine such that, effectively, there is no limitation on the timing of citizen suits is not a "realistic assessment of legislative intent."  See Irwin, 498 U.S. at 95.  The better alternative is to allow the public a full six years to bring their claims to the courts, as authorized by express statutory language in section 2401(a), and then rely on Congress's ability to weigh the nation's changing regulatory priorities and, if necessary, to authorize further resort to the courts.

Even if the Court were to conclude that the United States' waiver of sovereign immunity against claims to compel regulation can be extended by the continuing violations doctrine, plaintiffs here have not alleged facts supporting the application of that doctrine in this instance. Where an agency has a duty to act according to a statutory deadline, that deadline creates "not an ongoing duty but a fixed point in time at which the violation for the failure of the Secretary to act arises."  Center for Biological Diversity, 453 F.3d at 1335 (concluding that an agency's failure to complete regulation by a statutory deadline is not a continuing violation).  This is consistent with this Circuit's law, which has described the statutory deadline as integral to a nondiscretionary duty claim under a citizen suit provision such as 15 U.S.C. § 2619.  See Sierra Club v. Thomas, 828 F.2d 783, 789-91 (D.C. Cir. 1987) (describing an agency's duty to act prior to a statutory deadline as a "duty of timeliness").  The statutory violation that plaintiffs have alleged under RCRA is thus not a continuing violation: the Administrator of EPA is not alleged to have violated any duty of timeliness within the last six years, but specifically on October 21, 1983.

    5.    <u>The D.C. Circuit has not previously ruled on the question presented in this Motion.</u>

In one previous case, this Court held that <u>Irwin</u> and its progeny did not permit the

application of equitable tolling or the continuing violations doctrine to section 2401(a) in a claim

under the APA, alleging that the National Park Service ("NPS") had failed to complete certain

regulatory duties under the Wilderness Act, 16 U.S.C. § 1131 *et seq.* See Wilderness Society v.

Norton, No. 03-cv-64 (RMC), 2005 WL 3294006 (D.D.C. 2005). The D.C. Circuit upheld the

District Court's decision on other grounds but, in *dicta*, questioned it on this point, stating that

"it is unlikely that [plaintiff's] complaint would be held by this court to be time-barred by 28

U.S.C. § 2401(a)." Wilderness Society v. Norton, 434 F.3d 584, 589 (D.C. Cir. 2006).

Although the D.C. Circuit's statement in Wilderness Society addresses issues related to this

Motion, that decision does not control this case and does not require this Court to accept

jurisdiction over plaintiffs' claims for the reasons discussed below.

        *a.      The D.C. Circuit's statement in* Wilderness Society *was non-binding dicta.*

First, the D.C. Circuit in Wilderness Society questioned the District Court's Irwin

analysis only in *dicta*, noting that "we need not reach a final determination on this issue because

we find TWS lacks standing as to its statutory claims." 434 F.3d at 588. NPS had not tried to

defend the District Court's statute of limitations holding on appeal, and so the D.C. Circuit did

not have the benefit of full briefing from the parties when it made its observation about the

probable fate of that argument on appeal. In fact, the Wilderness Society provided the D.C.

Circuit with eighteen pages of briefing against the application of section 2401(a) in its opening

brief, and NPS's response brief devoted only one footnote to the issue, noting that the court did

not need to reach it. The D.C. Circuit's brief analysis of this issue perhaps was not as carefully

reasoned as would have been if both sides had presented argument on it. This is one reason that

the District Court should not apply the *dicta* of the Court of Appeals, even if they were on point,

as though they were binding.  See United States v. Torres, 115 F.3d 1033, 1036-37 (D.C. Cir.

1997) (noting that, although the District Court had followed a statement of the Court of Appeals

as if it were a holding, the statement was *dicta* only and therefore had not been binding on the

District Court).  This is especially true with respect to Wilderness Society, in which the D.C.

Circuit explicitly noted that its comments concerning the statute of limitations were not

necessary to its decision.

> b.    The D.C. Circuit's reasoning in Wilderness Society was incorrect.

Moreover, the Court's statement in Wilderness Society was not fully reasoned or

supported by the precedents cited.  The D.C. Circuit simply did not address the issues of the

court's subject matter jurisdiction, the scope of the waiver of sovereign immunity in section

2401(a), or the question of whether the claim was analogous to one available in private litigation

– despite the fact that those issues are central to a consideration of claims against the United

States.  The court's suggestion that section 2401 does not apply to claims of agency inaction

contravenes its prior statement that section 2401 applies to "all civil actions whether legal,

equitable, or mixed."  Spannaus, 824 F.2d at 55 ("[T]he words 'every civil action' [in § 2401(a)]

mean what they say").  If the D.C. Circuit had not disposed of the claims at issue in Wilderness

Society on other grounds, it would have been obliged to examine the question of sovereign

immunity as a limit on its own jurisdiction.  See, e.g., Trudeau v. FTC, No. 05-5363, 2006 WL

2087122, *3 (D.C. Cir. July 28, 2006) (citing LoBue v. Christopher, 82 F.3d 1081, 1082 (D.C.

Cir. 1996)).

In addition, the precedents that the court cited in opining on the statute of limitations

question did not support its conclusion on that issue.  In re United Mine Workers, 190 F.3d 545

(D.C. Cir. 1999), involved a petition for a writ of mandamus to compel the Mine Safety and

Health Administration to issue certain regulations concerning the permissible level of diesel

exhaust in underground coal mines.  An intervenor suggested that this petition was actually a

challenge to other diesel equipment rules that had been promulgated in 1996, and that it was

untimely because it was not filed within the statutory 60-day period for challenges to that rule.

Id. at 548.  The court held that the petition for mandamus sought a new rule on a completely

different topic, and was not subject to the 60-day limitation on challenges to the 1996 rule.  Id. at

548-49.  Therefore, when the court stated that it was allowing the petition because it "does not

complain about what the agency has done but rather about what it has yet to do," id. at 549, it

was not holding that *any* complaint about "what [the agency] has yet to do" was outside the

scope of statute of limitations analysis; it was merely stating that the complaint need not have

been filed within the 60-day petition period that had applied to the 1996 rule.  This sentence,

however, was quoted in Wilderness Society for a completely different proposition, i.e., that the

six-year statute of limitations in section 2401(a) does not apply to any APA claim of

unreasonable delay.  434 F.3d at 589.

Similarly, In re Bluewater Network, 234 F.3d 1305 (D.C. Cir. 2000), involved a petition

for writ of mandamus to compel the Coast Guard to promulgate certain regulations concerning

protective monitoring devices for oil tankers.  The court considered the same argument as in

United Mine Workers, i.e., that the petition should have been brought within the 90-day period

to challenge an earlier rulemaking and was now untimely.  The court held that the 90-day

limitation period did not apply to the new challenge because the previous rulemaking had

instituted only a temporary rule, and that the new petition (for a *permanent* rulemaking) was

beyond the scope of potential challenges to the previous rulemaking. <u>Bluewater Network</u>, 234 F.3d at 1312-14. Again, the court did not consider the question of whether the petition before it was time-barred by any statute of limitations.

By suggesting that these prior cases may illustrate a clear dichotomy between claims challenging "what the agency has done" (in which the statute of limitations would apply) and claims challenging "what the agency has yet to do" (in which it would not), the statement in <u>Wilderness Society</u>, 434 F.3d at 589, went well beyond the reach of those prior cases. Neither <u>United Mine Workers</u> nor <u>Bluewater Network</u> involved a defense under section 2401(a) that the challenge to agency inaction was time-barred, and neither supports the statement in <u>Wilderness Society</u> that the court would likely reject such a defense. Instead of focusing on these inapposite cases concerning agency delay claims under the APA, the Court should begin with the required sovereign immunity analysis to determine whether it has jurisdiction.

**B.    Plaintiffs' Complaint should be dismissed for failure to state a claim because EPA has fulfilled its mandatory duties and Plaintiffs are attempting to challenge collaterally EPA's performance of those duties through a belated deadline lawsuit.**

As described above, EPA undisputedly conducted the required studies and submitted the required reports to Congress on December 31, 1985 and on July 31, 1990. These reports fulfilled EPA's obligations under RCRA § 8002(f) and (p). Moreover, DOI consulted with EPA on the required studies. At bottom, plaintiffs are attempting to bring a collateral challenge to EPA's interpretation of RCRA and the manner in which the agency has chosen to comply with the statute. Accordingly, plaintiffs' Complaint should be dismissed for failure to state a claim.

The 1985 study on mining wastes from extraction and beneficiation did not include coal mining wastes because EPA determined that those wastes are subject to SMCRA, <u>see</u> 1985

26

Report to Congress, p. 1-9, and the agency did not interpret RCRA § 8002 as mandating the inclusion of coal mining wastes, id. at ES-3.  Under RCRA § 8002(f), Congress specifically allowed the Administrator to "as he deems appropriate, review studies and other actions of other Federal agencies concerning such wastes with a view toward avoiding duplication of effort and the need to expedite such study."  42 U.S.C. § 6982(f).  Thus, EPA's exclusion of mining wastes from the report that are "the primary responsibility of other regulatory agencies," 1985 Report to Congress at 1-8, was an exercise of the discretion afforded the agency under RCRA § 8002(f).

Plaintiffs also claim that EPA failed to study coal processing wastes, Compl. ¶18, but EPA included coal processing wastes in its study on mineral processing wastes and the 1990 Report to Congress, 1990 Report to Congress at 1-2.  Moreover, EPA included coal processing wastes in its regulatory determination for whether Subtitle C regulation is warranted for mineral processing wastes.  56 Fed.Reg. 27, 301.

While plaintiffs have styled their claim against EPA as a mandatory duty suit for a missed deadline and their claim against DOI as an agency action unreasonably delayed, plaintiffs are actually attempting to bring a collateral challenge to EPA's performance of its duties under RCRA.  However, EPA reasonably excluded solid waste generated from the extraction and beneficiation of coal from the mining waste studies and resulting regulatory determinations, and judicial review of EPA's interpretation of the Bevill Amendment is governed by the framework set out in Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984).  See United States v. Mead Corp, 533 U.S. 218, 231 (2001) (even in the absence of notice and comment or administrative formality, a court may accord Chevron deference when an agency action has the force of law).  Plaintiffs had opportunity to challenge EPA's interpretation of the

27

mining wastes the agency was required to study under RCRA § 8002 (f) and (p) and chose not

to.  Plaintiffs could have commented during the public comment period when the 1985 Report to

Congress was published prior to the issuance of the Subtitle C regulatory determination and

argued to EPA in its comments that coal should be included in the mining waste study.  In

addition, plaintiffs could have challenged the final Subtitle C regulatory determination on mining

waste produced from the extraction and beneficiation of minerals as arbitrary and capricious

under the APA.[9]  To the extent they had similar concerns about the wastes covered by EPA's

1990 Report to Congress and 1991 regulatory determination on mineral processing wastes, those

remedies were equally available.  Plaintiffs did neither, and the statute of limitations for

challenging the final Subtitle C regulatory determinations for mineral waste produced during

extraction and beneficiation and for mineral processing waste has run.  At the heart of plaintiffs'

challenge here is their disagreement with EPA's permissible interpretation of the obligation

under RCRA § 8002(f) and (p) to study mining wastes.  Plaintiffs' attempt to characterize their

lawsuit as mandatory deadline suit should not stand.  See Public Citizen v. Nuclear Regulatory

Comm'n, 845 F.2d 1105, 1108 (D.C.Cir. 1988) (finding that almost any objection to an agency

action can be dressed up as an agency's failure to act and dismissing such claims as time-barred).

Accordingly, plaintiffs' Complaint should be dismissed for failure to state a claim for which

relief may be granted.

**C.    Plaintiffs lack standing to bring their claims.**

---

[9]In fact, EPA's regulatory determination not to regulate mining wastes under Subtitle C was
challenged as arbitrary and capricious.  See Environmental Defense Fund, 852 F.2d 1309.  The
Court of Appeals in that case upheld EPA's determination, finding that: "EPA's interpretation of
the Bevill Amendment as allowing the agency discretion to base its regulatory determination on
a variety of factors is a permissible construction of the statute."  Id. at 1313.

Article III of the Constitution limits the jurisdiction of federal courts to resolving actual cases and controversies. See Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992). The question of standing involves both constitutional limitations on federal court jurisdiction as well as prudential limitations on its exercise. Bennett v. Spear, 520 U.S. 154 (1997). To meet the "irreducible constitutional minimum of standing," a plaintiff must show: (1) he has suffered an injury which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there is a causal connection between the alleged injury and conduct that is fairly traceable to the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Lujan. 504 U.S. at 560. The plaintiff bears the burden of proving standing. Id. Where an organization asserts standing in its own name, it must establish its own injury in fact, a concrete and demonstrable injury to its activities. Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1997). Where an organization asserts standing in a representative capacity, it must establish that the injury was suffered by at least one of its members. Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977).

In their Complaint, Plaintiffs claim that their "organizational missions are to protect human health and the environment in West Virginia and throughout Appalachia." Compl. ¶31. Plaintiffs further claim that: "The requirement in Section 8002(f) of RCRA that EPA must publish a report of its study of coal mining wastes statutorily entitles Plaintiffs to information about coal mining waste and its disposal." Compl. ¶ 34. Plaintiffs' alleged injuries do not satisfy the first element of constitutional standing because they are not concrete and particularized nor do they constitute the type of "informational injury" recognized by the case

law.  Plaintiffs have not alleged how their organizational activities are injured by EPA's

determination that the mining waste studies required by RCRA §§ 8002(f) and (p) did not

include mining waste from the extraction and beneficiation of coal.  Nor have plaintiffs made the

requisite showing of injury if the organizations are suing in a representative capacity.

    Moreover, "[i]nformational standing arises only in very specific statutory contexts where

a statutory provision has explicitly created a right to information."  American Farm Bureau v.

U.S. E.P.A., 121 F.Supp.2d 84 (D.D.C. 2000)(internal citations omitted)(citing Animal Legal

Defense Fund., Inc. v. Espy, 23 F.3d 496, 502 (D.C.Cir. 1994)).  No such informational right is

conferred upon plaintiffs by RCRA with respect to the mining waste studies under sections 8002

(f) and (p).  The mining waste studies were required by Congress as an attempt to preclude EPA

from regulating waste as hazardous waste under Subtitle C without sufficient information to

determine that those wastes were in fact hazardous.  Accordingly, plaintiffs' claims should be

dismissed for lack of standing.

## IV.    CONCLUSION

    This Court lacks subject matter jurisdiction to review plaintiffs' challenge because the

challenge is time-barred by the statute of limitations.  Furthermore, plaintiffs are attempting a

backdoor challenge to EPA's determination to exclude certain wastes generated from the mining

of coal from the studies EPA produced in 1985 and in 1990 pursuant to RCRA 8002(f) and (p)

by alleging that EPA never produced the required studies, and, as such, plaintiffs fail to state a

claim against the Administrator of EPA or the Secretary of the Interior for which relief can be

granted.  Moreover, plaintiffs do not meet the requirements for standing to bring this action.  For

the foregoing reasons, federal defendants respectfully request that this Court dismiss plaintiffs'

Complaint in its entirety.


       Respectfully submitted this 18th day of July, 2007.

                                         RONALD J. TENPAS
                                         Acting Assistant Attorney General
                                         United States Department of Justice
                                         LETICIA J. GRISHAW, Chief


                                                /s/ Mary Whittle
                                     By:_____
                                         MARY WHITTLE
                                       DC Bar #973916, TX Bar #24033336
                                       Trial Attorney
                                       Environmental Defense Section
                                       Environment and Natural Resources Division
                                       United States Department of Justice
                                       P.O. Box 23986
                                       Washington, D.C. 20026-3986
                                       Tel: (202) 514-0286
                                       Fax: (202) 514-8865
                                       Email: mary.whittle@usdoj.gov

                                       Attorneys for Defendants


OF COUNSEL:

LAUREL CELESTE
Attorney, Office of General Counsel
U.S. Environmental Protection Agency
(2333A)
1200 Pennsylvania Ave., N.W.
Washington D.C. 20460
Tel: (202) 564-1751
Fax: (202) 564-5644
Email: celeste.laurel@epa.gov

EMILY MORRIS
Department of the Interior
Office of the Solicitor

Tel: (202) 208-5236
Fax: (202) 219-1789

United States          Office of Solid Waste      EPA/530-SW-85-033
Environmental          and Emergency Response     December 1985
Protection
Agency

# Report To Congress

# Wastes from the Extraction and Beneficiation of Metallic Ores, Phosphate Rock, Asbestos, Overburden from Uranium Mining, and Oil Shale

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON D.C. 20460

## DEC 31, 1985

THE ADMINISTRATOR

Honorable George Bush
President of the Senate
Washington, D.C. 20510

Dear Mr. President:

    I am pleased to transmit the Report to Congress on "Wastes from the Extraction and Beneficiation of Metallic Ores, Phosphate Rock, Asbestos, Overburden from Uranium Mining, and Oil Shale" presenting the results of studies carried out pursuant to Sections 8002 (f) and (p) of the Resource Conservation and Recovery Act of 1976, as amended, (42 U.S.C. SS6982 (f) and (p)).

    The Report provides a comprehensive assessment of possible adverse effects on human health and the environment from the disposal and utilization of solid waste from the extraction and beneficiation of ores and minerals. All metal, phosphate, and asbestos mining segments of the United States mining industry are included in the assessment.  Waste categories covered include mine waste, mill tailings, and waste from heap and dump leaching operations.

The Report and appendices are transmitted in one volume.

        Sincerely yours,


        Lee M. Thomas

Enclosures

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON D.C.  20460

DEC 31, 1985

THE ADMINISTRATOR

Honorable Thomas P. O'Neill
Speaker of the House of Representatives
Washington, D.C. 20515

Dear Mr. Speaker:

I am pleased to transmit the Report to Congress on "Wastes from the Extraction
and Beneficiation of Metallic Ores, Phosphate Rock, Asbestos, Overburden from
Uranium Mining, and Oil Shale" presenting the results of studies carried out
pursuant to Sections 8002 (f) and (p) of the Resource Conservation and
Recovery Act of 1976, as amended, (42 U.S.C. SS6982 (f) and (p)).

The Report provides a comprehensive assessment of possible adverse effects on
human health and the environment from the disposal and utilization of solid
waste from the extraction and beneficiation of ores and minerals. All metal,
phosphate, and asbestos mining segments of the United States mining industry
are included in the assessment. Waste categories covered include mine waste,
mill tailings, and waste from heap and dump leaching operations.

The Report and appendices are transmitted in one volume.

Sincerely yours,

Lee M. Thomas

Enclosures

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| EXECUTIVE SUMMARY |  | ES-1 |
| SECTION 1. | INTRODUCTION | 1-1 |
| 1.1 Scope |  | 1-8 |
| 1.2 Contents |  | 1-10 |
| SECTION 2. | OVERVIEW OF THE NONFUEL MINING INDUSTRY | 2-1 |
| 2.1 Non fuel Mining Segments |  | 2-1 |
| 2.2 Geographic Distribution |  | 2-6 |
| 2.3 Mining and Beneficiation Wastes |  | 2-10 |
| 2.4 Waste Quantities |  | 2-18 |
| 2.5 Summary |  | 2-23 |
| SECTION 3. | MANAGEMENT PRACTICES FOR MINING WASTES | 3-1 |
| 3.1 Overview of the Mining Waste Management Process |  | 3-1 |
| 3.2 Waste Management Practices |  | 3-5 |
| 3.3 Waste Siting and Disposal Methods |  | 3-13 |
| 3.4 Mitigative Measures for Land Disposal Sites |  | 3-20 |
| 3.5 Summary |  | 3-52 |
| SECTION 4. | POTENTIAL DANGER TO HUMAN HEALTH AND THE ENVIRONMENT | 4-1 |
| 4.1 Waste Characteristics Considered |  | 4-2 |
| 4.2 Estimated Amounts of Potentially Hazardous Mining Waste |  | 4-42 |
| 4.3 Effectiveness of Waste Containment at Mining Waste Sites |  | 4-50 |
| 4.4 Structural Instability of Impoundments |  | 4-61 |
| 4.5 Damage Cases |  | 4-63 |
| 4.6 Risk Analysis |  | 4-68 |
| 4.7 Summary |  | 4-71 |
| SECTION 5. | THE ECONOMIC COST OF POTENTIAL HAZARDOUS WASTE MANAGEMENT | 5-1 |
| 5.1 Cost Methodology |  | 5-2 |
| 5.2 Potential Costs of RCRA Subtitle C Waste Management |  | 5-14 |

CONTENTS (Continued)

                                                        <u>Page</u>

SECTION 6.          CONCLUSIONS AND RECOMMENDATIONS          6-1

6.1 Scope                                                    6-1
6.2 Summary of Conclusions                                  6-1
6.3 Recommendations                                         6-12

SECTION 7.          SELECTED BIBLIOGRAPHY                    7-1


APPENDIX A.         SUMMARY OF MAJOR WASTES FROM THE MINING  A-1
                    AND PROCESSING OF OIL SHALES

APPENDIX B.         METHODOLOGY                              B-1

ENDIX C.     SELECTED CRITERIA ANALYZED FOR TOXIC

                    EFFECTS                                  C-1

APPENDIX D.         GLOSSARY                                 D-1

EXECUTIVE SUMMARY

This is the executive summary for the Environmental Protection Agency's Report to Congress on Wastes from the Extraction and Beneficiation of Metallic Ores, Phosphate Rock, Asbestos, Overburden from Uranium Mining, and Oil Shale. EPA has prepared this report in response to the requirements of Sections 8002(f) and (p) of the Resource Conservation and Recovery Act (RCRA). Section 8002(f), a part of RCRA when it was originally enacted in 1976, directed EPA to perform a

> detailed and comprehensive study on the adverse effects of solid wastes from active and abandoned surface and underground mines on the environment, including, but not limited to, the effects of such wastes on humans, water, air, health, welfare, and natural resources ....

Section 8002(p), which Congress added to RCRA when it amended the Act in 1980, required EPA to conduct a

> detailed and comprehensive study on the adverse effects on human health and the environment, if any, of the disposal and utilization of solid wastes from the extraction, beneficiation, and processing of ores and minerals .... Such study shall be conducted in conjunction with the study of mining wastes required by subsection (f) ....

Under the 1980 amendments, EPA is prohibited from regulating solid waste from the "extraction, beneficiation, and processing of ores and minerals" under Subtitle C of RCRA until at least 6 months after the Agency completes these studies and submits them to Congress. The purpose of this prohibition is to exempt these wastes temporarily from the requirements of the RCRA hazardous waste management system. After submitting the required studies, holding public hearings, and providing the public with an opportunity to

comment, the Administrator must "determine to promulgate regulations" or "determine such regulations are unwarranted" for these mining wastes.

If EPA decides to regulate mining wastes as hazardous under RCRA Section 3004(x), which Congress added to the Act as part of the Hazardous and Solid Waste Amendments of 1984, EPA may modify provisions of these regulations pertaining to liquids in landfills, land disposal restrictions, and minimum technology requirements, as they apply to mining wastes. In doing so, EPA may

> take into account the special characteristics of such wastes, the practical difficulties associated with implementation of such requirements, and site-specific characteristics, including, but not limited to, the climate, geology, hydrology and soil chemistry at the site, so long as such modified requirements assure protection of human health and the environment.

This report addresses wastes from the extraction and beneficiation of metallic ores (with special emphasis on copper, gold, iron, lead, silver, and zinc), uranium overburden, and the nonmetals asbestos and phosphate rock. The Environmental Protection Agency's findings on oil shales are summarized in Appendix A of this report.  EPA selected these mining industry segments because they generate large quantities of wastes that are potentially hazardous and because the Agency is solely responsible for regulating the waste from extraction and beneficiation of these ores and minerals.  Likewise, the Agency excluded from the study wastes generated by the clay, sand and gravel, and stone mining segments, since it judged wastes from these sources less likely to pose hazards than wastes from the industries included.  EPA also excluded uranium mill tailings wastes, because the Agency has already submitted a report to Congress on uranium mill tailings. The Agency excluded wastes from coal mining and beneficiation, because both EPA and the Department

ES-2

of the Interior play a role in their regulation, and it is not clear whether Congress intended coal mining to be included within the scope of the studies conducted in response to Sections 8002(f) and (p) of RCRA. Finally, EPA excluded large-volume processing wastes. On October 2, 1985, EPA proposed to reinterpret the scope of the mining waste exclusion as it applies to processing wastes, leaving only large volume processing wastes excluded (FR 401292). Other wastes from processing ores and minerals that are hazardous would be brought under full Subtitle C regulation after promulgation of the reinterpretation, and would therefore not be included in the scope of a subsequent Report to Congress on processing wastes. The large-volume processing wastes that remain within the exclusion would be studied and a Report to Congress prepared to complete EPA's response to the RCRA Section 8002 (p) mandate.

The remainder of this Executive Summary consists of five sections. First, we provide an overview of the industry segments covered in this report. Next, we describe management practices for mining wastes. Then we discuss the potential danger to human health and the environment that mining wastes pose. Following this, we estimate the costs that regulating mining wastes could impose under several scenarios and briefly outline the effects of these costs on product prices. Finally, we present the Agency's conclusions and recommendations.

### OVERVIEW OF THE NONFUEL MINING INDUSTRY

The nonfuel mining industry[1] is an integral part of our economy, providing a wide range of important products. The value of raw nonfuel

1    For the purposes of this report, the nonfuel mining industry is defined to include uranium, although processed uranium may be used as a fuel.

minerals is about 1 percent of the Gross National Product (GNP), and products made from these raw materials account for about 9 percent of the GNP.

The number of active mines varies from year to year, depending on economic factors; in 1980 (the most recent year for which complete data are available from the U.S. Bureau of Mines), there were about 600 metal mines and about 12,000 nonmetal mines. Most of the nonmetal mines were clay, sand and gravel, and stone mines, and thus fall outside the scope of this report. In the industry segments that this report covers, a few large mines generally produce most of the ore and generate most of the waste.

Ores occur only in certain geologic formations, so much of the mining within an industry segment is concentrated in a few locations. Because the raw ore must be extracted from the earth, and only a small percentage of the mined rock is valuable, vast quantities of material must be handled for each unit of marketable product. Much of this material is waste.

Mine waste is the soil or rock that is generated during the process of gaining access to the ore or mineral body. Tailings are the wastes generated by several physical and chemical beneficiation processes that may be used to separate the valuable metal or mineral from the interbedded rock; the choice of process depends on the composition and properties of the ore and of the gangue, the rock in which the ore occurs. Some low-grade ore, waste rock, and tailings are used in dump or heap leaching, a process that the mining industry considers a form of beneficiation and one that involves spraying the material with acid or cyanide to leach out metals. This process is most widely practiced in the copper, silver, and gold mining segments, and the associated wastes are termed dump/heap leaching wastes. The final waste type is mine

ES-4

water, water that infiltrates the mine during the extraction process. Table ES-1 lists the types and quantities of mining wastes generated by each mining segment of concern.

Extraction and beneficiation produce large quantities of waste. The segments covered in this report generate 1 to 2 billion tons of waste each year and have so far produced over 50 billion tons of waste. Copper, iron ore, uranium, and phosphate mining operations are responsible for more than 85 percent of this total volume of waste and continue to account for most of the waste presently generated. As lower and lower grades of ore are mined, more waste per unit of product is generated.

Approximately one-half of the waste generated by the segments of concern is mine waste, and one-third is tailings. Most of the mine waste is from phosphate, copper, iron ore, and uranium mining; the majority of tailings are from the copper, phosphate, and iron ore segments. Only the copper, gold, and silver mining industries presently generate dump or heap leach waste. The following section discusses how industry currently manages these wastes.

WASTE MANAGEMENT PRACTICES

Mine waste, tailings, heap and dump leach wastes, and mine water can be managed in a variety of ways. Figure ES-1 provides an overview of waste management practices. Waste management practices include recovery operations, volume reduction, treatment, onsite and offsite use, and waste siting and disposal. For mine waste and tailings, disposal constitutes the major practice; about 56 percent of mine wastes are currently managed by disposal in piles, and about 61 percent of tailings are managed in tailings ponds. About 30 percent of mine waste and tailings are used on site in leaching operations,

Table ES-1 Waste Generation
(Millions of Metric Tons in 1982)

| Mining industry segment | Mine waste | Tailings | Leaching wastes | Total |
|---|---|---|---|---|
| Metals: | | | | |
| Copper | 124 | 178 | 200 (dump) | 502 |
| Gold | 39 | 24 | 11 (heap) | 74 |
| Iron | 102 | 75 | – | 177 |
| Lead | 2 | 9 | – | 11 |
| Molybdenum | 24 | 6 | – | 30 |
| Silver | 20 | 6 | <1 (heap) | 26 |
| Uranium | 73 | NA | – | 73 |
| Zinc | 1 | 6 | – | 7 |
| Other metals | 23 | 3 | – | 26 |
| Subtotal | 408 | 307 | 211 | 926 |
| Nonmetals: | | | | |
| Asbestos | 4 | 2 | – | 6 |
| Phosphate | 294 | 109 | – | 403 |
| Subtotal | 298 | 111 | – | 409 |
| TOTAL | 706 | 418 | 211 | 1,335 |

Source: Estimated by Charles River Associates 1985 based on BOM 1983.

ES-6



ES-7

construction of tailings impoundments, and road construction.  Present disposal and utilization practices for all metal and nonmetal industry segments are presented in Table ES-2. A discussion of waste management practices follows.

Several methods are available to treat, change, or reduce wastes before disposing of them.  In operations using cyanide, it may be possible to oxidize the cyanide before disposal.  It may also be possible to remove pyrites from tailings, thus reducing, although not eliminating, their potential for forming acid.  Finally, water can be removed from tailings, creating a thickened discharge.

Extraction and milling wastes can also be used off site; the most common use of these wastes is in road construction.  Researchers are investigating other uses for both mine wastes and tailings, such as use in soil supplements, in wallboard and brick/block products, and in ceramic products. However, it is unlikely that use of mining wastes will increase greatly in the future, because in most cases their commercial potential is not sufficient to overcome the economic disadvantages, such as high transportation costs, associated with their use.

Mine water can also be used on site in the milling process as makeup water or for dust control, cooling, or drilling fluids.  In most cases, however, the amount of mine water exceeds the quantity that can be used.

The majority of the solid waste generated in mining is not reduced by any of the methods described above and must be disposed of.  Siting disposal facilities in appropriate locations is fundamental to environmental protection, and other management methods are available for ameliorating waste disposal problems.

Table ES-2 Present Mining Waste Disposal and Utilization Practices (Millions of Metric Tons/Year)

| Practice | Waste type and volume | |
|---|---|---|
| | Mine waste | Mill tailings |
| Pile | 569 | – |
| Backfill | 86 | 21 |
| Onsite utilization | 313 | 141 |
| Impoundments | – | 267 |
| Offsite utilization | 43 | 8 |
| TOTAL | 1,011 | **437** |

ES-9

During active site life, during closure, and in the post-closure period, facilities could employ engineering controls to prevent erosion, to keep leachate out of the ground water, or to remove contaminants introduced into ground water. However, EPA data on management methods at mining facilities indicate that only a small percentage of mines currently monitor their ground water, use run-on/runoff controls or liners, or employ leachate collection, detection, and removal systems. EPA has not determined the circumstances under which these waste measures would be appropriate at mine waste and mill tailing disposal sites.

POTENTIAL DANGER TO HUMAN HEALTH AND THE ENVIRONMENT

The potential dangers posed by wastes from nonfuel mining and beneficiation vary greatly and depend on the industry segment; the beneficiation process; and site-specific geologic, hydrologic, and climatic factors. Some rock is naturally high in metals or radionuclides. Some beneficiation processes use acids and cyanides. Mine waste, tailings, and mine water can contain these materials and also be acidic or alkaline. Hazardous substances could leak into the environment, polluting the soil and surface and ground water and endangering receptor populations.

The Agency has not yet performed a quantitative risk assessment. Risk analysis can provide a quantitative estimate and allow EPA to distinguish between the risk posed by current, past, and alternative management practices. Additionally, it will enable the Agency to evaluate how site-specific factors such as hydrology, proximity to surface water, climate, distance from human populations, type and sensitivity of aquatic populations, closeness to drinking water supplies, and the chemical and physical composition of the waste itself affect risk.

EPA evaluated the potential dangers posed by mining wastes by testing for the RCRA characteristics of corrosivity and EP toxicity and by assessing the level of several other substances in these wastes. A substance was considered corrosive if the pH was equal to or less than 2 (acidic) or equal to or greater than 12.5 (alkaline). A substance was determined to be EP toxic if, using a specified leaching procedure, it exceeded the National Interim Primary Drinking Water Standards (NIPDWS) for an EP toxic metal by a factor of 100.

Only samples from copper dump leach met the RCRA characteristic for corrosivity because of low pH, but pH values were quite low (more than 2 and less than or equal to 4) for many samples from the copper and other metals industry segments and for one sample from the molybdenum segment. Only one sample, from the "other" metals industry segment, met the RCRA characteristic for corrosivity because of high pH. In addition, one sample each from the gold and silver industry segments, three from the copper industry segment, and four from the other metals segment had relatively high (more than 10 and less than or equal to 12.5) pH values. EP toxic results were obtained for at least one sample from copper dump/heap leachate, gold tailings and mine waste, lead mine waste and tailings, silver tailings and mine waste, and zinc tailings. EPA's water quality criteria for the protection of aquatic life are generally set at levels at lower concentrations than those established by the NIPDWS.

Another potential threat to organisms and the environment is acid formation. Wastes with the highest acid formation potential are in the copper, gold, and silver industry segments, although the degree of potential harm varies with the mineral content of wastes and soils (some wastes and soils have neutralizing chemicals), amount of precipitation (more increases the potential for acid drainage), and other factors not evaluated.

ES-11

Of the other potentially hazardous constituents considered, cyanide was detected in copper and gold tailings ponds and gold heap leachate. Radioactive material was found in uranium and phosphate mine waste samples and in phosphate tailings. Although only asbestos mining wastes were tested in this study for asbestos content, effluent guideline data suggest that asbestos may be present in wastes generated by some metal mining industry segments. EPA has insufficient data to evaluate the hazard, if any, posed by asbestos contained in metal mining wastes.

Based on these sampling results, EPA estimates that the copper mining segment generates 50 million metric tons of RCRA corrosive waste annually. The gold, lead, silver, and zinc industry segments generate a total of 11.2 million metric tons of RCRA EP toxic waste annually. EPA estimates that 182 million metric tons of copper dump leach are generated annually, and that the gold and silver segments generate a total of 9.3 million metric tons of tailings and 14 million metric tons of heap leach annually. High acid formation potential waste is estimated at 95 million metric tons a year. The phosphate and uranium mining industries generate approximately 443 million metric tons of radioactive waste (with a radioactivity level of more than 5 picocuries/gram, the level established as a "cleanup" standard under the 1983 standards for Protection Against Uranium Mill Tailings). There are also 5 million metric tons of asbestos-containing waste (asbestos content greater than 1 percent by weight) generated each year. Estimated amounts of potentially hazardous wastes are reported in Table ES-3.

Of the estimated 1,340 million metric tons of waste generated annually by metal, asbestos, and phosphate mining, 61 million tons are estimated to be hazardous under current RCRA Subtitle C characteristics. Adding wastes with

ES-12

Table ES-3 Estimated Amounts of Wastes with RCRA Hazardous Characteristics and Other Wastes Potentially Subject to Regulation as Hazardous Wastes Under RCRA

| Category | Annual amount (millions of metric tons) | Source | Potential danger |
|---|---|---|---|
| RCRA Characteristics | | | |
| Corrosive | 50 | Copper 1 each dump liquor | Ground-water acidification |
| EP toxic | 11 | Gold, silver, lead, zinc wastes | Toxic metal ground-water contamination |
| Other Categories | | | |
| Precious metal recovery wastes | 9 | Gold, silver | Cyanide contamination of surface and ground water |
| Heap leaching wastes | 14[a] | Gold, silver | Cyanide contamination of surface and ground water |
| Dump leaching waste | 182[a] | Copper dump leach wastes | Massive release of toxic metals and low pH liquids |
| Radioactive wastes (5 pCi/g) | 352 91 | Phosphate, uranium | Radon emissions |
| Acid formation | 95 | Copper mill tailings | Release of low pH liquids after closure |
| Asbestos | 5 | Asbestos mines and mills | Cancer |
| | 755[a] | | |

a The total annual amount of waste is not equal to the sum of hazardous waste in each category because some wastes are in more than one category. For example, 50 million metric tons of copper dump leach waste are also corrosive, and 4 million metric tons of gold tailings are both EP toxic and contaminated with cyanide.

ES-13

high acid formation potential, those that contain asbestos, those that are
potential candidates for listing because they commonly have high levels of
cyanide (greater than or equal to 10 mg/l), and radioactive wastes (radium-226
greater than or equal to 5 picocuries/gram) would increase this total to 755
million metric tons of potentially hazardous waste generated by these mining
industry segments each year.

EPA conducted a study to determine whether mining waste management
facilities leak and, if they do, whether they release constituents that are of
concern. Surface water and/or ground water was monitored at eight
representative active mine sites. Results indicate that constituents from
impoundments do enter ground water at most sites, but significant increases in
the concentrations of hazardous constituents were rarely demonstrated.

Damage cases, however, show that mine runoff and seepage have adversely
affected surface and ground water in several mining districts. Sudden and
chronic releases of cyanides, acids, and metals have reduced fish populations
and the number of other freshwater organisms. However, some of these incidents
were caused by waste management practices that are no longer in use.


THE ECONOMIC COST OF POTENTIAL RCRA WASTE MANAGEMENT

EPA examined the wide range of potential costs that regulating mining
wastes as hazardous under RCRA could impose on facilities and segments of the
mining industry. To examine this range, EPA estimated the incremental costs,
those over and above the costs the industry already incurs to manage wastes,
for eight regulatory scenarios of varying stringency. EPA constructed these
eight scenarios by taking all combinations of four different sets of manage-
ment standards and two criteria for determining whether wastes are hazardous.

ES-14

The estimation procedure applied specific information from 47 mines to develop costs at these mines and then extrapolated these results to the universe covered in this report.

The management standards that EPA examined ranged from imposing the full set of RCRA Subtitle C regulations (the most expensive set of management standards, Scenario 1) to requiring only a limited set of requirements: permits, a leachate collection system, a ground-water monitoring system, a run-on/runoff system, and post-closure maintenance (Scenario 4). Under the first criterion for determining whether wastes were hazardous, waste streams failing the Subtitle C characteristics tests for EP toxicity and corrosivity and cyanide wastes from gold metal recovery operations were included as hazardous (Scenario A). Under the second criterion, all wastes captured under the first set were included, as well as (1) wastes from gold and silver heap leach operations, (2) wastes with high acid formation potential, and (3) copper dump leach wastes (Scenario B). Both hazardous waste criteria captured only wastes from the copper, gold, silver, lead, and zinc mining segments.

Estimated costs could be very substantial, depending on the management standards and criteria for defining hazardous waste. Under the most costly combination (the unlikely scenario imposing the full set of RCRA regulations and the most restrictive criterion for determining whether waste is hazardous, Scenario 1B), the annualized costs for the mining segments covered by the assessment were $850 million per year, while for the least costly combination (maintenance and monitoring), the annualized cost was $7 million per year. (Annualized costs resemble mortgage payments, in that they spread the present value of total costs into equal payments over the time period EPA estimates the affected mines will be productive.)

ES-15

As the previous paragraph demonstrates, costs vary substantially across the different cost scenarios. Generally, the highest cost scenarios are several times more expensive than the intermediate cost scenarios; these, in turn, are several times more expensive than the least expensive. The additional waste management costs incurred by adding Scenario B wastes to the wastes to be regulated are also substantial; the costs of managing all Scenario B wastes would be two to four times higher than the costs of managing only the Scenario A wastes, for any given management standard.

The potential costs of regulation also vary widely for the five individual metal mining segments, both across segments and scenarios. Under all scenarios, the copper industry would incur the largest cost, while the gold industry would bear the second highest lifetime cost.

The additional effects of regulation on some segments of the mining industry could be substantial. For a low-cost scenario, average affected facilities in the zinc segment (the segment most affected by regulatory costs as a percent of direct product cost) would incur costs as high as 5 percent of direct product costs, while under a high-cost scenario a zinc facility could incur costs of 10 percent. Under a high-cost scenario, RCRA compliance costs as a percent of direct product cost for the average affected facility were 21 percent in the lead industry and ranged upward of 120 percent in the copper industry.

CONCLUSIONS

Structure and Location of Mines

EPA focused on segments producing and concentrating metallic ores, phosphate rock, and asbestos, totalling fewer than 500 active sites during 1985. These sites are predominantly in sparsely populated areas west of the

ES-16

Mississippi but have great diversity in size, product value, and volumes of material handled. Several segments are concentrated primarily in one state: the iron segment is mainly concentrated in Minnesota, lead in Missouri, copper in Arizona, asbestos in California, and phosphate in Florida.

Waste Quantities

Aggregate waste quantities generated were 1.3 and 2 billion metric tons per year in 1982 and 1980, respectively. The accumulated waste (for segments other than coal) is estimated to be approximately 50 billion metric tons. Waste-to-product ratios are generally higher in mining industry segments than in other industrial segments. Some individual mines and mills handle more materials than many entire industries, but 25 percent of the mines studied handled less than 1,000 metric tons per year.

Potential Hazard Characteristics

Of the 1.3 billion metric tons of wastes that EPA estimates will be generated by extraction and beneficiation in 1985, about 61 million metric tons (5 percent) exhibit the characteristics of corrosivity and EP (extraction procedure) toxicity. Another 23 million metric tons (2 percent) are beneficiation wastes contaminated with cyanide. Also, there are 182 million metric tons (14 percent) of copper leach dump material and 95 million metric tons (7 percent) of copper mill tailings with the potential for release of acidic and toxic liquids. If waste with radioactivity content greater than 5 picocuries per gram is considered hazardous, the hazardous volume is 443 million metric tons (34 percent) from the phosphate and uranium segments; if waste with radioactivity greater than 20 picocuries per gram is considered hazardous, the total is 93 million metric tons (7 percent). Four asbestos mines generated about 5 million metric tons (less than 1 percent) of waste with a chrysotile content greater than 5 percent.

ES-17

Evidence of Environmental Transport

At mine sites, ground-water monitoring is difficult and expensive, and generally is not conducted on a large scale. From short-term monitoring studies at eight sites, EPA detected seepage from tailings impoundments, a copper leach dump, and a uranium mine water pond. However, EP toxic metals of concern did not appear to have migrated during the 6- to 9-month monitoring period. Other ground-water monitoring studies have detected sulfates, cyanides, and other contaminants from mine runoff, tailings pond seepage, and leaching operations.

Evidence of Damages

Incidents of damage (contamination of drinking water aquifers, degradation of aquatic ecosystems, fish kills, and related reductions of environmental quality) have been documented in the phosphate, gold, silver, copper, lead, and uranium segments. There are 13 mining sites on the National Priorities List (Superfund), including five gold/silver, three copper, three asbestos, and two lead/zinc mines. The asbestos Superfund sites differ from other sites in that these wastes pose a hazard via airborne exposure. It is not clear, from the analysis of damage cases and Superfund sites, whether or not current waste management practices can prevent damage from seepage or sudden releases. However, it is clear that some of the problems at abandoned or Superfund sites are attributable to waste disposal practices not currently used by the mining industry.

Waste Management Practices

Site selection for the mine, as well as its associated beneficiation and waste disposal facilities, is the single most important aspect of environmental protection in the mining industry. Most mine waste is disposed of in piles, and most tailings in impoundments. Mine water is often recycled

through the mill and used for other purposes on site. Offsite utilization of mine waste and mill tailings is limited (2 to 4 percent). Some management measures (e.g., source separation, treatment of acids or cyanides, and waste stabilization) now used at some facilities within a segment of the mining industry could be more widely used. Other measures applied to hazardous waste in nonmining industries may not be appropriate. Soil cover borrowed from surrounding terrain may create additional reclamation problems in arid regions.

Potential Costs of Regulation

For five metal mining segments, total annualized costs range from $7 million per year (for a scenario that emphasizes primarily basic maintenance and monitoring, for wastes that are hazardous by RCRA characteristics) to over $800 million per year (for an unlikely scenario that approximates a full RCRA Subtitle C regulatory approach, emphasizing cap and liner containment for all wastes considered hazardous under the current criteria, plus cyanide and acid formation wastes). About 60 percent of the total projected annualized cost at active facilities can be attributed to the management of waste accumulated from past production. Those segments with no hazardous wastes (e.g., iron) would incur no costs. Within a segment, incremental costs would vary greatly from facility to facility, depending on current requirements of state laws, ore grade, geography, past waste accumulation, percentage of waste with hazardous characteristics, and other factors.


RECOMMENDATIONS

Section 8002(f) of RCRA requires EPA to conduct a study of the adverse effects of mining waste and to provide "recommendations for Federal...actions concerning such effects." Based on our findings from this study, we make

several <u>preliminary</u> recommendations for those wastes and industry segments included in the scope of the study. The recommendations are subject to change based on continuing consultations with the Department of the Interior (DOI) and new information submitted through the public hearings and comments on this report. Pursuant to the process outlined in RCRA ~3001(b)(3)(C), we will announce our specific regulatory determination within 6 months after submitting this report to Congress.

First, EPA is concerned with those wastes that have the hazardous characteristics of corrosivity or EP toxicity under current RCRA regulations. EPA intends to investigate those waste streams. During the course of this investigation, EPA will assess more rigorously the need for and nature of regulatory controls. This will require further evaluation of the human health and environmental exposures mining wastes could present. EPA will assess the risks posed by mining waste sites and alternative control options. The Agency will perform additional waste sampling and analysis, additional ground-water or surface water monitoring and analysis, and additional analysis of the feasibility and cost-effectiveness of various control technologies.

If the Agency determines through the public comments, consultation with DOI and other interested parties, and its own analysis, that a regulatory strategy is necessary, a broad range of management control options consistent with protecting human health and the environment will be considered and evaluated. Moreover, in accordance with Section 3004(x), EPA will take into account "the special characteristics of such waste, the practical difficulties associated with implementation of such requirements and site specific characteristics...," and will comply with the requirements of Executive Orders 12291 and 12498 and the Regulatory Flexibility Act.

Second, EPA will continue gathering information on those waste streams that our study indicates may meet EPA's criteria for listing as hazardous wastes requiring regulation--dump leach waste, because of its high metal concentrations and low pH, and wastes containing cyanides. Although these waste streams are potential candidates for listing as hazardous wastes, we need to gather additional information similar to the information gathered for the rulemaking for corrosive and EP toxic wastes. When we have gathered sufficient information, we will announce our decision as to whether to initiate a formal rulemaking. If the Agency finds it necessary to list any of these wastes, we will also develop appropriate management standards in the same manner as we did those developed for corrosive and EP toxic wastes.

Finally, EPA will continue to study radioactive waste and waste with the potential to form sulfuric acid. The Agency is concerned that radioactive wastes and wastes with the potential for forming acid may pose a threat to human health and the environment, but we do not have enough information to conclude that they do. We will continue to gather information to determine whether these wastes should be regulated. If EPA finds that it is necessary to regulate these wastes, the Agency will develop the appropriate measures of hazard and the appropriate waste management standards.

ES-21

SECTION 1 INTRODUCTION

This report is required by Sections 8002(f) and (p) of the Resource Conservation and Recovery Act (RCRA), which directs the Environmental Protection Agency (EPA) to perform studies of wastes generated in the mining, beneficiation, and processing of ores and minerals and to report the results of these studies to Congress. This report is based on literature reviews and contractor studies, including numerous analytical testing results on the wastes. EPA's RCRA Docket contains copies of the source materials that the Agency used in preparing this report.

Because Congress has amended the Act several times in ways that changed the requirements for mining wastes, and because EPA regulations continue to evolve both in response to legislation and as EPA collects additional information, a brief legislative and regulatory history provides a useful context for this Report to Congress.

When first enacted in 1976 (P.L. 94-580), RCRA contained a broad definition of solid waste that included "solid, liquid, semi-solid, or contained gaseous material resulting from...<u>mining</u>...operations." [emphasis added] (Section 1004(27)).

Section 8002(f) of the original Act directed EPA to conduct a

> detailed and comprehensive study on the adverse effects of solid wastes from active and abandoned surface and underground mines on the environment, including, but not limited to, the effects of such wastes on humans, water, air, health, welfare, and natural resources, and on the adequacy of means and measures currently employed by the mining industry, Government agencies, and others to dispose of and utilize such solid wastes to prevent or substantially mitigate such adverse effects.

1-1

The study was to include an analysis of:

    1.    The sources and volume of discarded material
          generated per year from mining;

    2.    Present disposal practices;

    3.    Potential danger to human health and the environment
          from surface runoff of leachate and air pollution by
          dust;

    4.    Alternatives to current disposal methods;

    5.    The cost of those alternatives in terms of the impact
          on mine product costs; and

    6.    Potential for use of discarded material as a secondary source of the
          mine product.

The Act did not specify a date for the completion of this study.

On December 18, 1978, EPA proposed regulations to implement Subtitle C of RCRA, including rules for identifying and listing hazardous wastes and for managing these wastes. Based on the language in the House Committee Report accompanying the House Bill, which was the predecessor to the Act, EPA specifically excluded as a hazardous waste "overburden resulting from mining operations and intended for return to the mine site" unless the overburden was specifically listed. The Agency proposed to list waste rock and overburden from uranium mining and overburden and slimes from phosphate surface mining because of concern about their radioactivity. The proposal also considered any other mining wastes that were ignitable, corrosive, reactive, or EP toxic as hazardous waste.

In addition, the proposal included distinct management standards for "special wastes," which "occur in very large volumes" and for which "the potential hazards...are relatively low" (43 FR 58992, December 18, 1978). The Agency proposed less stringent standards for these wastes than for other

hazardous wastes, pending the development of additional information and a subsequent planned rulemaking. Certain mining wastes were among the special wastes. They included phosphate mining, beneficiation, and processing wastes; uranium mining waste; and other mining waste that was ignitable, corrosive, reactive, or EP toxic.

On May 19, 1980, EPA promulgated interim final regulations implementing Subtitle C of RCRA. The Agency retained the exclusion for overburden that was returned to the mine site; however, the Agency dropped the two proposed listings, because the regulations "eliminated the part of the proposed exemption that would. allow exempted overburden to be brought within RCRA jurisdiction through specific listing as a hazardous waste" (45 FR 33100, May 19, 1980). EPA also promulgated interim final listings for three specific mining waste streams: (1) flotation tailings from selective flotation from mineral metals recovery operations, (2) cyanidation wastewater treatment tailings pond sediment from mineral metals recovery operations, and (3) spent cyanide bath solutions from mineral metals recovery operations. Before the first of these listings became effective, however, EPA withdrew this listing based on technical comments from the regulated community.

These promulgated standards did not have distinct and less stringent management standards for mining wastes. Between the time of the proposal and the promulgation of the interim final rule, EPA modified the EP toxic and corrosivity criteria for hazardous wastes, and the Agency therefore anticipated that a smaller quantity of mining wastes would be classified as hazardous based on results of tests for these two characteristics. However, EPA judged that wastes so classified would clearly exhibit sufficient toxicity to be of concern. "Thus the concern over the inapplicability of the proposed

regulations to hazardous special wastes, due to the potentially large volume and low level of hazard of these wastes, is not a valid concern in the final regulations" (45 FR 33174, May 19, 1980). The preamble also noted that there was no current provision that would permit deferring the regulation of mining wastes until the results of the Section 8002(f) study were available. EPA did point out, however, that Congress was considering legislation that would amend RCRA to require deferral until the study was complete.

Congress then amended RCRA in the Solid Waste Disposal Act of 1980 (P.L. 96-482), enacted on October 21, 1980. Among other things, the amendments prohibited EPA from regulating solid waste from the "extraction, beneficiation, and processing of ores and minerals, including phosphate rock and overburden from the mining of uranium ore" as hazardous wastes under Subtitle C of RCRA until at least 6 months after the Agency completed and submitted to Congress the studies required by Section 8002(f) and by a new section, 8002(p).

Section 8002(p) requires EPA to perform a comprehensive study on the disposal, and utilization of solid waste from the extraction, beneficiation, and processing of ores and minerals, including phosphate rock and overburden from uranium mining. This new study, to be conducted in conjunction with the study of mining wastes required by Section 8002(f), mandated an analysis of:

1.   The source and volumes of such materials generated per year;

2.   Present disposal and utilization practices;

3.   Potential danger, if any, to human health and the environment from the disposal and reuse of such materials;

4.   Documented cases in which danger to human health or the environment has been proven;

1-4

5.    Alternatives to current disposal methods;

6.    The costs of such alternatives;

7.    The impact of these alternatives on the use of
phosphate rock and uranium ore, and other natural
resources; and

8.    The current and potential utilization of such materials.

The amendments also required the Administrator, "after public hearings and opportunity for comment, either to determine to promulgate regulations" for mining wastes or "to determine that such regulations are unwarranted." These determinations must be published in the Federal Register.

Finally, the amendments specified that EPA could control radiation exposures caused by mining wastes under RCRA. Section 3001(b)(3)(B)(iii) authorized the Administrator to

prescribe regulations. ..to prevent radiation exposure which
presents an unreasonable risk to human health from the use in
construction or land reclamation (with or without revegetation)
of (I) solid waste from the extraction, beneficiation, and
processing of phosphate rock or (II) overburden from the mining
of uranium ore.

On November 19, 1980, EPA published an interim final rule to implement the 1980 RCRA Amendments. Specifically, EPA excluded from regulation under Subtitle C of the Resource Conservation and Recovery Act "... solid waste from the extraction, beneficiation and processing of ores and minerals (including coal), including phosphate rock and overburden from the mining of uranium ore" (45 Fed. Reg. 76618, codified at 40 CFR 261.4(b)(7)). The Agency interpreted the scope of the exclusion very broadly:

Until the Agency takes further rulemaking action on this
matter, it will interpret the language of today's amendments,
with respect to the mining and mineral processing waste
exclusion, to include solid waste from the exploration, mining,
milling, smelting and refining of ores and

1-5

minerals. This exclusion does not, however, apply to solid
wastes, such as spent solvents, pesticide wastes, and discarded
commercial chemical products, that are not uniquely associated
with these mining and allied processing operations (45 FR 76619,
November 19, 1980).

EPA solicited public comment on its interpretation to assist in determin-

ing the appropriate scope of the statutory exclusions.

In particular, EPA questions whether Congress intended to
exclude (1) wastes generated in the smelting, refining and
other processing of ores and minerals that are further
removed from the mining and beneficiation of such ores and
minerals, (2) wastes generated during exploration for mineral
deposits, and (3) wastewater treatment and air emission
control sludges generated by the mining and mineral processing
industry. EPA specifically seeks comment on whether such
wastes should be part of the exclusion. EPA also seeks comment
on how it might distinguish between excluded and non-excluded
solid wastes (45 FR 76619, November 19, 1980).

The Hazardous and Solid Waste Amendments of 1984, enacted in November of

that year as P.L. 98-616, represent the culmination of the House and Senate

reauthorization hearings begun in early 1983. Of chief concern to the mining

industry are amendments that provide EPA flexibility in applying bans on land

disposal and certain requirements for obtaining permits under Subtitle C of

RCRA to the mining industry.

The amended statute provides, under Section 3004(x), that if mining wastes

become subject to regulation as hazardous wastes under Subtitle C, the

Administrator of EPA, in promulgating regulations, is authorized to modify the

requirements of subsections (c), (d), (e), (f), (g), (o), and (u) of Section

3004 and subsection 3005(j), which relate to:

1. Liquids in landfills,

2. Prohibitions on land disposal,

3. Solvents and dioxins,

4. Disposal into deep injection wells,

5. Additional land disposal prohibition determinations,

6. Minimum technological requirements,

7. Continuing releases at permitted facilities, and

8. Interim status surface impoundments.

The Administrator is authorized to take into account the special characteristics of mining and beneficiation wastes, "the practical difficulties associated with implementation of such requirements, and site-specific characteristics, including, but not limited to, the climate, geology, hydrology, and soil chemistry at the site, so long as such modified requirements assure protection of human health and the environment."

The Conference Report accompanying H.R. 2867 (which in its final amended form was passed by both Houses of Congress as P.L. 98-616) provides clarification:

> This Amendment recognizes that even if some of the special study wastes [which include mining wastes as specified in Sections 8002 (f) and (p)] are determined to be hazardous it may not be necessary or appropriate because of their special characteristics and other factors, to subject such wastes to the same requirements that are applicable to other hazardous wastes, and that protection of human health and the environment does not necessarily imply the uniform application of requirements developed for disposal of other hazardous wastes. The authority delegated to the Administrator under this section is both waste-specific and requirement-specific. The Administrator could also exercise the authority to modify requirements for different classes of wastes. Should these wastes become subject to the requirements of Section 3005 (j), relating to the retrofit of surface impoundments, the Administrator could modify such requirements so that they are not identical to the requirements that are applied to new surface impoundments containing such wastes. It is expected that before any of these wastes become subject to regulations under subtitle C, the Administrator will determine whether the requirements of Section 3004 (c), (d), (e), (f), (g), (o), and (u), and Section 3005(3) should be modified [H.R. Report 98-1133, pp. 93-94, October 3, 1984].

On October 2, 1985, EPA proposed (50 Fed. Reg. 401292) to reinterpret the scope of the mining waste exclusion as it applies to processing wastes,

leaving within it only large-volume processing wastes, such as slag from primary metal smelters and elemental phosphorus plants, red and brown muds from bauxite refineries, and phosphogypsum from phosphoric acid plants. Those other wastes from processing ores and minerals that are hazardous would be brought under full Subtitle C regulation after the promulgation of the reinterpretation, and would therefore not be included in the scope of a subsequent Report to Congress on processing wastes. The large-volume processing wastes that remain within the exclusion would be studied and a Report to Congress prepared to complete EPA's response to the RCRA Section 8002(p) mandate.

Thus, EPA must submit a Report to Congress under RCRA Sections 8002(f) and (p) and then publish its findings in the Federal Register before any waste covered by the mining exclusion can be regulated under Subtitle C of RCRA. No such restrictions, however, apply to wastes not included within the scope of the exclusion.

### 1.1 SCOPE

This report addresses waste from the mining and beneficiation of metallic ores, with special emphasis on copper, gold, iron, lead, molybdenum, silver, and zinc; uranium overburden; and the nonmetals asbestos, phosphate rock, and oil shales. (Appendix A to this report addresses wastes from the mining and beneficiation of oil shales.) EPA selected the mining industry segments to be covered in this report on the following basis. First, the Agency excluded wastes that are the primary responsibility of other regulatory agencies. Thus, this report does not address uranium mill tailings or the mining and beneficiation of coal. The Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA) (P.L. 95-604) requires proper disposal of "residual radioactive

material," including mill tailings and residual stocks of unprocessed ores or low-grade materials. UMTRCA directed EPA to prepare a Report to Congress on uranium mill railings, and the Agency has done so.[1]  Under UMTRCA, EPA determines "standards of general application," and the Nuclear Regulatory Commission writes the implementing regulations and enforces them for active mills. Uranium mill tailings are defined as "byproduct material" by the Atomic Energy Act and, as such, do not constitute a "solid waste" as defined by RCRA Section 1004(27). Therefore, they are not subject to RCRA requirements.

The Surface Mining Control and Reclamation Act of 1977 (SMCRA) (P.L. 95-87) applies to surface coal mining reclamation activities. Under RCRA, the Administrator of EPA must review any regulations under SMCRA that are applicable to coal mining wastes and overburden. However, the Secretary of the Interior, with concurrence from the Administrator of EPA, is responsible for promulgating regulations that effectuate the purposes of Subtitle C of RCRA with respect to "coal mining wastes or overburden for which a surface coal mining and reclamation permit is issued or approved under the Surface Mining Control and Reclamation Act of 1977."

The Agency also excluded from the scope of this report wastes generated in the processing of ores or minerals. EPA will address large-volume wastes (such as slag and phosphogypsum) generated by these processes in a subsequent report. EPA will also evaluate other nonmetal mining wastes (in addition to asbestos and phosphate) and wastes from inactive or abandoned mines at a later time.

1.2 CONTENTS

This report consists of seven sections and four appendices. The following paragraphs briefly discuss each of the remaining sections of the report.

Section 2, OVERVIEW OF THE NONFUEL MINING INDUSTRY,[2] presents a summary of the mining and beneficiation of ores and minerals and provides information on the number of mines, their geographic distribution, and the quantity of waste generated in mining and beneficiation.

Section 3, MANAGEMENT PRACTICES FOR MINING WASTES, provides an overview of the mining waste management process and discusses specific waste management practices and mitigative measures for the land disposal of mining waste. For some segments of the industry, the section provides information on the proportion of mine facilities that currently practice these mitigative measures.

Section 4, POTENTIAL DANGER TO HUMAN HEALTH AND THE ENVIRONMENT, presents information on the characteristics of the wastes that pose a potential threat to human health and the environment. It estimates how much mining industry waste would fail current RCRA hazardous waste characteristics, and how much would be hazardous under an augmented set of characteristics. It then provides the results of EPA's monitoring of ground water at selected sites. It also discusses the structural stability of impoundments used to manage mining waste. Next, it presents damage cases. Finally, it describes how risk analysis could be used to quantify the effects that current and alternative practices have on human health and the environment.

Section 5, THE ECONOMIC COST OF POTENTIAL RCRA WASTE MANAGEMENT, first presents the methodology EPA used to determine the potential cost of regulating mining wastes under RCRA, using four different regulatory scenarios

1-10

and two different sets of hazard criteria. The section then presents the results of the analysis in terms of total potential costs, the potential costs to various mining sectors, and the potential costs to the affected mines.

Section 6, CONCLUSIONS AND RECOMMENDATIONS, summarizes the conclusions reached in the other sections of the report and presents EPA's recommendations.

Section 7, SELECTED BIBLIOGRAPHY, lists the sources that were used in this report as well as some references that contain valuable information related to mining waste.

This report also contains four appendices:

*   Appendix A, SUMMARY OF MAJOR WASTES FROM THE MINING AND PROCESSING OF OIL SHALES, summarizes a report on high-volume wastes generated by the mining and processing of oil shales. This information was not included in this Report to Congress because the United States oil shale industry is not yet operating on a commercial scale. The entire oil shale report is available in the EPA docket.


*   Appendix B, METHODOLOGY, describes the methodology used by EPA to assess current industry waste management practices and to estimate the amount of hazardous mining waste generated annually.


*   Appendix C, SELECTED CRITERIA ANALYZED FOR TOXIC EFFECTS, contains tables comparing levels of metals measured by the EP toxicity test allowed by various EPA standards and criteria; tables on arsenic, cadmium, chromium, lead, mercury, selenium, and cyanide toxicity to aquatic biota are also included. In addition, this appendix summarizes radiation effects and effects of asbestos exposure on various biological species, and the effects of decreasing pH on fish.

1-11

* Appendix D, GLOSSARY, provides definitions of mining-
  related and other technical terms referred to in the text.

1-12

SECTION 1 FOOTNOTES

1    US EPA 1983a.

2    For the purposes of this report, the nonfuel mining industry is defined as
     including uranium although processed uranium may be used as fuel.

1-13

# 1990 Report to Congress
# Summary and Findings

---

## Table of Contents

**Page**

1.0   Introduction .................................................................. 1

2.0   RCRA §8002(p) Study Factors ................................................ 3

3.0   Methods, Information Sources and Decision Rationale ........................ 4

    3.1   EPA Data Collection Activities ...................................... 4
    3.2   Analytical Approach and Methods .................................... 4
    3.3   Decision Rationale ................................................. 8

4.0   Findings ................................................................... 11

    4.1   Application of the RCRA §8002(p) Study Factors:  Approach 1 ......... 11
    4.2   Application of the RCRA §8002(p) Study Factors and Additional
          Considerations:  Approach 2 ....................................... 16

## 1.0   Introduction

In October, 1980, the Resource Conservation and Recovery Act (RCRA) was amended by adding §3001(b)(3)(A)(ii) to exclude "solid waste from the extraction, beneficiation, and processing of ores and minerals" from regulation as hazardous waste under Subtitle C of RCRA, pending completion of a study and a Report to Congress required by §8002(f) and (p) and a determination by the EPA Administrator either to promulgate regulations under Subtitle C or that such regulations are unwarranted (as required by §3001(b)(3)(C)). EPA modified its hazardous waste regulations in November 1980 to reflect this "Mining Waste Exclusion," and issued a preliminary, and quite broad, interpretation of the scope of its coverage. In particular, EPA interpreted the exclusion to include "solid waste from the exploration, mining, milling, smelting and refining of ores and minerals" (45 FR 76618, November 19, 1980).

In 1984, EPA was sued for failing to submit the Report to Congress and make the required regulatory determination by the statutory deadline (*Concerned Citizens of Adamstown v EPA* No. 84-3041, D.D.C., August 21, 1985). In responding to this lawsuit, the Agency explained that it planned to propose a narrower interpretation of the scope of the Mining Waste Exclusion, so that it would encompass fewer wastes, and proposed to the Court two schedules: one for completing the §8002 studies of extraction and beneficiation wastes and submitting the Report to Congress for these wastes, and one for proposing and promulgating a reinterpretation for mineral processing wastes. In so doing, the Agency, in effect, split the wastes that might be eligible for exclusion from regulation into two groups: mining (mineral extraction and beneficiation) wastes, and mineral processing wastes. The Court agreed to this approach and established a schedule for the two tasks.

On December 31, 1985, EPA published the required Report to Congress on solid wastes from mineral extraction and beneficiation,[1] and on July 3, 1986 (51 FR 24496) published a determination that regulation of such wastes under Subtitle C of RCRA was not warranted. Since the determination was made, the Agency has been developing a tailored regulatory approach for these materials under the auspices of RCRA Subtitle D. In May, 1988, EPA issued a staff-level approach for regulating mining wastes (referred to as "Strawman") for public comment. More recently, the Agency issued a revised staff-level approach ("Strawman II") that incorporates comments from and responds to issues raised by the states, environmental groups, and the regulated community. The Agency is working to develop a formal proposal of a regulatory program for mineral extraction and beneficiation wastes.[2]

In keeping with its Court-ordered directive to reinterpret the Mining Waste Exclusion for mineral processing wastes, in October, 1985, EPA proposed to narrow the scope of the Exclusion for mineral processing wastes to include only a few specific waste streams. However, the Agency did not specify the criteria that it used to identify these materials, or to distinguish them from other wastes that were not eligible for the exclusion. In response to this proposal, many companies and industry organizations "nominated" wastes that they believed were eligible for the regulatory exemption. Faced with an inability at that time to articulate criteria that could be used to distinguish exempt from non-exempt wastes and the approaching Court-ordered deadline for final action, EPA withdrew its proposal on October 9, 1986.

In response to this action, the Agency was sued again. In July, 1988, the court in *Environmental Defense Fund v. EPA*, 852 F.2d 1316 (D. C. Cir. 1988), *cert. denied*, 109 S. Ct. 1120 (1989) ordered EPA to reinterpret the scope of the Exclusion for mineral processing wastes according to a new schedule. In particular, EPA was directed by the court to restrict the scope of the Exclusion as it applied to mineral processing wastes to include only "large volume, low hazard" wastes. In a series of rulemaking notices, EPA has, during the past two years, established the boundaries of the Mining Waste Exclusion for mineral processing wastes, and has articulated the criteria that were used to define "mineral processing" and to evaluate whether individual wastes are large volume and low hazard and, thus, eligible for the temporary exclusion provided by RCRA §3001(b)(3)(A)(ii). This rulemaking process was completed with the publication of a final rule on January 23, 1990 (55 FR 2322).[3] With the completion of these notices, the Agency established that the temporary exemption from Subtitle C requirements established by the Exclusion for mineral processing wastes and, therefore, the scope of this report, is limited to 20 mineral processing wastes generated by 91 facilities located in 29 states, representing 12 mineral commodity sectors. In particular, this report covers the following wastes:

- Alumina
  -- red and brown muds from bauxite refining
- Chromium (Sodium chromate/dichromate)
  -- treated residue from roasting/leaching of chrome ore
- Coal gas

---

[1] U. S. Environmental Protection Agency, 1985. <u>Report to Congress on Wastes from the Extraction and Beneficiation of Metallic Ores, Phosphate Rock, Asbestos, Overburden from Uranium Mining, and Oil Shale</u>, EPA/530-SW-85-033, Washington, D.C. Available from the U.S. Department of Commerce, National Technical Information Service, Springfield, VA. NTIS Document No. PB88-162631.

[2] The Agency has recently requested comments on Strawman II, including the appropriate scope of the program (i.e., which wastes should be covered).

[3] This rulemaking process also included publication of a proposed rule on October 20, 1988 (53 FR 41288), a proposed rule on April 17, 1989 (54 FR 15316), a final rule on September 1, 1989 ( 54 FR 36592), and a proposed rule on September 25, 1989 (54 FR 39298).

- -- gasifier ash from coal gasification
- -- process wastewater from coal gasification
- Copper
  - -- slag from primary processing
  - -- calcium sulfate wastewater treatment plant sludge from primary processing
  - -- slag tailings from primary processing
- Elemental phosphorus
  - -- slag from primary production
- Ferrous metals (iron and carbon steel)
  - -- iron blast furnace air pollution control dust/sludge
  - -- iron blast furnace slag
  - -- basic oxygen furnace and open hearth furnace air pollution control dust/sludge
  - -- basic oxygen furnace and open hearth furnace slag
- Hydrofluoric acid
  - -- fluorogypsum
  - -- process wastewater
- Lead
  - -- slag from primary processing
- Magnesium
  - -- process wastewater from primary magnesium processing by the anhydrous process
- Phosphoric acid
  - -- phosphogypsum
  - -- process wastewater
- Titanium tetrachloride
  - -- chloride process waste solids
- Zinc
  - -- slag from primary processing

All other solid wastes from the processing of ores and minerals were removed from the Mining Waste Exclusion as of the effective date of the September 1, 1989 or January 23, 1990 final rules (March 1, 1990, or July 23, 1990 in non-authorized states), and are subject to regulation as hazardous wastes if they exhibit one or more characteristics of hazardous waste or are otherwise listed as hazardous waste.[4]

---

[4] Because the requirements of the September 1, 1989 and January 23, 1990 final rules were not imposed pursuant to the Hazardous and Solid Waste Amendments of 1984, they will not be effective in RCRA authorized states until the state program amendments are effective. Thus, the rules are effective on March 1, 1990 and July 23, 1990 (for the September 1, 1989 and January 23, 1990 rules, respectively) only in those states that do not have final authorization to operate their own hazardous waste programs in lieu of the Federal program. In authorized states, the rules are not applicable until the state revises its program to adopt equivalent requirements under state law and receives authorization for these new requirements. (Of course, the requirements will be applicable as state law if the state law is effective prior to authorization.) States that have final authorization must revise their programs to adopt equivalent standards regulating non-exempt mineral processing wastes that exhibit hazardous characteristics as hazardous by July 1, 1991 if regulatory changes only are necessary, or by July 1, 1992 if statutory changes are necessary. Once EPA approves the revision, the state requirements become RCRA Subtitle C requirements in that state.

A summary of the important events in the rulemaking process and of the criteria that have been developed by the Agency to identify the 20 special wastes from mineral processing operations is presented in Appendix A to the report (contained in Volume III).

Following receipt and analysis of public comment on this report, the Agency will issue the regulatory determination required by RCRA §3001(b)(3)(C) that will either subject one or more of the 20 special mineral processing wastes to regulation under Subtitle C as hazardous wastes or conclude that such regulation is unwarranted. Wastes for which the Exclusion is retained will continue to be subject to regulation under RCRA Subtitle D as solid wastes. Our assessment of risk in this report has been based on a conservative set of risk assumptions. If additional regulation of these wastes is determined to be necessary, we would make such a determination with this in mind.

## 2.0    RCRA §8002(p) Study Factors

This report addresses the following eight study factors required by §8002(p) of RCRA for the 20 mineral processing wastes listed above:

1. The sources and volumes of such materials generated per year;
2. Present disposal and utilization practices;
3. Potential danger to human health and the environment from the disposal and reuse of such materials;
4. Documented cases in which danger to human health or the environment has been proved;
5. Alternatives to current disposal methods;
6. The costs of such alternatives;
7. The impacts of these alternatives on the use of phosphate rock, uranium ore, and other natural resources; and
8. The current and potential utilization of such materials.

The Agency's approach in preparing this report was to combine certain study factors for purposes of analysis and exposition. The resulting discussions, which are found in individual chapters (in Volume II) addressing each of the mineral commodity sectors, are organized in seven sections. The first section provides a brief overview of the industry, including the types of production processes used and the number and location of operating facilities that generate one or more mineral processing special wastes. The second section summarizes information on special waste characteristics, generation, and current management practices (study factors 1 and 2), while the third section provides a discussion of potential for and documented cases of danger to human health or the environment (study factors 3 and 4). The fourth section (as suggested by § 8002(p) of RCRA, independent of the eight study factors) summarizes applicable federal and state regulatory controls. The fifth section discusses alternative waste management practices and potential utilization of the wastes (study factors 5 and 8), while the sixth section discusses costs and impacts of alternative practices (study factors 6 and 7). The seventh and final section summarizes and analyzes the findings of EPA's evaluation of the above study factors.

## 3.0    Methods, Information Sources and Decision Rationale

In preparing this report, EPA has developed facility-specific data and analytical methods that reflect the complexity of the issues that are addressed herein. The facilities that generate the special study wastes vary considerably in the types of production operations and waste management techniques that they employ. Moreover, to examine in detail the broad array of study factors mandated by RCRA §8002(p), EPA had to develop approaches and methods that were sufficiently sophisticated to take into account the special nature of high volume mineral processing wastes. This section briefly outlines the data sources, methods, and decision rationale that the Agency employed to respond to the study factors.

### 3.1    EPA Data Collection Activities

EPA's Office of Solid Waste conducted a number of data collection activities to supplement and update previous work. The focus of most of these efforts was site-specific. As a consequence, EPA has been able to compile detailed facility- and sector-specific data bases, which the Agency has used extensively to prepare this report as well as a series of rulemakings which, as discussed above, have clarified the boundaries of the Mining Waste Exclusion as it applies to mineral processing wastes. The major information-gathering initiatives are as follows:

• Review of Public Comments

• 1989 National Survey of Solid Wastes from Mineral Processing Facilities (SWMPF Survey)

• 1989 EPA Mineral Processing Waste Sampling and Analysis

• EPA Damage Case Collection

• EPA Site Visits

• RCRA §3007 Waste Characteristics Data Requests

These activities are described in more detail in Chapter 2 of Volume II, with additional discussion and/or examples provided in Appendix B, which is contained in Volume III.

### 3.2    Analytical Approach and Methods

This section summarizes EPA's approach for addressing each of the study factors. Waste Characteristics, Generation, and current Management Practices To characterize the generation and management of each of the 20 special mineral processing wastes, EPA had to identify the facilities that generate the wastes, the production processes used and the products produced, the quantity and characteristics of the wastes generated, and the practices that are employed to manage them.

The identification of the facilities that generate one or more of the 20 special wastes was based upon prior EPA work, supplemented extensively by information provided by Commodity Specialists with the U.S. Bureau of Mines. The operators of these facilities then were sent a survey questionnaire (SWMPF Survey) requesting information on waste generation and management. Survey responses allowed EPA to finalize its list of the active facilities in the mineral processing sectors of concern, and serve as the primary basis of EPA's understanding of the current management practices that are applied to special wastes from mineral processing operations.

Information submitted by industry in response to the SWMPF Survey was supplemented with and critically evaluated against data obtained from published sources, information collected as part of the damage case development process, and EPA observations made during waste sampling and other site visits. The descriptions of waste management practices provided in this report reflect EPA's synthesis of the information obtained during all of these information collection activities.

# Potential and Documented Danger to Human Health and the Environment

### *Potential Danger to Human Health and the Environment*

EPA conducted a facility-specific analysis of the risks associated with each of the 20 mineral processing wastes. The Agency collected information on the major factors that influence risks from the management of the special wastes at each of the 91 facilities that generate the wastes, and analyzed this information to develop conclusions on the potential for toxic constituents to be released from the waste and cause human health and environmental impacts. In a limited number of cases, EPA also conducted quantitative risk modeling to estimate potential danger to human health and the environment.

EPA employed a three step approach in this risk assessment, using each step as a means of narrowing the scope of the analysis to those wastes and facilities that pose the greatest potential risk. First, the Agency assessed the intrinsic hazard of the wastes by comparing the concentrations of toxic constituents in the wastes and in leachate from the wastes to screening criteria.[5] This step was used to determine which, if any, constituents of the special wastes may pose risks to human health and the environment based on reasonable, but conservative exposure assumptions. Second, EPA assessed the potential for toxic constituents from the subject wastes to cause damage at the 91 facilities by evaluating the practices currently used to manage the wastes and the environmental settings in which the wastes are managed. Using facility-specific information about special waste management and environmental setting, EPA then evaluated the potential for toxic or radioactive constituents to be released from the specific waste management units and to migrate to potential exposure points. Finally, for waste stream/environmental settings combinations at which risk potential appeared to be the greatest, EPA performed quantitative modeling to estimate the human health and environmental risks associated with existing waste management practices.

In all steps of the analysis, EPA focused on human health and environmental risks associated with chronic exposure to potential releases of waste constituents to ground water, surface water, and air. When possible, however, the Agency did evaluate the potential for large episodic releases of waste constituents (e.g., from storm or flood events) to endanger human health or the environment. To analyze risks to human health, the Agency evaluated the cancer and noncancer risks to maximally exposed individuals at each site. To analyze environmental risks, the Agency evaluated the potential for contaminants to migrate from the waste and adversely affect aquatic organisms. In addition to risks to human health and aquatic life, EPA also evaluated the potential for existing waste management practices to reduce the quality of water and air resources by considering the potential for air and water contamination, irrespective of the potential for humans or ecological receptors to be exposed to the contamination.

### *Documented Cases of Danger to Human Health or the Environment*

Section 8002(p)(4) of RCRA requires that EPA's study of mineral processing wastes examine "documented cases in which danger to human health or the environment has been proved." In order to address this requirement, EPA defined danger to human health and the environment in the following way. First, danger to human health includes both acute and chronic effects associated with management of mineral processing wastes. Second, danger to the environment

---

[5]The focus of the screening criteria is on toxicity and radioactivity, in addition to a simple determination of corrosivity. EPA has sufficient knowledge of the characteristics of the 20 special mineral processing wastes to conclude that none are ignitable or reactive.

includes: (1) impairment of natural resources; (2) ecological effects resulting in impairment of the structure or function of natural ecosystems and habitats; and (3) effects on wildlife resulting in impairment to terrestrial or aquatic species.

The statutory requirement is that EPA examine "proven" cases of danger to human health or the environment. As a result, EPA developed a "test of proof" to be used for determining if documentation available on a case proves that danger/damage has occurred. This "test of proof" contains three separate tests; a case that satisfies one or more of these tests is considered "proven." The tests are as follows:

1. <u>Scientific investigation</u>:  Damages are found to exist as part of the findings of a scientific study.  Such studies include both extensive formal investigations supporting litigation or a State enforcement action and the results of technical tests (such as monitoring of wells).  Scientific studies must demonstrate that damages are significant in terms of impacts on human health or the environment.  For example, information on contamination of a drinking water aquifer must indicate that contamination levels exceed drinking water standards.

2. <u>Administrative ruling</u>:  Damages are found to exist through a formal administrative ruling, such as the conclusions of a site report by a field inspector, or through existence of an enforcement action that cited specific health or environmental damages.

3. <u>Court decision</u>:  Damages are found to exist through the ruling of a court or through an out-of-court settlement.

EPA has taken care in the course of preparing this evaluation to report only damages that are relevant to the decisions that will be based upon the Report to Congress (i.e., whether regulation of each of the special wastes from mineral processing under Subtitle C is appropriate).  Consequently, the damage cases reported here are believed to be attributable (at least in part) to the special study wastes, and are believed to have resulted from management practices that are currently employed by active facilities in the commodity sectors of interest.

## Existing Federal and State Waste Management Controls

In accordance with the suggestion in RCRA §8002(p), EPA has also examined other applicable federal and state waste management controls in an effort to minimize duplication.

### Federal Controls

EPA's objective in this analysis was to identify and evaluate the existing regulatory controls over the management of special mineral processing wastes that have been promulgated by agencies of the federal government, focusing on programs and requirements established by EPA.  This evaluation was performed for two reasons.  First, some states do not have regulatory programs, meaning that federal requirements apply directly.  Second, the federal government has not delegated authority to states for implementing some environmental protection statutes and regulations.

The initial phase of the analysis examined the relevant statutes and regulations pertaining to hazardous waste, solid waste, air quality, and water quality as they might apply to the management of the mineral processing special wastes, in general.  The second phase of this analysis was to identify and evaluate any specific regulations that pertain to any of the 20 special mineral processing wastes.  The final phase of the analysis involved contacting Regional EPA staff in those states that do not have federally approved programs for implementation of the major environmental statutes, as well as relevant staff within other federal agencies and departments, and performing a regulatory analysis of the implementation of all existing federal statutes and regulations that pertain specifically to the management of the 20 special mineral processing wastes.  The findings of this review are contained within the twelve commodity-specific chapters, while descriptions of the major federal statutes and regulations that affect mineral processing wastes management generally are provided in Appendix D-1 (in Volume III).

### Requirements in Selected States

EPA's goal in this analysis was to determine the current regulatory stance of states with regard to the mineral processing wastes generated by the 12 commodity sectors addressed in this report.  The analysis serves more generally to help characterize current waste management and disposal practices taking place as a result of state regulation.

The first step in the analysis focused on reviewing material in a previous EPA-sponsored study on state-level regulation of mining and mineral processing wastes.  The second step of EPA's analysis was to perform a more detailed review of individual state statutes and regulations; this review was limited in scope to a representative sample (18) of the 29 states containing facilities of interest for further analysis.  While this more detailed study addressed, in part, the regulatory status of special mineral processing wastes, EPA found that the scope of state programs was not always clear from the state statutory and regulatory language that was reviewed.  The final step of EPA's analysis, therefore, consisted of contacting state officials involved with the implementation of legal requirements in order to learn how those statutes and regulations are interpreted in practice, and to obtain facility-specific implementation information.  The

information compiled from these contacts was combined with the existing information on statutory and regulatory requirements to produce a final implementation analysis, which describes the existing regulatory structure applicable to the 20 mineral processing wastes generated by the twelve commodity sectors considered in this Report to Congress.

## Alternative Management Practices and Potential Utilization

Section 8002(p) of the RCRA statute requires that EPA consider alternatives to current disposal methods, as well as the current and potential utilization of the wastes addressed by the Report to Congress. In order to accomplish this, this report identifies demonstrated alternatives for waste management and utilization. The costs, current use, potential use, and environmental impact of each alternative are evaluated to the extent permitted by the information available.

Because the primary purpose of this report is to determine whether the regulation of the special mineral processing wastes under Subtitle C is warranted, EPA focused its efforts and the discussion of waste management alternatives presented herein on those wastes that potentially may be candidates for Subtitle C regulation, excluding consideration of the costs and impacts of the various scenarios.

The focus of this analysis was on conducting a comprehensive computer-assisted literature search, then evaluating the information obtained thereby. In some instances, more detailed information was solicited from individual researchers, agencies, and trade associations. Detailed discussion of alternatives is limited in scope, however, to those for which information is adequate to assess their technical feasibility (i.e., EPA has not generally included alternatives that are experimental, unproven, or have not seen at least pilot-scale application).

## Cost and Economic Impacts

Section 8002(p) of RCRA requires EPA to analyze "alternatives to current disposal methods" for solid wastes generated from the extraction, beneficiation, and processing of ores and minerals. EPA is also required to analyze "the costs of such alternatives." Section 6 of each commodity-specific chapter (in Volume II) discusses the costs and associated economic impacts of alternative waste management practices. The analysis of costs and impacts is limited in scope to those waste streams that exhibit one or more characteristics of hazardous waste and/or exhibit documented damage or potential risk.

The focus of the analysis is on the comparative operational and financial consequences of regulating these materials under various regulatory schemes. First, cost and impacts are calculated for regulation of these wastes under full Subtitle C of RCRA. Two less stringent regulatory scenarios are also considered, one of which reflects the potential for relaxed hazardous waste management controls found at §3004(x) of RCRA ("Subtitle C-Minus"), while the other is a hypothetical Subtitle D program designed to specifically address mineral processing wastes ("Subtitle D-Plus").

The incremental costs associated with alternative regulatory options are compared to several financial indicators at the facility level in order to determine the relative magnitude of potential impacts. In addition, the Agency has evaluated market conditions facing each affected facility and sector to assess the extent to which facilities potentially facing compliance costs would be able to pass through these costs to various product markets or force reductions in the cost of inputs (e.g., ore concentrate, labor).

In conducting this cost analysis, EPA has assumed, in most cases, that waste streams are potentially hazardous at only the individual facilities for which data submitted by industry or EPA sampling data indicate that the waste exhibits one or more of the four characteristics of a hazardous waste, as defined by 40 CFR Part 261 Subpart C. When wastes do exhibit a hazardous waste characteristic, it is assumed that the waste(s) would be regulated as hazardous waste were it not for the exclusion provided by RCRA §3001(b)(3)(A)(ii), and the wastes are examined in the cost analysis accordingly.

## 3.3    Decision Rationale

EPA has developed two alternative approaches to analyze the information presented in this report regarding each of the 20 special wastes from mineral processing. Both approaches share a three-step process that the Agency used to evaluate the RCRA §8002(p) study factors by first assessing the need for additional regulatory controls (or absence thereof), then evaluating the options for appropriate requirements that could be applied to each individual waste stream for which additional controls might be in order, and, finally, estimate the associated costs and impacts. The second approach is distinguished from the first by the addition of a fourth step in which the Agency considered additional factors based on broader Agency goals and objectives. By applying this decision-making framework, consistent decisions regarding the need for additional regulatory controls for each of the 20 special study wastes were achieved.

In applying the decision criteria, EPA believes that the factors that are most important in establishing the regulatory status of the special wastes should be given major emphasis. Therefore, potential risks posed and documented damages caused by the wastes, the need for additional regulations, the costs and impacts that would be associated with more stringent regulatory controls, and overall Agency objectives are the focus of the four steps in the

analysis process. The reason for this is that in the absence of potential risk and/or documented damages, there is no need for hazardous waste regulation under RCRA Subtitle C (the key issue in question); if greater regulatory controls are needed because of significant potential or documented danger, the costs and impacts of regulatory controls are the critical factors in determining whether a given alternative would lead to the desired outcome (adequate protection of human health and the environment and continued operation of the affected industries).

It should be noted that EPA has done its best to develop and analyze alternatives to current disposal methods. However, these scenarios represent an assessment of how regulatory requirements might be tailored to reflect the unusual characteristics of mineral processing wastes, that is, the assumptions made here in developing these scenarios may not resemble any actual Subtitle C-Minus or Subtitle D-Plus requirements that may be developed by the Agency in the future. As a result, EPA solicits comments on the regulatory scenarios that the Agency has used and the appropriateness of the underlying assumptions for the possible future development of regulatory programs under Subtitle D or under Subtitle C using the flexibility provided by RCRA §3004(x).

In considering whether Subtitle C regulation may be warranted or not, EPA is considering how or whether to implement the flexibility provided by RCRA §3004(x) to the extent that it can do so and continue to ensure human health and environmental protection. Specifically, EPA would consider this flexibility in establishing treatment standards for land disposal of these newly identified wastes under 40 CFR Part 268 in separate rulemaking under §3004(g)(4) and would develop corrective action requirements on a site-specific basis as part of the permitting process. With respect to the flexibility for minimum technology requirements (§3004(o) and §3005(j)), EPA solicits comments on how best to implement the flexibility provided by §3004(x), such as establishing requirements on a site-specific basis as part of the permitting process or development of revised standards under Subtitle C regulations.

The step-wise process that the Agency applied to the available information is outlined below.

## Step 1.    Does management of this waste pose human health/environmental problems?  Might current practices cause problems in the future?

Critical to the Agency's decision-making process is whether each special waste either has caused or may cause human health or environmental damage. To resolve this issue, EPA has posed the following key questions:

1.    Has the waste, as currently managed, caused documented human health impacts or environmental damage?

2.    Does EPA's analysis indicate that the waste may pose a significant risk to human health or the environment at any of the sites that generate it (or in off-site use), under either current management practices or plausible mismanagement scenarios?

3.    Does the waste exhibit any of the characteristics of hazardous waste?

If the answer to any of these three questions was yes, then EPA concluded that further evaluation was necessary. If the answer to all of these questions was no, then the Agency tentatively concluded that regulation of the waste under RCRA Subtitle C is unwarranted.

## Step 2.    Is more stringent regulation necessary and desirable?

If the waste has caused or may potentially cause human health or environmental impacts under conservative risk assumptions, then EPA concluded that an examination of alternative regulatory controls was appropriate. Given the context and purpose of the present study, the Agency focused on an evaluation of the likelihood that such impacts might continue or arise in the absence of Subtitle C regulation, by posing the following three questions:

1.    Are current practices adequate to limit contaminant release and associated risk?

2.    What is the likelihood of new facilities opening in the future and generating and managing the special waste in a different environmental setting than those examined for this report?

3.    Are current federal and state regulatory controls adequate to address the management of the waste?

If current practices or existing regulatory controls are adequate, and if the potential for actual future impacts is low (e.g., facilities in remote locations, low probability of new facilities being constructed, low likelihood of actual risk), then the Agency may tentatively conclude that regulation of the waste under Subtitle C is unwarranted. Otherwise, further examination of regulatory alternatives is necessary.

## Step 3.    What would be the operational and economic consequences of a decision to regulate a special waste under Subtitle C?

If, based upon the previous two steps, EPA believed that a waste might potentially be a candidate for regulation under Subtitle C, then the Agency estimated and evaluated the costs and impacts of two regulatory alternatives that are based upon Subtitle C, and one alternative that reflects one possible approach that might be taken under RCRA Subtitle D ("Subtitle D-Plus"). Two evaluations were performed. The first focused on the magnitude, distribution, and significance of the incremental costs of regulation under full Subtitle C as compared to the Subtitle D-Plus scenario for each potentially affected facility. The second focused on incremental costs and impacts associated with regulation under the Subtitle C-Minus scenario as compared to Subtitle D-Plus. The key questions in the Agency's decision-making process for both comparisons were as follows:

1.    Are predicted economic impacts associated with the full Subtitle C (or Subtitle C-Minus in the case of the second comparison) scenario significant for any of the affected facilities?

2.    Are these impacts substantially greater than those that would be experienced under the Subtitle D-Plus scenario?

3.    What is the likely extent to which compliance costs could be passed through to product markets or input costs could be reduced, i.e., to what extent could regulatory cost burdens be shared?

4.    In the event that costs are significant, could a large proportion of domestic capacity or product consumption be affected?

5.    What effects would hazardous waste regulation have upon the viability of the beneficial use or recycling of the special waste?

In EPA's judgment, an ability to pass through costs or an absence of significant impacts suggested that Subtitle C regulation (or Subtitle C-Minus in the case of the second comparison) might be appropriate for wastes that pose significant risk. In cases in which the Subtitle C (or Subtitle C-Minus) scenario would impose widespread and significant impacts on facilities, result in reductions in domestic capacity or supply, and/or deter the safe and beneficial use of the waste, EPA tentatively concluded that regulation under some form of Subtitle D program might be more appropriate.

## Step 4.  Additional Considerations

In this fourth step, which EPA only included in one of the two decision-making approaches, EPA considered factors in addition to the §8002(p) study factors that relate to the broader goals and objectives of the Agency, including developing and maintaining strong state programs to regulate mining and mineral processing wastes. EPA believes that it may be appropriate to facilitate both development and maintenance of strong state programs and implementation of federal regulations for mineral processing wastes by regulating all special wastes from mineral processing under the mining wastes program being developed under Subtitle D of RCRA. The relevance of these additional factors, and their impact on EPA's findings, is discussed below.

## 4.0    Findings

Section 3001(b)(3)(C) of RCRA requires that the Agency determine, based on the findings of this report, and public hearings and comment, either to promulgate regulations under Subtitle C of RCRA for the wastes covered by this study or determine that such regulations are unwarranted. Accordingly, to facilitate comment on this report and the subsequent preparation by the Agency of the required "regulatory determination," this section presents EPA's findings regarding the 20 special wastes from mineral processing based on two separate approaches. These two approaches include:

•    Application of the RCRA §8002(p) Study Factors, which discusses the regulatory approach (i.e., Subtitle D or Subtitle C) that the Agency tentatively concludes is appropriate for each of the 20 mineral processing wastes if the study factors listed in the statute alone are considered; and

•    Application of the RCRA §8002(p) Study Factors and Additional Considerations, which discusses (1) additional factors that the Agency believes may be appropriate to consider in making a "regulatory determination" and (2) the tentative conclusions that may be drawn that include consideration of these additional factors.

EPA solicits comments on both of these approaches and the tentative conclusions presented below. With respect to the decision-making approaches, EPA solicits comments on: (1) what factors the Agency should consider in making the required regulatory determination; (2) what information should be used to evaluate these factors; and (3) the relative weight that the factors should be given in developing a regulatory determination.

### 4.1    Application of the RCRA §8002(p) Study Factors: Approach 1

As discussed above, RCRA §8002(p) specifies eight factors that the Agency shall include in the analysis performed for this report and suggests that EPA also examine federal and state agency programs to avoid duplication of effort. This section presents a summary of the Agency's analysis of these factors and the possible conclusions,

pending receipt and analysis of public comments, that EPA might make regarding the appropriate regulatory status of the 20 mineral processing special wastes covered by this report. The 20 mineral processing special wastes are discussed in two groups: (1) wastes that the Agency might recommend regulating under Subtitle D of RCRA; and (2) wastes that the Agency might tentatively consider for regulation under Subtitles C or D.

## Wastes EPA Might Tentatively Recommend to Remain Under RCRA Subtitle D

The available data, the analysis presented in this report, and consideration of the RCRA §8002(p) study factors suggest that regulation under Subtitle C of RCRA is unwarranted for the following 16 mineral processing wastes:

- Red and brown muds from bauxite refining;
- Treated residue from roasting/leaching of chrome ore;
- Gasifier ash from coal gasification;
- Process wastewater from coal gasification;
- Slag from primary copper processing;
- Slag tailings from primary copper processing;
- Slag from elemental phosphorus production;
- Iron blast furnace slag;
- Basic oxygen furnace and open hearth furnace slag from carbon steel production;
- Air pollution control dust/sludge from iron blast furnaces;
- Air pollution control dust/sludge from basic oxygen furnaces and open hearth furnaces from carbon steel production;
- Fluorogypsum from hydrofluoric acid production;
- Process wastewater from primary magnesium processing by the anhydrous process;
- Process wastewater from phosphoric acid production;
- Phosphogypsum from phosphoric acid production; and
- Slag from primary zinc processing.

In using the study factors listed in RCRA §8002(p), EPA used the approach described above in Section 3 to examine: (1) the potential for and documented danger to human health and the environment; (2) the need for additional regulations; and (3) the costs and impacts of Subtitle C regulation.

EPA did not find significant actual or potential danger associated with the following three wastes, based on waste characteristics, management practices, and damage case investigations:

- Treated residue from roasting/leaching of chrome ore;
- Process wastewater from coal gasification; and
- Slag tailings from primary copper processing.

None of these wastes exhibit a characteristic of hazardous waste and no documented damages were identified as associated with their management.

The other thirteen wastes listed above were identified as having some actual or potential hazard associated with current management practices or plausible mismanagement scenarios, and so were subsequently evaluated in the second stage of the process.

In the second stage of the evaluation, EPA identified four wastes that did not exhibit a hazardous characteristic (with the exception of one sample of copper slag at one facility) but for which documented cases of adverse environmental impacts that affected surface water were identified in at least one facility:

- Iron blast furnace slag;
- Slag from primary copper processing;
- Basic oxygen furnace and open hearth furnace slag from carbon steel production; and
- Fluorogypsum from hydrofluoric acid production.

In all four cases, however, these surface water releases (one of which occurred via ground water) have been and/or are being addressed under existing regulatory authorities at the state and/or federal level. In addition, the potential for risks associated with management of these wastes at potential new facilities is not likely to be greater than at the existing facilities. In the case of fluorogypsum, however, the available data indicate that the radionuclide content of the waste

is such that under some circumstances (e.g., use of the wastes in construction) the waste may pose some radiation risk. As a result, EPA plans to investigate further the potential for exposure and associated radiation risk for fluorogypsum and, if appropriate, take steps to limit such risks under authorities provided by RCRA and other statutes.

EPA found that two wastes exhibited one or more of the hazardous characteristics, slag from primary zinc processing and process wastewater from primary magnesium processing by the anhydrous process. However, each is generated by a single facility, neither of which have documented damages after about 50 and 20 years of operation, respectively. In both cases, market conditions and production processes are such that construction of additional facilities in the foreseeable future is unlikely. In addition, state regulations are in effect for the one primary magnesium facility and being revised/strengthened for the primary zinc processing facility. EPA plans to investigate further off-site uses of zinc slag for uses that constitute disposal.

In addition, EPA found that the available data indicate that air pollution control (APC) dust/sludge from iron blast furnaces and from basic oxygen and open hearth furnaces used to make carbon steel exhibit the characteristic of EP toxicity at some facilities. For both types of dust and sludge, relatively few of the samples and facilities tested yielded EP-toxic results (for at most two constituents) and the magnitude of the exceedances was generally low. No damage cases were identified for either type of dust/sludge, either for on-site or off-site management. In addition, several facilities recycle rather than dispose the dust, the facilities are generally not in high risk settings, and construction of new facilities is not likely.

EPA also found that the potential for hazard associated with two other wastes, red and brown muds from bauxite refining and gasifier ash from coal gasification, was comparatively low, except for the radionuclide content of the wastes; in addition, no documented damages attributable to these two wastes were identified.[6] For both of these wastes, however, available data indicate that under some circumstances (e.g., use of the wastes in home building materials) the wastes may pose some radiation risk. As a result, EPA plans to investigate further the potential for exposure and associated radiation risk associated with use of these two mineral processing special wastes and, if appropriate, take steps to limit such risks under authorities provided by statutes other than RCRA.

The radionuclide content, and the associated potential for radiation risk, is also of concern in three other wastes: slag from elemental phosphorus production, and phosphogypsum and process wastewater from phosphoric acid production. With respect to slag from elemental phosphorus production, EPA found that average life-time cancer risks range from $4 \times 10^{-4}$ to $1 \times 10^{-3}$ in Soda Springs and Pocatello, Idaho as a result of the use of the slag in a wide range of construction applications. In other respects, the potential and documented danger associated with non-radioactive contaminants contained in elemental phosphorus slag appears to be relatively low because: (1) the slag does not exhibit any of the characteristics of hazardous waste; and (2) there are no documented damage cases.[7] In addition, construction of additional facilities in the foreseeable future appears unlikely. EPA plans to use the authority of RCRA §3001(b)(3)(B)(iii) to ban the use of this material in construction and/or land reclamation when the Agency issues its regulatory determination for mineral processing wastes. EPA is soliciting comments on the appropriate regulatory language that should be used and how such a ban should be implemented.

In the case of phosphogypsum, radionuclide hazards associated with air releases from gypsum stacks and off-site uses of phosphogypsum are being addressed by the Agency under 40 CFR, Part 61, Subpart R, National Emission Standards for Hazardous Air Pollutants (NESHAP), Radon Emissions from Phosphogypsum Stacks (54 FR 51654, December 15, 1989; 55 FR 13480, April 10, 1990; 55 FR 13482, April 10, 1990).

Phosphogypsum and phosphoric acid process wastewater are also of concern because damage case information indicates that both closed and currently active phosphogypsum stacks (in which both the phosphogypsum and the wastewater are managed) and wastewater cooling ponds have caused and/or are causing ground-water contamination at many facilities. In addition, available data indicate that phosphogypsum tested EP toxic at one of ten facilities, and process wastewater exhibits the characteristic of corrosivity at most facilities and the EP-toxicity characteristic at some facilities. Current regulations are apparently not adequate to prevent contamination (although this situation may change as state regulatory programs improve), so the potential costs of regulation under Subtitle C were examined in the third stage of the evaluation. EPA estimated that the incremental annualized cost of either full Subtitle C regulation or the Subtitle C-Minus scenario for phosphogypsum and process wastewater, as compared to the Subtitle D-Plus scenario developed for cost estimating purposes, could exceed $500 million and $50 million respectively, and could significantly affect several facilities. At facilities that EPA estimates could be significantly affected by costs associated with the Subtitle C or Subtitle C-Minus scenarios, the estimated costs of the Subtitle D-Plus scenario, expressed as a percent of the value of shipments, are substantially less at seven facilities. The estimated impacts associated with Subtitle C or C-Minus regulation at these facilities would be expected to be significant, and it is unlikely that these facilities could pass along their higher costs. EPA considered the combined costs of Subtitle C requirements

---

[6] Ground-water contamination at the Dakota Gasification facility in North Dakota was identified, but the source of the contamination appears to be wastes other than the gasifier ash.

[7] Ground-water contamination has been identified at one site, but it appears that wastewater was the source rather than slag.

for phosphogypsum and process wastewater because: (1) these two wastes are typically co-managed; and (2) the compliance costs associated with both wastes would apply to each facility. EPA is aware, however, that only a portion of the total process wastewater flow is typically co-managed with the phosphogypsum. The Agency may investigate the feasibility of separate management of these wastes, as well as separating various wastewater streams in the context of this decisionmaking and the development of the mining waste program under Subtitle D.

In any case, however, EPA is concerned that under some circumstances process wastewater from phosphoric acid may pose some radiation risk that would not be addressed by the NESHAP regulation noted above. As a result, EPA plans to investigate further the potential for exposure and associated radiation risk associated with this waste and, if appropriate, take steps to limit such risks under authorities provided by RCRA and other statutes.

## Wastes EPA Might Tentatively Consider for Regulation Under RCRA Subtitles C or D

For the remaining four wastes (calcium sulfate wastewater treatment plant sludge from primary copper processing, slag from primary lead processing, process wastewater from hydrofluoric acid production, and chloride process waste solids from titanium tetrachloride production), EPA proceeded to evaluate the estimated incremental compliance costs and associated impacts in Step 3 of the analysis in two ways. First, EPA examined the estimated costs of regulation under Subtitle D (using the "D-Plus" scenario) relative to the estimated costs of full Subtitle C regulation (Approach 1A). Second, EPA examined the estimated cost of Subtitle D-Plus regulation relative to the cost of regulation under a Subtitle C scenario that utilizes flexibility provided by RCRA §3004(x) (Approach 1B). These two analyses are discussed below along with the results of analysis Steps 1 and 2 for each of the wastes. As already indicated, the Subtitle C-Minus and Subtitle D-Plus scenarios are based on the Agency's preliminary assessment of how regulatory requirements might be tailored for mineral processing wastes. Because of this, the Agency is unsure whether the cost/impacts in these comparisons are fully appropriate and specifically requests comments on them. The fact that a hypothetical Subtitle D-Plus scenario was used for comparison does not mean that any or all of these wastes will necessarily be proposed for further regulation.

### Comparison of Subtitle D-Plus and Full Subtitle C (Approach 1A)

In applying Steps 1 and 2 of the analysis process, EPA found that each of these four special wastes have posed or may pose a danger to health or the environment. Available data indicate that all four of the wastes exhibit one or more of the characteristics of hazardous wastes. All of the wastes except process wastewater from hydrofluoric acid production exhibit the characteristic of EP toxicity at at least one facility. Process wastewater from hydrofluoric acid production is corrosive at all facilities where it is generated. Documented damages associated with current lead slag management practices were identified and the potential for damages exists for the other wastes as well. Ground-water contamination that may in part be attributable to calcium sulfate sludge from primary copper processing and chloride process waste solids from titanium tetrachloride production was identified at least one facility that generates one of these wastes.[8]

In addition, the Agency is not confident that current practices and regulations are adequate to prevent further danger to health or the environment from these four wastes. Specific reasons are as follows:

- Current management practices for hydrofluoric acid process wastewater have not prevented release at one of the currently active facilities. There is a potential for development of additional domestic hydrofluoric acid production capacity, and the corresponding construction of new facilities. New facilities may be located in sensitive environmental settings given that the principal feedstock (acid-grade fluorspar) is generally imported and facility locations with ready access to water transportation are most likely.

- In the case of calcium sulfate wastewater treatment plant sludge from primary copper processing, applicable solid waste regulations are limited in states where it is currently generated and generation of this waste at additional facilities appears likely.[9] At least some of these additional facilities are in environmental settings that may have a greater potential for risk than the facilities where the waste is currently generated. Ground-water contamination at one facility may be due at least in part to disposal of the sludge.

---

[8] Attribution of the observed ground-water contamination at these sites was not possible due to co-management of the special wastes with other wastes, the close proximity of other waste management units, and/or a long history of production and waste management activities at the site.

[9] Additional facilities where the calcium sulfate wastewater treatment sludge may be generated include both existing copper smelting/refining facilities that do not currently generate the waste and potential new smelting/refining facilities, including a facility on the Gulf Coast of Texas.

- Current management practices contributing to documented damages associated with lead slag are not adequately addressed by current regulations.

- Chloride process waste solids from titanium tetrachloride production are generated by facilities in eight states, some of which have relatively few solid waste regulations that are applicable to the management of this waste. Construction of several new facilities is expected and these facilities may be located in sensitive environmental settings given that the principal feedstock is generally imported and facility locations with ready access to water transportation are most likely. In addition, EPA is concerned that under some circumstances, chloride process waste solids from titanium tetrachloride production may pose some radiation risk. As a result, EPA plans to investigate further the potential for exposure and associated radiation risk associated with this waste and, if appropriate, take steps to limit such risks under authorities provided by RCRA and other statutes.

To conduct Step 3 of the analysis process under Approach 1A, EPA estimated the cost of regulating each of these wastes under full Subtitle C requirements. The Agency then compared the costs for full Subtitle C regulation to the estimated costs that might result from regulation under Subtitle D requirements similar to those being developed for mining wastes ("Subtitle D-Plus"). For three of the four wastes (calcium sulfate wastewater treatment plant sludge from primary copper processing, slag from primary lead processing, and chloride process waste solids from titanium tetrachloride production), the estimated costs for full Subtitle C regulation would be significantly larger and the associated impacts would be more significant at nearly all facilities than the estimated costs of regulation under the Subtitle D-Plus scenario. Using this approach, EPA would tentatively conclude that regulation of these three wastes under Subtitle C is not warranted.

For process wastewater from hydrofluoric acid production, EPA found that the estimated compliance costs for regulation under full Subtitle C and regulation under the Subtitle D-Plus scenario were comparable and that the likely economic impacts were not expected to be significant. Using this approach to the cost analysis, EPA would tentatively conclude that process wastewater from hydrofluoric acid production may warrant regulation under Subtitle C.

### Comparison of Subtitle D-Plus and Subtitle C-Minus (Approach 1B)

Under Approach 1B to conducting Step 3, EPA estimated the cost of managing these four wastes under a Subtitle C scenario that utilizes flexibility provided by RCRA §3004(x) (Subtitle C-Minus). The Agency then compared the costs for Subtitle C-Minus regulation (rather than full Subtitle C regulation, as in Approach 1A) to the estimated costs that might result from regulation under Subtitle D requirements similar to those being developed for mining wastes (Subtitle D-Plus). EPA found that the estimated costs for the Subtitle C-Minus and Subtitle D-Plus scenarios are similar for nearly all facilities.

## 4.2    Application of the RCRA §8002(p) Study Factors and Additional Considerations: Approach 2

Section 8002(p) of RCRA and the decision in *Environmental Defense Fund v. EPA*, 852 F.2d 1309 (D.C. Cir. 1988) make it clear that the Agency may and should consider the specific factors of §8002(p)(1)-(8) in making its decision regarding the appropriate regulatory status of special wastes from mineral processing. In addition, the Agency believes that it may be appropriate to consider other factors relating to the broader goals and objectives of the Agency, such as developing and maintaining strong state mining and mineral processing waste regulatory programs and facilitating implementation of federal programs (see Step 4 of the discussion of the decision rationale in Section 3.3 above).

The analysis of the §8002(p) study factors presented above indicates that management of one, and perhaps as many as four, mineral processing special wastes may be appropriate for regulation under Subtitle C if only the study factors are considered, primarily because: (1) they have or could pose a significant risk to human health and the environment under current management practices or plausible mismanagement scenarios; and (2) the costs and impacts of regulation under full Subtitle C (for one waste) or Subtitle C-Minus (for three additional wastes) are estimated to be comparable to the costs associated with regulation under a Subtitle D-Plus program. In the case of process wastewater from hydrofluoric acid production, the estimated costs for the various scenarios are similar in large part because EPA has projected that requirements that would be protective of human health and the environment under Subtitle C-Minus, and under full Subtitle C as well, might be similar to those that may be required under a Subtitle D-Plus program. Because of the potential similarity between Subtitle C-Minus and Subtitle D-Plus requirements, as well as broader Agency objectives, EPA believes that it may be appropriate to include consideration of the additional factors of state program development for mining and mineral processing waste streams, including federal program oversight, in order better to distinguish between these two regulatory scenarios.

Many states have recently or are currently expanding the scope and requirements of their regulatory programs as they apply to mineral processing wastes. For example, Florida has recently developed a policy that requires additional controls, such as liners, for new or expanded phosphogypsum stacks and is developing proposed regulations to update this policy and expand its scope to include phosphoric acid process wastewater. Missouri passed the Metallic Minerals Waste Management Act in 1989, and implementing regulations are being developed, which require permits, closure plans,

maintenance plans, and provisions for financial assurance.  Pennsylvania has proposed Residual Waste Regulations that, if promulgated, would require permits with provisions for liners, leachate collection systems, monitoring wells, and disposal of leachate for special wastes from iron and steel production and zinc slag (as well as other wastes).  Similarly, Delaware, Ohio, and Tennessee have all recently developed revised solid waste regulations that will increase the stringency of requirements for management of special wastes.  Some other states, such as Indiana and Kentucky, already have programs that specify management standards for mineral processing wastes.

In addition, some of these and many other states are currently working with EPA in the development of a regulatory program for mining wastes.  This program is designed to be site-specific, risk based, and comprehensive.  It also is being targeted to address the characteristics of mining wastes and site conditions at mining sites.

EPA believes that it may be appropriate to facilitate both development and maintenance of strong state programs and implementation of any federal regulations that may be necessary for mineral processing wastes by regulating all special wastes from mineral processing under Subtitle D of RCRA.  Some mining and mineral processing wastes may be excluded from any further federal regulation under RCRA.

In light of these considerations, the results of Approach 2 indicate that it may be appropriate for the waste streams identified above for potential Subtitle C (full C or C-Minus) regulation not to be subject to hazardous waste management standards, but instead to be retained within the Mining Waste Exclusion for mineral processing wastes.  If such a finding is appropriate, EPA believes that it would need to be conditioned on the premise that major steps be taken to take near term actions to control releases from the facilities producing these waste streams.  Some corrective measures are already being taken under a variety of Agency authorities (i.e., RCRA, Superfund, CWA) and more can and will be undertaken.  EPA believes that the states must act to address the most immediate problems posed by these wastes, as well as any of the other mineral processing special wastes that have been found in this report to pose significant actual or potential hazard to human health or the environment.  To assist in this effort, EPA would provide technical and other resource support to the involved states to improve their programs.  If near term actions did not result in adequate control of such wastes, EPA would then take action to reconsider its regulatory determination and could designate certain waste streams as Subtitle C hazardous wastes.