IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WEST VIRGINIA HIGHLANDS
CONSERVANCY; OHIO VALLEY
ENVIRONMENTAL COALTION, and
COAL RIVER MOUNTAIN WATCH,

        Plaintiffs,

    v.                                **CIVIL ACTION NO. 07-0667(JDB)**
                                         **ORAL ARGUMENT REQUESTED**

STEPHEN L. JOHNSON, Administrator,
U.S. Environmental Protection Agency; and
DIRK KEMPTHORNE, Secretary, United
States Department of Interior,

        Defendants.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO FEDERAL DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

DEREK O. TEANEY (WVSB # 10223)
Appalachian Center for the Economy and
     the Environment
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 793-9007
Fax:  (304) 645-9008
E-mail: dteaney@appalachian-center.org

JONATHAN TURLEY (DC Bar #417674)
Attorney and Director, Shapiro
     Environmental Clinic
George Washington University Law School
2000 H ST., N.W.
WASHINGTON, D.C. 20052
(o) 202-994-7001
(f) 202-994-9811
Email: jturley@law.gwu.edu

Counsel for Plaintiffs

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ....................................................................................................... iii

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 1

    A.    Coal Mining Wastes and Disposal in West Virginia ............................................. 1

    B.    Regulation of Coal Mining Waste Has Slipped Through the Cracks ..................... 2

STANDARD OF REVIEW ......................................................................................................... 8

    A.    Defendants' Statute of Limitations Arguments Must be Treated as a Motion to Dismiss for Failure to State a Claim ....................................................................... 8

    B.    Defendants' Arguments Regarding the Legal Import of the Incomplete Studies Must be Treated as Motion for Summary Judgment ............................................... 9

    C.    Defendants' Standing Arguments are Properly Presented in a Motion to Dismiss for Lack of Subject Matter Jurisdiction ................................................................ 11

ARGUMENT .............................................................................................................................. 12

    A.    Plaintiffs' Claims are Not Time-Barred .............................................................. 12

        1.    In the D.C. Circuit, Agency Nonfeasance is a Continuing Violation ....... 12

        2.    The D.C. Circuit's Continuing Violation Doctrine is The Nearly Unanimous Position of the Federal Courts ............................................... 15

        3.    This Case is Indistinguishable from the Above Described Cases ............. 19

        4.    The Sole Contrary Decision is Neither Binding nor Persuasive ............... 19

        5.    This Court Should Decline Defendants' Invitation to Ignore D.C. Circuit Case Law .................................................................................................. 20

        6.    28 U.S.C. § 2401(a) is Non-Jurisdictional and can be Tolled ................. 23

    B.    Plaintiffs' Claims are Not Challenges to Defendants Earlier Actions, and Those Actions Were Not Reasonable .............................................................................. 29

        1.    Plaintiffs Challenge What Defendants Have Yet to Do, Not What They Have Already Done ................................................................................... 29

     2.     RCRA Requires Defendants to Study Coal Mining Wastes.....................32

C.     Plaintiffs Have Standing to Challenge Defendants' Nonfeasance.......................35

     1.     Plaintiffs' Have Standing to Sue on Their Own Behalf...........................36

     2.     Plaintiffs Have Standing as Representatives of Their Members ..............40

CONCLUSION......................................................................................................45

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGES**

Action Alliance of Senior Citizens v. Heckler,
    789 F.2d 931 (D.C. Cir. 1986) ................................................................... 38

American Canoe Ass'n v. U.S. E.P.A.,
    30 F. Supp. 2d 908 (E.D. Va. 1998) ........................................................ 17, 18

Arbaugh v. Y&H Corp.,
    546 U.S. 500 (2006)................................................................................... 28

Bell Atlantic Corp. v. Twombly,
    ___ U.S. ___, 127 S. Ct. 1955 (2007).............................................................. 9

Bennett v. Spear,
    520 U.S. 154 (1997)................................................................................... 35

Bolduc v. U.S.,
    72 Fed. Cl. 187 (2006) ............................................................................... 27

Brock v. Pierce County,
    476 U.S. 253 (1986)................................................................................... 19

Caldwell v. Bechtel, Inc.,
    631 F.2d 1000 (D.C. Cir. 1980) ................................................................... 29

Cerro Metal Products v. Marshall,
    620 F.2d 964 (3d Cir. 1980)......................................................................... 22

Chevron U.S.A., Inc. v. Natural Resources Defense Council,
    467 U.S. 837 (1984).......................................................................... 32, 33, 34

Chung v. U.S. Dep't of Justice,
    333 F.3d 273 (2003)........................................................................... passim

Citizens for Biological Diversity v. Hamilton,
    453 F.3d 1331 (11th Cir. 2006) ................................................................... 20

Competitive Enterprise Institute v. National Highway Traffic Safety Admin.,
    901 F.2d 107 (D.C. Cir. 1990) ..................................................................... 38

Concerned Citizens of Adamstown v. EPA,
    No. 84-3041 (D.D.C. 1984) ........................................................................... 6

Denney v. Deutsche Bank AG,
    443 F.3d 253 (2d Cir. 2006)..................................................................... 41

Eddy v. Colonial Life Ins. Co. of Amer.,
    919 F.2d 747 (D.C. Cir. 1990) ................................................................. 29

Erby v. United States,
    424 F. Supp. 2d 180 (D.D.C. 2006) ......................................................... 11

Erickson v. Pardus,
    ___ U.S. ___, 122 S. Ct. 2197 (2007)................................................... 9, 10

Ethyl Corp. v. E.P.A.,
    306 F.3d 1144 (D.C. Cir. 2002) ............................................................... 37

Fed. Election Comm'n v. Akins,
    524 U.S. 11 (1998)................................................................................... 37

Felter v. Kempthorne,
    412 F. Supp. 2d 118 (2006) .......................................................... 27, 28, 29

Felter v. Kempthorne,
    473 F.3d 1255 (D.C. Cir. 2007) .................................................... 12, 27, 29

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,
    528 U.S. 167 (2000)................................................................................. 41

Fund for Animals v. Norton,
    295 F. Supp. 2d. 1 (D.D.C. 2006) ............................................................ 37

Gabbs v. Udall,
    315 F.2d 37 (D.C. Cir. 1963) ................................................................... 22

Haase v. Session,
    835 F.2d 902 (D.C. Cir. 1987) ................................................................. 11

Harris v. F.A.A.,
    353 F.3d 1006 (D.C. Cir. 2004) ................................................................. 9

Havens Realty Corp. v. Coleman,
    455 U.S. 363 (1982)................................................................................. 38

*   In re Bluewater Network,
    234 F.3d 1305 (D.C. Cir. 2000) ........................................................ passim

In re Permanent Surface Mining Regulation Litigation,
    620 F. Supp. 1519 (D.D.C. 1985) ...................................................................... 7

\* In re United Mine Workers of America International Union,
    190 F.3d 545 (D.C. Cir. 1999) ............................................................... passim

Irwin v. Department of Veterans Affairs,
    498 U.S. 89 (1990)........................................................................ 24, 25, 27, 28

Jerome Stevens Pharm., Inc. v. FDA,
    402 F.3d 1249 (D.C. Cir. 2005) ................................................................ 11, 36

Natural Resources Defense Council v. EPA,
    ___ F.3d ___ 2007 WL 1748069 (D.C. Cir. 2007)........................................... 36

Natural Resources Defense Council, Inc. v. Fox,
    909 F. Supp. 153 (S.D.N.Y. 1995)............................................................. 18, 19

\* P & V Enterprises v. U.S. Army Corps of Eng'rs,
    466 F. Supp. 2d 134 (D.D.C. 2006) .................................................. 8, 9, 11, 28

S. Appalachian Biodiversity Project v. U.S. Fish & Wildlife Servs.,
    181 F. Supp. 2d 883 (E.D. Tenn. 2001) ...................................................... 17, 19

Scarborough v. Principi,
    541 U.S. 401, 422 (2004)........................................................................ 26, 27, 29

Shoeffler v. Kempthorne,
    ___ F. Supp. 2d ___, 2007 WL 1850711 (W.D. La. June 26, 2007).............. 15, 16, 17, 19

Sierra Club v. Mainella,
    459 F. Supp. 2d 76 (D.D.C. 2006) .................................................................. 45

Soriano v. United States,
    352 U.S. 270 (1957)......................................................................................... 24

Spannaus v. U.S. Dep't of Justice,
    643 F. Supp. 698 (1986) .................................................................................. 28

Spannaus v. U.S. Dep't of Justice,
    824 F.2d 52 (D.C. Cir.1987) ...................................................................... 27, 28

Stolarz v. Rosen,
    No. 03-cv-3083, 2005 WL 2124545 (S.D.N.Y. Aug. 26, 2005)........................ 29

TermoRio S.A. E.S.P. v. Electranta S.P.,
    487 F.3d 928, 941 (D.C. Cir. 2007) ................................................................. 11

\*   The Wilderness Society v. Norton,
    434 F.3d 584 (D.C. Cir. 2006) .................................................................... passim

The Wilderness Society v. Norton,
    No. 03-cv-64 (RMC), 2005 WL 3294006 (D.D.C. 2005) ................... 13, 14, 21

U.S. v. Beggerly,
    524 U.S. 38 (1998) .......................................................................................... 26

U.S. v. Bell,
    524 F.2d 202 (2d Cir. 1975) ............................................................................ 22

U.S. v. Microsoft Corp.,
    87 F. Supp. 2d 30, 47 (D.D.C. 2000) .............................................................. 22

United States v. Mead Corp.,
    533 U.S. 218 (2001) ................................................................................... 32, 33

Yates v. District of Columbia,
    324 F.3d 724 (D.C. Cir. 2003) ........................................................................ 10

**STATUTES**

16 U.S.C. § 1533(a)(3) ................................................................................................. 16

16 U.S.C. § 1533(b)(6)(c) ............................................................................................ 16

28 U.S.C. § 2401(a) ............................................................................................. passim

30 U.S.C. § 1 ................................................................................................................ 34

30 U.S.C. § 4a ............................................................................................................. 34

30 U.S.C. § 4e ............................................................................................................. 34

42 U.S.C. § 6901 et seq. ................................................................................................ 2

42 U.S.C. § 6903(27) .................................................................................................... 2

42 U.S.C. § 6921(b)(3) .................................................................................................. 4

42 U.S.C. § 6921(b)(3)(C) ............................................................................................ 5

42 U.S.C. § 6925(f) ....................................................................................................... 5

42 U.S.C. § 6972(a) ...................................................................................................... 35

42 U.S.C. § 6982(f) ....................................................................................................... 34

42 U.S.C. § 6982(p) .................................................................................................. 4, 37

42 U.S.C. §§ 6905(c) ...................................................................................................... 5

42 U.S.C. §§ 6921-6939e ............................................................................................... 2

5 U.S.C. § 706(1) ..................................................................................................... 14, 27

## RULES

Fed. R. Civ. P. 12(b) ...................................................................................................... 9

Fed. R. Civ. P. 12(b)(1) .............................................................................................. 9, 11

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 9, 10

Fed. R. Civ. P. 56 ......................................................................................................... 11

## REGULATIONS

30 C.F.R. § 816.89(d) ................................................................................................. 6, 7

30 C.F.R. § 817.89(d) ................................................................................................. 6, 7

40 C.F.R. § 261.4(b) ..................................................................................................... 34

40 C.F.R. § 261.4(b)(7) .................................................................................................. 5

## CONSTITUTIONAL PROVISIONS

Article III of the United States Constitution ......................................................... passim

## LEGISLATIVE HISTORY

H.R. Rep. No. 1491(II), 94th Cong., 2d Sess. 15 ......................................................... 34

H.R. Rep. No. 1491, 94th Cong., 2d Sess. 15 ................................................................ 3

## SESSION LAWS

Pub. L. No. 94-580, 90 Stat. 2795 .................................................................................. 4

**FEDERAL REGISTER**

43 Fed. Reg. 58,946 (1978) ........................................................................................ 4

45 Fed. Reg. 33,154 (1980) ........................................................................................ 4

45 Fed. Reg. 76,618 (1980) .................................................................................. 5, 34

48 Fed. Reg. 44,006 (1983) ........................................................................................ 6

51 Fed. Reg. 24,496 (1986) ........................................................................................ 7

51 Fed. Reg. 41,952 (1986) ........................................................................................ 7

54 Fed. Reg. 15,316 ............................................................................................. 4, 35

**LAW REVIEW ARTICLES**

Comment, <u>Dictum Revisited</u>, 4 Stan. L. Rev. 509 (1952) ...................................... 22

**INTRODUCTION**

Plaintiffs West Virginia Highlands Conservancy ("WVHC"), Ohio Valley Environmental Coalition ("OVEC"), and Coal River Mountain Watch ("CRMW") submit this memorandum in opposition to Defendants' motion to dismiss and request oral argument on the merits of the motion. Defendants' motion should be denied because (1) Plaintiffs' complaint is timely, (2) Defendants' failures to perform their statutory duties are unreasonable, and (3) Plaintiffs have standing to bring this action.

As explained below, the Court should treat Defendants' motion to dismiss as one for failure to state a claim with respect to whether Plaintiffs' complaint is timely. The Court should review Defendants' argument that this litigation is an untimely challenge to their "permissible" statutory interpretation as it would a motion for summary judgment. Notwithstanding Defendants' characterizations of its motion, the only "jurisdictional" question is whether Plaintiffs have standing under Article III of the United States Constitution.

**BACKGROUND**

A.    **Coal Mining Wastes and Disposal in West Virginia**

In West Virginia today, there are at least 111 impoundments holding back billions of gallons of coal mining and cleaning waste. See generally http://www.coalimpoundment.org (last visited July 31, 2007). Many of those impoundments contain coal slurry, or fine refuse, that is generated when the coal is washed before it is delivered to the consumer. See National Research Council, Coal Waste Impoundments: Risks, Responses, and Alternatives, Executive Summary at 2 (2002) (Executive Summary Attached as Exhibit A).[1] Coal waste impoundments are constructed in the rugged Appalachian Mountains of West Virginia by constructing

---

[1] The scope of the National Research Council study did not include the short or long-term environmental effects of storing coal wastes in unlined impoundments. Id. at 1-2.

1

embankments from coarse coal refuse across valleys, creating unlined basins behind the embankments to hold slurry and other liquid and semi-liquid coal wastes.[2] Id.

In 1972, the embankment on a coal waste impoundment on Buffalo Creek in West Virginia catastrophically failed, releasing 132 million gallons of coal mining waste. Id. The resulting flood was the most destructive in West Virginia history: 125 people lost their lives, 1,100 were injured, and 4,000 were rendered homeless. Id. In October 2000, a coal waste impoundment released 250 million gallons of coal slurry into the environment near Inez, Kentucky, when the bed of the impoundment collapsed into an abandoned mine below it. Id. at 1. Although no human lives were lost, there was widespread damage to the streams and rivers into which the coal waste spilled. Id. Less catastrophic "blackwater" spills from coal waste impoundments are frequent, with damaging effects on surface water quality. See Exhibit G, Affidavit of Walter Young at ¶¶ 3-6..

Coal mining wastes are also disposed of by underground injection into abandoned coal mines. Id. at 11. That waste disposal practice has had devastating health effects on the residents of communities such as Rawl, West Virginia, whose well water has been contaminated by coal wastes. See Exhibit B, Affidavit of Vivian Stockman at ¶ 15.

**B.    Regulation of Coal Mining Waste Has Slipped Through the Cracks**

Congress enacted the Resource Conservation and Recovery Act of 1976 ("RCRA") to regulate the disposal of solid waste. 42 U.S.C. § 6901 et seq. Subtitle C of RCRA governs the treatment, storage, and disposal of hazardous wastes. 42 U.S.C. §§ 6921-6939e. Recognizing the massive quantities of solid waste generated by mining, Congress explained that

[a] thorough study of mining waste is essential because mining wastes represent

---

[2] For purposes of the Resource Conservation and Recovery Act ("RCRA"), liquid and semi-liquid wastes such as those stored in coal refuse impoundments are "solid wastes" and are regulated by the Act. 42 U.S.C. § 6903(27).

1.8 billion tons of waste a year. (The second largest waste generator by volume is agriculture at 687 million tons, [followed by] industrial at 200 million tons, followed by municipal waste at 135 million tons.) The traditional theory regarding mining waste has been that it is generally inert. However, a few recent studies indicate that some mining wastes can be harmful; some particularly so when mixed with water. Other mine tailings, particularly those containing heavy metals may be inert but nonetheless toxic even in their elemental form. Committee information on the potential danger posed by mining waste is not sufficient to form the basis for legislative action at this time. For this reason, the Committee has mandated a study of mining wastes.

H.R. Rep. No. 1491, 94th Cong., 2d Sess. reprinted in 1976 U.S. Code Cong. & Admin. News

6238, 6253. The required study was codified in Section 8002(f) of RCRA. That section, as

enacted in 1976, required the EPA Administrator,

in consultation with the Secretary of the Interior, [to] conduct a detailed and comprehensive study on the adverse effects of solid wastes from active and abandoned surface and underground mines on the environment, including, but not limited to, the effects of such wastes on humans, water, air, health, welfare, and natural resources, and on the adequacy of means and measures currently employed by the mining industry, Government agencies, and others to dispose of and utilize such solid wastes and to prevent or substantially mitigate such adverse effects. Such study shall include an analysis of—

(1) the sources and volume of discarded material generated per year from mining;

(2) present disposal practices;

(3) potential dangers to human health and the environment from surface runoff of leachate and air pollution by dust;

(4) alternatives to current disposal methods;

(5) the cost of those alternatives in terms of the impact on mine product costs; and

(6) potential for use of discarded material as a secondary source of the mine product.

In furtherance of this study, the Administrator shall, as he deems appropriate, review studies and other actions of other Federal agencies concerning such wastes with a view toward avoiding duplication of effort and the need to expedite such study. The Administrator shall publish a report of such study and shall include appropriate findings and recommendations for Federal and non-Federal actions

concerning such effects.

RCRA, § 8002(f), Pub. L. No. 94-580, 90 Stat. 2795.

Despite the requirements of Section 8002(f), EPA's initial work on mining wastes did not appear in a study, but rather in an exception to the regulations generally applicable to characteristically hazardous wastes. Specifically, EPA identified mining waste as one of six "special wastes" that would be treated differently from other hazardous wastes. 43 Fed. Reg. 58,946, 58,992, 59,016 (1978).[3] In May 1980, however, EPA abandoned the "special wastes" concept in a notice of proposed rulemaking. 45 Fed. Reg. 33,154, 33,173-75 (1980). Further, EPA announced that it was deferring any regulation of coal mining waste under RCRA pending an anticipated agreement with the Office of Surface Mining Reclamation and Enforcement ("OSMRE"). Id. at 33,173.. The agreement would require OSMRE to promulgate rules under the Surface Mining Control and Reclamation Act ("SMCRA"), subject to EPA approval, that were at least as stringent as the hazardous waste regulations under RCRA. Id.

Nonetheless, Congress picked up on EPA's "special wastes" idea as it considered amendments to RCRA in 1980. One such amendment was the Bevill Amendment, the background of which Defendants characterize in their motion to dismiss. That amendment, codified in section 3001(b)(3) of the Act, 42 U.S.C. § 6921(b)(3), required the Administrator to conduct studies on certain mining wastes before regulating them as hazardous. In fact, Congress expressly prohibited the Administrator from regulating those wastes as hazardous until the studies required under Section 8002(f) and the new Section 8002(p) had been completed.[4]

_____

[3] Although EPA did not explicitly refer to <u>coal</u> mining wastes in the proposed regulations, it later made clear in a 1979 Background Document that it believed coal mining waste should be treated as a "special waste." <u>See</u> 54 Fed. Reg. 15,316, 15,318-19 (1989).

[4] The Bevill Amendment added Section 8002(p) to RCRA, which requires the Administrator to conduct a study similar to the one required by Section 8002(f) on "solid waste

Congress set a deadline of October 21, 1983, for the completion of those studies and gave the Administrator six months after the publication of the studies to determine whether regulation of the studied wastes as hazardous was warranted. 42 U.S.C. § 6921(b)(3)(C). The 1980 amendments also added Sections 1006(c) and 3005(f) to the Act, which describe, in less than clear terms, the relationship between RCRA and SMCRA. 42 U.S.C. §§ 6905(c) & 6925(f).

In response to the 1980 amendments to RCRA, on November 19, 1980, EPA promulgated an interim final regulation without notice and comment. That rule categorically excluded "solid waste from the mining, beneficiation, and procession of ores and minerals (including coal)" from the definition of "hazardous waste." 40 C.F.R. § 261.4(b)(7). In the preamble to that rule, EPA stated that the new Sections 1006(c) and 3005(f) "present problems of legal interpretation which cannot be resolved" before the hazardous waste regulations were to become effective. 45 Fed. Reg. 76,618, 76,619 (1980). The agency further explained that it

> may seek public comment on its interpretation of those provisions in later rulemaking actions. This interim final rule does not attempt to interpret the scope of Section 1006(c) and 3005(f). However, since coal is arguably a "mineral or ore" under Section 3001(b)(3), wastes from the extraction, beneficiation and processing of coal are excluded from RCRA Subtitle C regulation in today's amendment to § 261.4(b). Until EPA has had an opportunity to analyze the intended scope of the exclusion, the terms "extraction, beneficiation and processing" will be interpreted broadly to include coal exploration, mining, cleaning, classification, and other processing activities. As with other elements of this exclusion, EPA will be examining this exclusion, particularly the exclusions for classification, and other processing activities, in more detail later and may decide to narrow its scope.

Id. Despite its promises to do so, EPA never attempted to interpret the SMCRA/RCRA interaction provisions through rulemaking or otherwise, nor has it ever revisited its decision to categorically exclude coal mining wastes from regulation as hazardous.

The next public statement regarding the regulation of coal mining waste from

from the extraction, beneficiation, and processing of ores and minerals, including phosphate rock and overburden from uranium mining." 42 U.S.C. § 6982(p).

either EPA or OSMRE came in 1983, when OSMRE came as close as it ever has to regulating coal mining waste as hazardous. In its permanent regulatory program under SMCRA, OSMRE promulgated 30 C.F.R. §§ 816.89(d) and 817.89(d), which provided that "any noncoal [coal] mine waste defined as 'hazardous' under [RCRA] and 40 CFR part 261 shall be handled in accordance with the requirements of subtitle C of RCRA and any implementing regulations." 48 Fed. Reg. 44,006, 44,030, & 44,032 (1983). In the preamble to that rule, OSMRE explained that the regulation was promulgated at the suggestion of EPA and that, "[a]s to the relationship of coal mine waste and RCRA, OSM and EPA have undertaken a joint study under Subtitle C of RCRA. Until that study is completed, OSM has no responsibility for regulating coal mine waste under Subtitle C or RCRA." 48 Fed. Reg. at 44,027. Presumably, OSMRE was referring the studies under Sections 8002(f) and (p) of RCRA that were due by October 21, 1983.

As Defendants acknowledge, EPA failed to meet that deadline and did not produce any study until ordered by this Court to do so in Concerned Citizens of Adamstown v. EPA, No. 84-3041. It published a report to Congress on December 31, 1985, entitled Wastes from the Extraction and Beneficiation of Metallic Ores, Phosphate Rock, Asbestos, Overburden from Uranium Mining, and Oil Shale (hereinafter, "Hard Rock Mining Report").[5] EPA did not, however, study coal mining wastes. Consequently, it neither published nor reported to Congress anything regarding the environmental effects of coal mining or beneficiation wastes.

Indeed, EPA specifically disclaimed any intention of studying or reporting the environmental effects of coal mining waste, stating that

> [t]he Agency excluded wastes from coal mining and beneficiation, because both EPA and the Department of the Interior play a role in their regulation, and it is not clear whether Congress intended coal mining to be included within the scope of the studies conducted in response to Sections 8002(f) and (p) of RCRA.

---

[5] The Hard Rock Mining Report is Exhibit A to Defendants' motion to dismiss.

<u>Hard Rock Mining Report</u>, Executive Summary at 2-3. The <u>Hard Rock Mining Report</u>'s introduction explains that the environmental effects of the disposal of coal mining wastes were not studied or reported in part because "the Secretary of the Interior, with concurrence from the Administrator of EPA, is responsible for promulgating regulations that effectuate the purposes of Subtitle C of RCRA with respect to coal mining wastes." <u>Id.</u> at 1-9 (internal quotation marks omitted). Other than those two self-exculpatory statements, the <u>Hard Rock Mining Report</u> was silent as to coal mining waste.

In July 1986, EPA made the determination required by Section 3001(b)(3)(C) of RCRA as to whether regulation of the Bevill wastes as hazardous was warranted. The Agency determined that such regulation was not warranted. 51 Fed. Reg. 24,496 (1986). That determination, however, neither expressly nor implicitly discussed whether continued exemption of coal mining wastes from such regulation was warranted. <u>Id.</u>

Finally, in November 1986, OSMRE suspended what appear to be the only regulations that it has ever promulgated that even mention Subtitle C of RCRA, 30 C.F.R. §§ 816.89(d) and 817.89(d). 51 Fed. Reg. 41,952 (1986). It did so in response to this Court's conclusion that the regulations had been promulgated without the requisite notice and comment. <u>In re Permanent Surface Mining Regulation Litigation</u>, 620 F. Supp. 1519, 1538 (D.D.C. 1985), <u>aff'd in part & rev'd in part by Nat'l Wildlife Fed'n v. Hodel</u>, 839 F.2d 694 (D.C. Cir. 1988).

In sum, as an EPA administrative law judge recently described it, EPA has an "embarrassing history with regard to the Bevill amendment." <u>In re Leed Foundary, Inc.</u>, RCRA 03-2004-0061, 2007 WL 1933126 (Apr. 24, 2007). OSMRE never promulgated the regulations to effectuate Subtitle C that EPA told Congress justified its failure to study or report the environmental effects of coal mining wastes. EPA continues to exempt coal mining wastes from

regulation under Subtitle C, despite its confusion as to whether it can do so.  EPA and OSMRE

each point the finger at the other when asked who must regulate coal mining wastes.  Meanwhile,

the studies of coal mining and beneficiation wastes that Congress required remain unperformed.

In this tragedy of the regulatory commons, regulation of coal mining wastes has slipped through

the cracks, leaving Plaintiffs and their members to deal with the consequences.

## STANDARD OF REVIEW

Defendants raise three arguments in support of their motion to dismiss.  First, they

assert that Plaintiffs' complaint is untimely.  Second, they assert that Plaintiffs have failed to

state a claim for which relief can be granted on the grounds that EPA's failure to study and report

the environmental effects of coal mining and beneficiation wastes was a "permissible"

interpretation of RCRA and the time to challenge the reasonableness of that interpretation has

passed.  Third, they assert that Plaintiffs lack standing under Article III to bring this action.  Each

of Defendants' arguments triggers a different standard of review.

### A.    Defendants' Statute of Limitations Arguments Must be Treated as a Motion to Dismiss for Failure to State a Claim

To the extent that Defendants argue that the six-year statute of limitations codified

in 28 U.S.C. s 2401(a)[6] bars Plaintiffs efforts to force Defendants to perform their mandatory

duties under RCRA, Defendants do not make a jurisdictional argument.  This Court recently held

"that 28 U.S.C. § 2401(a) is non-jurisdictional."  P & V Enterprises v. U.S. Army Corps of

Eng'rs, 466 F. Supp. 2d 134, 149-50 (D.D.C. 2006).  In that case, this Court agreed with the

plaintiff's argument that recent decisions of the United States Supreme Court rendered untenable

the D.C. Circuit's earlier statements that statutes of limitation, when applied to the government,

---

[6] In relevant part, 28 U.S.C. § 2401(a) provides that "every civil action
commenced against the United States shall be barred unless the complaint is filed within six
years after the right of action first accrues."

are jurisdictional. Id. at 147-50. Indeed, in P & V Enterprises, the government conceded that the very cases on which it relies in this case may have been overturned by the United States Supreme Court. Id. at 148. In making that concession, the government cited Harris v. F.A.A., 353 F.3d 1006 (D.C. Cir. 2004), cert denied, 543 U.S. 809 (2004). P & V Enterprises, 466 F. Supp. 2d at 148. In Harris, the D.C. Circuit reiterated its doubt about the jurisdictional nature of statutes of limitation applied to actions against the United States. 353 F.3d at 1013 n. 7.

Because it concluded that the argument that the plaintiffs' claims were untimely was not jurisdictional, in P & V Enterprises this Court treated the government's motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) as a motion to dismiss for failure to state a claim under Rule 12(b)(6). The Court should similarly disregard Defendants' jurisdictional label on those aspects of its motion based on the statute of limitations and should treat the motion as one under Rule 12(b)(6).

On a motion to dismiss under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, ___ U.S. ___, 122 S. Ct. 2197, 2200 (2007). The question for the Court is whether, on the pleaded facts, the pleader is entitled to relief. Bell Atlantic Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1964 (2007). The specific question at issue then is whether Plaintiffs are entitled to relief in light of the undisputed fact that the deadline for the duties at issue was October 21, 1983.

**B.     Defendants' Arguments Regarding the Legal Import of the Incomplete Studies Must be Treated as Motion for Summary Judgment**

The Court should treat Defendants' request that the Court dismiss Plaintiffs' complaint for failure to state a claim "because EPA has fulfilled its mandatory duties and Plaintiffs are attempting to challenge collaterally EPA's performance of those duties through a belated deadline suit" as a motion for summary judgment. Federal Defendants' Motion to

Dismiss Plaintiffs' Complaint at 26 (hereinafter "Defendants' Motion").  Plaintiffs have

identified two distinct questions presented by that argument.  The first is whether Plaintiffs'

action to compel Defendants to perform statutorily mandated duties should be treated as an

untimely challenge to the reasonableness of the Hard Rock Mining Report and the 1990 Report

to Congress, both of which are appended to Defendants' motion.  The second question is whether

Defendants' failure to perform their statutory duties to study and report the environmental effects

of coal mining and beneficiation wastes was based on a reasonable interpretation of RCRA.

Defendants direct the Court's attention to the exhibits to their motion to assist the Court in

resolving those questions.

    Because Defendants rely on materials beyond the complaint to make their

arguments on those points, the Court should treat Defendants' motion to dismiss as a motion for

summary judgment.  Fed. R. Civ. P. 12(b); Yates v. District of Columbia, 324 F.3d 724, 725

(D.C. Cir. 2003) (noting that consideration of materials outside the pleadings has the effect of

converting a motion under Rule 12(b)(6) into a motion for summary judgment).  Plaintiffs allege

in their complaint that Defendant have not performed the duties that RCRA imposes on them

regarding the study of coal mining and beneficiation wastes.  Plaintiffs' Complaint for Injunctive

and Declaratory Relief at ¶¶ 18-20, 58 (hereinafter "Plaintiffs' Complaint").  For purposes of a

motion to dismiss, those allegations must be taken as true.  See, e.g., Erickson, 122 S.Ct. at 2200.

Defendants seek to contradict Plaintiffs' allegations regarding the nonperformance of the

nondiscretionary duties by submitting exhibits.  Consequently, they seek not a dismissal for

failure to state a claim, but a summary judgment.

    Summary judgment, of course is governed by Fed. R. Civ. P. 56.  A Court should

grant a motion for summary judgment only "where the pleadings and the record show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 941 (D.C. Cir. 2007) (internal quotation marks omitted).  Plaintiffs do not dispute that Defendants submitted to Congress the reports that they have appended to their motion to dismiss.  What is disputed is the legal import of those reports.  Consequently, the questions for this court are (1) whether Defendants are entitled to judgment as a matter of law because Plaintiffs' action to compel the performance of statutorily mandated duties should be treated as an untimely challenge to the reasonableness of the reports that the Defendants did submit to Congress and (2) whether Defendants' failure to perform their duties to study and report the environmental effects of coal mining and beneficiation wastes was based on a reasonable interpretation of RCRA.

   C.    **Defendants' Standing Arguments are Properly Presented in a Motion to Dismiss for Lack of Subject Matter Jurisdiction**

        To the extent that Defendants ask the Court to dismiss Plaintiffs' complaint on standing grounds, Defendants have properly filed a Rule 12(b)(1) motion.  As such, materials beyond the pleadings may be considered without converting the motion into one for summary judgment.  Haase v. Session, 835 F.2d 902, 905-06 (D.C. Cir. 1987).  This Court recently explained that, "[o]nce a defendant has moved to dismiss a case pursuant to Rule 12(b)(1), 'the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence.'" P & V Enterprises, 466 F. Supp. 2d at 139 (quoting Erby v. United States, 424 F. Supp. 2d 180, 182 (D.D.C. 2006)).  Further, "[a] court ruling on a Rule 12(b)(1) motion to dismiss 'may consider materials outside the pleadings' to determine whether it has jurisdiction over the underlying claims." Id.  (quoting Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1254 (D.C. Cir. 2005)).  Consequently, the Court can consider the affidavits that Plaintiffs have submitted with this memorandum to determine whether Plaintiffs have standing to bring this

action without converting the standing aspects of Defendants' motion to dismiss into a motion for summary judgment.

## ARGUMENT

Defendants assert that Plaintiffs' claims are untimely, that Defendants have already performed the mandatory acts that Plaintiffs seek to compel, and that Plaintiffs lack standing. For the following reasons, Defendants are wrong.

### A.    Plaintiffs' Claims are Not Time-Barred

Plaintiffs do not complain about what Defendants have done but rather about what Defendants have yet to do—study and report the environmental effects of coal mining and beneficiation waste. Consequently, Plaintiffs' claims are not barred by 28 U.S.C. § 2401(a). The Wilderness Society v. Norton, 434 F.3d 584, 588-89 (D.C. Cir. 2006). See also Felter v. Kempthorne, 473 F.3d 1255, 1259 (D.C. Cir. 2007) (citing The Wilderness Society for the proposition that the D.C. Circuit has "repeatedly refused to hold that actions seeking . . . to compel agency action . . . are time-barred if initiated more than six years after an agency fails to meet a statutory deadline" (internal quotation marks omitted)). Five of the six courts that have considered 28 U.S.C. § 2401(a) in the context of agency inaction, including the D.C. Circuit, have concluded that agency nonfeasance is a continuing violation of federal law and that 28 U.S.C. § 2401(a) does not bar an action to compel the performance of a statutory duty, even if the applicable deadline passed more than six years prior to the action's commencement. The sole decision to reach the contrary conclusion is an outlier, was explicitly grounded in Eleventh Circuit precedent, and has not been followed by subsequent courts.

### 1.    In the D.C. Circuit, Agency Nonfeasance is a Continuing Violation

The D.C. Circuit regards an agency's failure to perform a mandatory duty by a specified deadline as a continuing violation of federal law. The Wilderness Society, 434 F.3d at

589; In re Bluewater Network, 234 F.3d 1305, 1312-16 (D.C. Cir. 2000); In re United Mine

Workers of America International Union, 190 F.3d 545, 549 (D.C. Cir. 1999).  Consequently, an

action to compel a recalcitrant government agency to perform its statutorily mandated duties is

not time-barred if it is brought more than six years after the expiration of the statutory deadline.

   The D.C. Circuit most recently spoke to that principle in The Wilderness Society.

In that case, the plaintiff environmental organization sued the National Park Service ("NPS") for,

among other things, failing to perform certain wilderness evaluations by the deadlines set by

Congress.  The Wilderness Society v. Norton, No. 03-cv-64 (RMC), 2005 WL 3294006 at *1, *7

(D.D.C. 2005), aff'd on other grounds, The Wilderness Society, 434 F.3d at 584.  The plaintiff

asked the Court to compel the NPS to conduct the requisite evaluations.  Id.  The NPS moved for

judgment on the pleadings, asserting that the plaintiff lacked standing and that its deadline claims

were untimely.  Id. at *1, *3, & *5.

   The Court first considered the plaintiff's standing and concluded that the plaintiff

had standing to bring the suit.  Id. at *4.  The Court then turned to the statute of limitations

argument.  The NPS raised the same issues that Defendants assert here.  For example, the NPS

contended that the statute of limitations is jurisdictional, that it is a limit on the federal

government's waiver of sovereign immunity, that in an action to compel government action the

statute of limitations is not subject to equitable tolling, and that an agency's violation of a

statutory deadline is not a continuing violation.  Id. at *5-*7; Defendants' Memorandum in Reply

to Plaintiff's Memorandum in Response to Defendants' Motion for Judgment on the Pleadings at

2-5, The Wilderness Society, No. 03-cv-64(RMC), 2005 WL 3294006 (D.D.C. 2005).

   The District Court accepted the NPS's statute of limitations arguments,

concluding that the agency's failures to perform Congressionally mandated duties were not

continuing violations and that, because the deadlines for the agency's performance of the duties had passed more than six years before the plaintiff brought its suit, the claims were time-barred by 28 U.S.C. § 2401(a). The Wilderness Society, 2005 WL 3294006 at *8. The Court thoroughly discussed the jurisdictional, sovereign immunity, equitable tolling, and other statute of limitations issues in its memorandum opinion. Id. at *5-*8.

On appeal, the D.C. Circuit indicated that the District Court and the NPS were less than persuasive on the statute of limitations issue and that, in fact, both were wrong. The Wilderness Society, 434 F.3d at 588-89. Because the Circuit Court's statements on the statute of limitations should be dispositive of Defendants' motion to dismiss, Plaintiffs set them out here at length. The Circuit Court explained that the plaintiff was

> right in its contention that the District Court erred in dismissing the counts under the Wilderness Act and the specific enabling statutes as time barred under 28 U.S.C. § 2401(a). This court has repeatedly refused to hold that actions seeking relief under 5 U.S.C. § 706(1) to "compel agency action unlawfully withheld or unreasonably delayed" are time-barred if initiated more than six years after an agency fails to meet a statutory deadline. For example, in In re United Mine Workers of America International Union, 190 F.3d 545 (D.C. Cir. 1999), the petitioner sought a writ of mandamus to compel a division of the Department of Labor to issue final regulations. The statute required the Secretary of Labor to promulgate the final regulations, or explain her decision not to promulgate them, within 90 days of a specific date. Id. at 550. The suit was brought eight years after the agency failed to meet its deadline. Id. The court nonetheless rejected the agency's contention that the suit was time-barred. The court ruled that, "[b]ecause the [union] does not complain about what the agency has done but rather about what the agency has yet to do, we reject the suggestion that the petition is untimely." Id. at 549.

> The decision in In re Bluewater Network, 234 F.3d 1305 (D.C. Cir. 2000), is to the same effect. There the court noted that the statute "command[ed] the Coast Guard to establish compliance standards. There are none." Id. at 1315. The court also noted that it was "faced with a clear statutory mandate, a deadline nine-years ignored, and an agency that has admitted its continuing recalcitrance." Id. at 1316. Notwithstanding that the statutory deadline has been missed by nine years, the court found the petition was timely. Id. at 1314.

> TWS claims that NPS has chronically failed to undertake various legal

> obligations with respect to the identification and management of "wilderness" in the National Park System. The Society's complaint alleges continuing violations by the Government. It "does not complain about what the agency has done but rather about what the agency has yet to do." <u>United Mine Workers</u>, 190 F.3d at 549.

<u>Id.</u> (modifications in original). The Circuit Court concluded its discussion of the statute of limitations by stating that, when an agency fails to meet a statutory deadline, it is unlikely that the D.C. Circuit would hold a complaint seeking to compel the agency to perform its duties to be time-barred, even if the complaint were filed more than six years after the deadline for agency action had passed. <u>Id.</u> at 589.

> **2.    The D.C. Circuit's Continuing Violation Doctrine is The Nearly Unanimous Position of the Federal Courts**

The D.C. Circuit is hardly a renegade court when it comes to the question of whether 28 U.S.C. § 2401(a) bars suits to compel recalcitrant government agencies to perform their statutorily mandated duties if the duties have remained unperformed for more than six years. Four federal district courts have concluded, like the D.C. Circuit, that an agency's failure to perform a mandatory duty is an ongoing violation and that a suit to compel the performance of such a duty may be brought more than six years after the deadline for the agency's performance.

Most recently, the United States District Court for the Western District of Louisiana rebuked Defendant Kempthorne on the same statute of limitations argument that he makes here. <u>Shoeffler v. Kempthorne</u>, ___ F. Supp. 2d ___, 2007 WL 1850711 (W.D. La. June 26, 2007). In <u>Shoeffler</u>, the plaintiffs brought a citizen suit under the Endangered Species Act ("ESA") to compel Defendant Kempthorne to designate critical habitat for the Louisiana black bear. <u>Id.</u> at *2. The ESA charges the Secretary of the Department of Interior with a nondiscretionary duty to designate critical habitat for species listed as endangered or threatened. 16 U.S.C. § 1533(a)(3). If, at the time that the Secretary lists a species as endangered or

threatened, he or she concludes that the species's critical habitat is "not determinable," then the Secretary must designate the critical habitat within one year.  16 U.S.C. § 1533(b)(6)(c).

In <u>Schoeffler</u>, the Secretary had listed the Louisiana black bear as a threatened species on January 7, 1992.  2007 WL 185071 at *3.  The Secretary failed to designate critical habitat for the bear by the one-year statutory deadline, which expired on January 7, 1993.  <u>Id.</u> More than 12 years later, on September 5, 2005, the plaintiffs filed their citizen suit seeking to compel Defendant Kempthorne to perform his statutory duty.  <u>Id.</u> at *4.

Defendant Kempthorne made the same statute of limitations argument in <u>Schoeffler</u> that he makes here, prompting the court to discuss sovereign immunity, subject matter jurisdiction, and the applicability of the continuing violations doctrine at length.  <u>Id.</u> at *5-*12. The court rejected the statute of limitations argument, concluding that "[t]he Secretary's continuing failure to comply with his non-discretionary duty under the law constitutes a continuing violation with every day's nonfeasance."  <u>Id.</u> at *12.  In other words, the court concluded that Secretary Kempthorne had violated the law each day after the deadline for compliance had passed.  Consequently, because "the statute of limitations runs from the last day of the continuing offense," 28 U.S.C. § 2401(a) did not bar the plaintiffs action.  <u>Id.</u>

The <u>Shoeffler</u> court explained its reasoning this way:

> The Secretary has an ongoing duty to comply with the law, even after the statutory deadline has passed.  In fact, it would be at odds with congressional intent and the serious purpose of this important legislation to hold that the Secretary is only responsible for a timely performance, and that the Secretary would only be in violation of the law for an instant of time at the passing of a deadline and no more once the deadline passed. . . . The Secretary still has the duty and the authority to act; it is logical and equitable that the citizen suit provision should also still be available to compel the required performance.

<u>Id.</u> at *14.  Consequently, the court held that the plaintiffs' "effort to compel the Secretary to perform its non-discretionary duty under the ESA is not time-barred by the six year statute of

limitations of 28 U.S.C. § 2401(a)." Id. at *12.

The United States District Court for the Eastern District of Tennessee reached an identical conclusion in 2001. S. Appalachian Biodiversity Project v. U.S. Fish & Wildlife Servs., 181 F. Supp. 2d 883 (E.D. Tenn. 2001). The plaintiff in that case sought to compel the government to designate critical habitat under the ESA for sixteen species. Id. at 885. The government had announced at the time that it listed them that, for nine of the species, critical habitat was not determinable. Id. That triggered the same one-year statutory deadline that was at issue in Shoeffler. The defendants missed that deadline, and the plaintiff filed its citizen suit more than six years after the deadline had passed. Id. at 886.

As it did in Shoeffler, the government argued that 28 U.S.C. § 2401(a) barred the plaintiff's suit. Id. at 885. The court rejected that argument, stating that

> the non-repeal of 16 U.S.C. § 1533(b)(6)(C), which unequivocally directs the Service to designate critical habitat within one year of listing a species as endangered, must be presumed to be an indication of Congress's wishes. . . . The Service's non-action logically can only be construed as a continuing violation of [the ESA]. The statute of limitations commences to run anew each and every day that the Service does not fulfill the affirmative duty required of it.

Id. at 887 (footnote omitted; emphasis in original). Consequently, the court denied the defendants' motion for summary judgment and ordered the defendants to designate critical habitat for the nine species, notwithstanding the fact that the plaintiff did not bring its suit within six years. Id. at 887-88.

The United States District Court for the Eastern District of Virginia is also among the federal courts that has considered and rejected the statute of limitations argument that Defendants make here. In American Canoe Ass'n v. U.S. E.P.A., 30 F. Supp. 2d 908 (E.D. Va. 1998), the plaintiffs brought an action against the EPA for, among other things, the agency's failure to perform what the plaintiffs alleged to be a mandatory duty under the Clean Water Act.

17

The deadline for the duty had passed nearly ten years before the plaintiffs filed their complaint.

Id. at 925.  Nonetheless, the court concluded that the plaintiffs claim was not barred by the six-

year statute of limitations codified at 28 U.S.C. § 2401(a).  Id.  The court explained that the

> application of a statute of limitations to a claim of unreasonable delay is grossly
> inappropriate, in that it would mean that EPA could immunize its allegedly
> unreasonable delay from judicial review simply by extending that delay for six
> years. . . . EPA's delay is better understood as a continuing violation, which
> plaintiffs may challenge at any time provided the delay continues.

Id. (internal citation omitted).

Completing the quintet of courts that have concluded that 28 U.S.C. § 2401(a)

does not bar suits to compel agency action, even if brought more than six years after a statutory

deadline, is the United States District Court for the Southern District of New York.  In Natural

Resources Defense Council, Inc. v. Fox, 909 F. Supp. 153 (S.D.N.Y. 1995), the court was

presented with the question whether 28 U.S.C. § 2401(a) barred a citizen suit under the Clean

Water Act to compel the Administrator of EPA to perform a statutory duty, the deadline for

which had passed in 1979.  The court rejected the Administrator's argument that the action,

which was filed in 1994, was untimely.  Id. at 159.  The Court reasoned that

> If [a citizen suit to compel the performance of a nondiscretionary duty] were to be
> foreclosed by a statute of limitations, the result will be far more than the
> unfortunate, but necessary foreclosure of rights caused by most statutes of
> limitations.  Most statutes of limitations foreclose the enforcement of rights of
> general application.  When one potential plaintiff loses the right to sue, the rule of
> law still remains in force.  By contrast, where there is only one body charged with a
> duty by Congress, and that body cannot be forced by the Court to carry out its duty
> because of a statute of limitations, the practical result is a repeal of the mandatory
> duty itself.  The [Clean Water Act] was enacted in order to create a perpetual
> scheme for protecting the nation's water quality, and does not evince an intent for
> the mandatory duties of the Administrator to expire after a period of nonfeasance.
> The Act, like other acts of Congress, can be amended or repealed by subsequent
> action by Congress and the President.  The practical effect of imposing a statute of
> limitations in a suit such as this is to repeal the mandatory duties established by
> Congress and the President without the constitutionally prescribed scheme for
> altering a statute of the United States.

<u>Id.</u> Consequently, the court held that the suit was not barred by 28 U.S.C. § 2401(a).  <u>Id.</u>

In sum, five of the six courts to address the statute of limitations argument raised here by Defendants have rejected them.  The theme running through those cases is that a government agency's failure to perform a statutorily mandated duty by a statutory deadline is a continuing violation, rather than a discrete event.  That is, the agency's obligation continues beyond the deadline, and each day that it fails to perform its duty it violates the statute anew.

### 3.    This Case is Indistinguishable from the Above Described Cases

There is no principled distinction between the five cases discussed above and this case.  Here, Defendants have failed to perform their statutorily commanded duties to study and report the environmental effects of coal mining and beneficiation waste by the deadline set by Congress.  Congress has not repealed the statute mandating the study; therefore Defendants retain the authority to conduct it.  <u>Brock v. Pierce County</u>, 476 U.S. 253, 261-62 (1986).  As the court in <u>Shoeffler</u> explained, where an agency retains the duty and the authority to act, "it is logical and equitable that the citizen suit provision should also still be available to compel the required performance."  2007 WL 1850711 at *14.  <u>See also</u> <u>S. Appalachian Biodiversity Project</u>, 181 F. Supp. 2d at 887 (concluding that, where Congress has not repealed a mandatory duty, that should be taken as an indication that Congress wishes it to remain enforceable).

Under the cases cited above, Defendants are in continuing violation of their duties under RCRA to study and report the environmental effects of coal mining and beneficiation wastes.  The upshot of the continuing violation is that the statute of limitations has never run.  Rather, it starts anew with each passing day.  The Court should reject Defendants attempts to use the passage of time to shield their recalcitrance from judicial review.

### 4.    The Sole Contrary Decision is Neither Binding nor Persuasive

Simply stated, <u>Citizens for Biological Diversity v. Hamilton</u>, 453 F.3d 1331 (11th Cir. 2006), is an outlier. In that <u>per curiam</u> opinion, the Eleventh Circuit became the first and only court to conclude that 28 U.S.C. § 2401(a) bars actions to compel mandatory agency action if more than six years have passed since the deadline for the action. The mandatory duty at issue once again was Defendant Kempthorne's duty to designate critical habitat under the ESA. <u>Id.</u> at 1333. The plaintiffs filed their citizen suit to compel the designation of critical habitat for two species of minnow in 2004, roughly ten years after the deadline had passed. <u>Id.</u> The court concluded that the defendants were not in ongoing violation of their duty, and that the statute of limitations began to run on the deadline date. <u>Id.</u> at 1335. Consequently, the court affirmed the dismissal of the plaintiffs' complaint. <u>Id.</u> at 1336.

Defendants would have this Court join <u>Center for Biological Diversity</u> in its lonely position. The Court should decline that invitation. <u>Center for Biological Diversity</u> is grounded in Eleventh Circuit employment discrimination law. In contrast, the D.C. Circuit has a rich history in administrative law and a wealth of precedent more closely related to the facts of this case than employment discrimination cases. <u>The Wilderness Society</u>, <u>In re Bluewater Network</u>, and <u>In re United Mine Workers</u> are three such precedents. In all three cases, the D.C. Circuit treated the agencies' failure to perform nondiscretionary duties as continuing violations, subject to enforcement beyond the six year period prescribed in 28 U.S.C. § 2401(a). <u>See</u> <u>The Wilderness Society</u>, 434 F.3d at 588-89 (explaining that a suit brought more than six years after statutory deadline alleged continuing violation); <u>In re United Mine Workers</u>, 190 F.3d at 549 (permitting suit that had been brought eight years after deadline); <u>In re Bluewater Network</u>, 234 F.3d at 1312-16 (permitting suit that had been brought nine years after deadline).

**5.    This Court Should Decline Defendants' Invitation to Ignore D.C. Circuit Case Law**

Defendants contend that the Court should ignore its own Circuit's pronouncements on the continuing violations doctrine, asserting that the statements in The Wilderness Society need not be followed because they are dicta. Whatever label one places on the statements, it cannot be denied that the Circuit Court discussed the statute of limitations issue with the intention of providing direction to the District Court. As noted above, the district court in The Wilderness Society had held that the plaintiff had standing, but that its claims were barred by 28 U.S.C. § 2401(a). The Wilderness Society, 2005 WL 3294006 at *4, *8. The Circuit Court concluded that the District Court had it backwards. That is, the Circuit Court held that the district court was right for the wrong reason. Although it would have reversed the district court on the statute of limitations question, the Circuit Court affirmed the district court's result because the plaintiff lacked standing. The Wilderness Society, 434 F.3d at 588-91.

Standing, of course, is a jurisdictional question, and a court "cannot address the merits of [a plaintiff's] claim[] . . . unless [it] is assured that [the plaintiff] has Article III standing." Id. at 589. Because it concluded that the plaintiff did not have standing, the Circuit Court could have dismissed the appeal in The Wilderness Society without further discussion.[7] It chose, however, to let the District Court know in the clearest terms that it could that it had erred by dismissing the plaintiff's deadline claims as untimely under 28 U.S.C. § 2401(a). The Wilderness Society, 434 F.3d at 588 (concluding that the plaintiff was "right in its contention that the District Court erred in dismissing the courts under the Wilderness Act and the specific enabling statutes as time-barred under 28 U.S.C. § 2401(a)").

Because of the Circuit Court's intention to provide direction to the District Court,

---

[7] If the statute of limitations issue had presented a jurisdictional question, then the Circuit Court could have resolved that question and would not have had to reach the standing question. That it did not proceed that way indicates that the Circuit Court did not consider the statute of limitations question to be a jurisdictional one.

if its statements regarding the statute of limitations are <u>dicta</u>, they are <u>judicial dicta</u> as opposed to <u>obiter dicta</u>. As the Second Circuit has explained,

> a distinction should be drawn between "obiter dictum," which constitutes an aside or an unnecessary extension of comments, and considered or "judicial dictum" where the Court, as in this case, is providing a construction of a statute to guide the future conduct of inferior courts. While such dictum is not binding upon us, it must be given considerable weight and can not be ignored in the resolution of the close question we have to decide.

<u>U.S. v. Bell</u>, 524 F.2d 202, 206 (2d Cir. 1975). <u>See also</u> <u>Cerro Metal Products v. Marshall</u>, 620 F.2d 964, 978 n. 39 (3d Cir. 1980) ("'Judicial dicta are conclusions that have been briefed, argued, and given full consideration even though admittedly unnecessary to decision. A judicial dictum may have great weight.'" (quoting Comment, <u>Dictum Revisited</u>, 4 Stan. L. Rev. 509, 513 (1952))). Consequently, this Court should not simply disregard <u>The Wilderness Society</u>, as Defendant would have it do. Rather, it should understand it as deliberate guidance from its Circuit Court. <u>See</u> <u>Gabbs v. Udall</u>, 315 F.2d 37, 39 (D.C. Cir. 1963) ("[A]lthough a decision of an appellate court is controlling only to the extent of the actual facts involved, and an expression as to the law based on other facts is regarded as dictum and not controlling on lower courts, such dictum certainly deserves serious consideration."); <u>U.S. v. Microsoft Corp.</u>, 87 F. Supp. 2d 30, 47 (D.D.C. 2000) ("[B]oth prudence and the deference this Court owes to pronouncements of its own Circuit oblige that it follow in the direction that it is pointed until the trail falters."), <u>rev'd in part on other grounds</u>, 253 F.3d 34 (2001).

In <u>The Wilderness Society</u>, the D.C. Circuit had before it the comprehensive discussion of the District Court on the topics of sovereign immunity, jurisdiction, equitable tolling, and the continuing violations doctrine. The record before the Circuit Court included all of the memoranda of the parties below. The plaintiff argued the issue in its appellate brief. "[N]oticeably, [the government did] not attempt to defend the District Court's decision" on

appeal.  The Wilderness Society, 434 F.3d at 588.  Strikingly, the government now wants to

defend the District Court's decision and seeks to use its silence on the issue on appeal in The

Wilderness Society to justify its suggestion that the Court ignore the appellate decision.  In truth,

however, the Circuit Court's discussion of the statute of limitations issue in The Wilderness

Society was well-considered and informed by a thorough record.

Consequently, its statements regarding the applicability of the continuing

violations doctrine are the type of judicial dicta that this Court should follow unless obviously

wrong.  In light of the binding D.C. Circuit precedent (e.g., In re Bluewater Network and In re

United Mine Workers) that support the statements in The Wilderness Society, and in light of the

statements' accordance with the nearly unanimous conclusions of other federal courts, it cannot

be said that The Wilderness Society is wrong.  Although this Court may not be bound in a formal

sense, there is no reason that it should not follow The Wilderness Society and conclude that

Defendants are in continuing violation of RCRA and that Plaintiffs' action is not time-barred.

### 6.    28 U.S.C. § 2401(a) is Non-Jurisdictional and can be Tolled

Defendants also argue that the continuing violations doctrine cannot toll or

otherwise affect the six-year statute of limitations because (1) 28 U.S.C. § 2401(a) presents a

question of subject matter jurisdiction and (2) 28 U.S.C. § 2401(a) is not subject to the

continuing violations doctrine in this case because this action has no private litigation equivalent.

Defendants are wrong on both points.

Defendants endeavor to navigate the muddled waters in this area of law but they

ultimately arrive in the wrong destination.  As explained below, the statute of limitations in 28

U.S.C. § 2401(a) does not present a question of subject matter jurisdiction and is subject to the

continuing violations doctrine, regardless of whether it is being applied to a suit that has no

private litigation equivalent.

The starting point for this analysis is the watershed decision <u>Irwin v. Department of Veterans Affairs</u>, 498 U.S. 89 (1990).  Although the precise statute of limitations at issue in <u>Irwin</u> was the statute applicable to Title VII employment discrimination suits, the Supreme Court seized the opportunity presented by the controversy before it to speak to statutes of limitation generally, as applied against the federal government.  The Court explained that

> [t]he phraseology of this particular statutory time limit is probably very similar to some other statutory limitations on suits against the Government, but probably not to all of them.  In the present statute, Congress said that "[w]ithin thirty days . . . an employee . . . may file a civil action . . . .  In <u>Soriano [v. United States</u>, 352 U.S. 270, 271 n.1 (1957)], Congress provided that "[E]very claim . . . shall be barred unless the petition . . . is filed . . . within six years . . . ."  An argument can undoubtedly be made that the latter language is more stringent than the former, but we are not persuaded that the difference between them is enough to manifest a different congressional intent with respect to the availability of equitable tolling.  Thus a continuing effort on our part to decide each case on an ad hoc basis, as we appear to have done in the past, would have the disadvantage of continuing unpredictability without the corresponding advantage of a greater fidelity to the intent of Congress.  We think that this case affords us an opportunity to adopt a more general rule to govern the applicability of equitable tolling in suits against the Government.

<u>Id.</u> at 94-95.  Hence, the rule in <u>Irwin</u> is applicable, at a minimum, to statutes like those at issue in that case and in <u>Soriano</u>.  As noted above, 28 U.S.C. § 2401(a) provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  Because of its similarity to the statute at issue in <u>Soriano</u>, the <u>Irwin</u> rule on equitable tolling is applicable to 28 U.S.C. § 2401(a).

The <u>Irwin</u> rule is really quite simple:  "[T]he same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States."  498 U.S. at 95-96.  In reaching that holding, the Supreme Court recognized that equitable tolling has "customarily" been a feature of statute of limitations jurisprudence.  <u>Id.</u>

at 95.  The Court further recognized that when Congress enacts statutes of limitations that apply to the government, it does so against the backdrop of the judicially developed doctrine of equitable tolling and intends for that doctrine to inform the construction of the statutes.  See id. (explaining that its holding "is likely to be a realistic assessment of legislative intent"); Chung v. U.S. Dep't of Justice, 333 F.3d 273, 276 (2003) (noting that, in Irwin, the "Court reasoned that the Congress, legislating against the backdrop of private litigation, should be presumed to have included equitable tolling as a component of its waiver of sovereign immunity").  Consequently, the Supreme Court held that there is a rebuttable presumption that equitable doctrines may toll statutes of limitations such as 28 U.S.C. § 2401(a).

In 2003, the D.C. Circuit addressed whether the Irwin rule applied to the statute of limitations in the Privacy Act.  Chung, 333 F.3d at 274.  The first step in resolving that question required the Court to determine whether the Irwin rule was limited to statutes of limitation applicable to both private parties and the government, or whether the rule applied to such statutes that applied only in suits against the government.  Id. at 276.  The Court reasoned that the "general rule" in Irwin would not be much of a general rule if it were inapplicable to statutes that do not apply to private parties.  Id.  Hence, the Court concluded that the Irwin rule applies to statutes of limitation relevant only to actions against the government.  Id. at 277.

Chung, however, put a gloss on the Irwin rule that had not previously been there. Parsing the language in Irwin a little too closely, and relying on a "suggest[ion]" in a post-Irwin Supreme Court case, the Court concluded that "the type of litigation at issue must not be so peculiarly governmental that there is no basis for assuming customary ground rules apply."  Id. Chung recognized, however, that the "similarity" qualification was not to be carried too far, stating that the "'similarity' inquiry . . . must be conducted at a fairly high level of generality if

we are not to undermine the Court's goal in <u>Irwin</u> of simplifying the equitable tolling issue." <u>Id.</u>

Thus, the Court phrased the preliminary inquiry this way:

> [T]he question we ask, therefore, is not whether the elements of, and remedies
> available in, the action against the Government mimic those of a private claim,
> but <u>whether the injury to be redressed is of a type familiar to private litigation</u>.

<u>Id.</u> (emphasis added).  If the answer to the latter question is yes, then the court must apply the

<u>Irwin</u> presumption and ask whether there is "good reason to believe that Congress did <u>not</u> want

the equitable tolling doctrine to apply." <u>Id.</u> (internal quotation marks omitted).  To resolve that

question, the court is to look at the language of the statute.  <u>See</u> <u>U.S. v. Beggerly</u>, 524 U.S. 38,

48 (1998) ("Equitable tolling is not permissible where it is inconsistent with the text of the

relevant statute.").  Under that analysis, the Court concluded that the statute of limitations in the

Privacy Act is subject to equitable tolling.  <u>Chung</u>, 333 F.3d at 278.

The <u>Chung</u> similarity inquiry did not survive for long.  In 2004, the United States

Supreme Court rejected the notion that there must be a parallel private action to an action against

the government in order for the statute of limitations applicable to the latter is subject to

equitable tolling.  <u>Scarborough v. Principi</u>, 541 U.S. 401, 422 (2004).  In <u>Scarborough</u>, the

government argued that the <u>Irwin</u> presumption did not apply to the time limit at issue in that case

because the substantive dispute had no private equivalent.  <u>Id.</u>  The Supreme Court rejected that

argument, explaining that

> it is hardly clear that <u>Irwin</u> demands a precise private analogue.  Litigation against
> the United States exists because Congress has enacted legislation creating rights
> against the Government, often in matters peculiar to the Government's
> engagements with private persons . . . .  Because many statutes that create claims
> for relief against the United States or its agencies apply only to Government
> defendants, <u>Irwin</u>'s reasoning would be diminished were it instructive only in
> situations with a readily identifiable private-litigation equivalent.

<u>Id.</u>  With that statement, the Supreme Court invalidated that aspect of <u>Chung</u> that suggested that

26

equitable tolling could not apply to "peculiarly governmental" litigation.  See also Bolduc v. U.S., 72 Fed. Cl. 187, 196 n. 11 (2006) (rejecting government's argument that equitable tolling cannot apply because claimant's claims were not analogous to private party claims, reasoning that, under Scarborough, there is no such requirement).

In sum, after Irwin, Chung, and Scarborough, there is a rebuttable presumption regardless of whether there is a precise private analogue that a statute of limitations such as 28 U.S.C. § 2401(a) is subject to equitable tolling, and to determine whether the presumption is rebutted, a court is to look at the language of the statute of limitations itself for indications that Congress did not want equitable tolling to apply.  Although the reasoning of those cases makes it certain that equitable tolling applies to 28 U.S.C. § 2401(a), and although it recently assumed without deciding that 28 U.S.C. § 2401(a) is subject to equitable tolling,[8] the closest that the D.C. Circuit has come to explicitly stating that proposition is in The Wilderness Society.

In The Wilderness Society, the Court emphasized that it had "repeatedly refused to hold that actions seeking relief under 5 U.S.C. § 706(1) to 'compel agency action unlawfully withheld or unreasonably delayed' are time-barred if initiated more than six years after an agency fails to meet a statutory deadline."  434 F.3d at 588.  The Wilderness Society does not treat the statute of limitations question as one of subject matter jurisdiction.  That is clear from (1) its willingness to toll the statute with the continuing violations doctrine and (2) its reliance on its resolution of the standing issue to affirm the District Court.  Although at first blush that would seem to create tension between The Wilderness Society and Spannaus v. U.S. Dep't of Justice, 824 F.2d 52 (D.C. Cir.1987), close consideration reveals the apparent tension to be illusory.

The Court in Spannaus described 28 U.S.C. § 2401(a) as a "jurisdictional

---

[8] Felter v. Kempthorne, 473 F.3d 1255, 1260 (D.C. Cir. 2007), vacating Felter v. Kempthorne, 412 F. Supp. 2d 118 (2006).

condition," but it did not treat it as a matter of <u>subject matter</u> jurisdiction.  <u>Spannaus</u>, 824 F.2d at

55.  Nor did the district court.  <u>Spannaus v. U.S. Dep't of Justice</u>, 643 F. Supp. 698 (1986).  That

is an important distinction because, as the Supreme Court recently observed, "such unrefined

dispositions [are] 'drive-by jurisdictional rulings' that should be accorded 'no precedential

effect' on the question of whether the federal court had authority to adjudicate the claim in suit."

<u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 500, 511 (2006).  Courts often describe something as

jurisdictional, without close consideration of whether it truly is.  <u>Id.</u> at 510.  The Supreme Court

has made clear that, despite "jurisdictional" language in prior cases, statutes of limitations are not

jurisdictional.  <u>Id.</u> ("[I]n recent decisions, we have clarified that time prescriptions, however

emphatic, are not properly typed jurisdictional." (Internal quotation marks omitted.)).

Consequently, <u>Spannaus</u> need not be, and indeed cannot be, read to hold that 28 U.S.C. § 2401(a)

presents a question of subject matter jurisdiction.

That is precisely the conclusion that this Court reached in <u>P & V Enterprises</u>.

After examining <u>Spannaus</u>, <u>Irwin</u>, <u>Chung</u>, and <u>Arbaugh</u>, the Court held "that the rebuttable

presumption of equitable tolling applies to lawsuits governed by the six-year limitations period

of § 2401(a)" and that the statute "is non-jurisdictional."  <u>P & V Enterprises</u>, 466 F. Supp 2d at

149.  That December 2006 opinion represents the best synthesis of this "muddled" area of law.

In sum, there is a rebuttable presumption that 28 U.S.C. § 2401(a) is subject to

equitable tolling.  There is nothing in the language of the statute to indicate that Congress

intended otherwise.  Consequently, 28 U.S.C. § 2401(a) is subject to the continuing violations

doctrine and does not render Plaintiffs' complaint untimely.[9]  For those reasons, the Court should

---

[9] Defendants rely on <u>Felter v. Kempthorne</u>, 412 F. Supp. 2d 118 (2006), and argue that, because there is no analogous private claim to Plaintiffs' efforts to compel the performance of Defendants' mandatory duties, the continuing violations doctrine is not available in this case. Defendants are wrong for three reasons.  First, as a result of the appeal in <u>Felter v. Kempthorne</u>,

deny Defendants' motion to dismiss on statute of limitations grounds.

**B.    Plaintiffs' Claims are Not Challenges to Defendants Earlier Actions, and Those Actions Were Not Reasonable**

In their second argument in support of their motion to dismiss, Defendants present two questions: (1) whether Plaintiffs' action to compel Defendants to perform their statutorily mandated duties should be treated as an untimely challenge to the reasonableness of the <u>Hard Rock Mining Report</u> and the <u>1990 Report to Congress</u> and (2) whether Defendants' failure to perform their statutory duties to study coal wastes was based on a reasonable interpretation of RCRA. As discussed above, because Defendants ask the Court to consider materials beyond the pleadings to answer those questions, the Court must treat this aspect of Defendants' motion to dismiss as a motion for summary judgment. For the following reasons, the Court should deny the motion, no matter its style.

**1.    Plaintiffs Challenge What Defendants Have Yet to Do, Not What They Have Already Done**

in which the D.C. Circuit remanded the case that the district court had dismissed, that district court opinion has been vacated and no longer represents the law of the district. <u>Felter v. Kempthorne</u>, 473 F.3d at 1261.

Second, <u>Felter</u> ignored the United States Supreme Court's opinion in <u>Scarborough</u> that made clear that there is no requirement for a precise private analogue in order to apply the <u>Irwin</u> presumption. Thus, the district court erred in looking for private-litigation equivalents.

Finally, even if there is some remaining vitality to the similarity inquiry, it does not preclude the application of equitable tolling in this case. <u>Chung</u> made clear that the inquiry must be made at a "high level of generality" and that the relevant question is "whether the injury to be redressed is of a type familiar to private litigation." 333 F.3d at 277.

Here, Plaintiffs' injuries are analogous to those incurred by private litigants asserting that the opposing party (1) negligently breached a duty to warn, (2) breached a fiduciary duty to provide information, or (3) breached a statutory duty to provide information, such as that in § 2302 of the Employment Retirement Income Security Act ("ERISA"). <u>Caldwell v. Bechtel, Inc.</u>, 631 F.2d 989, 1000 (D.C. Cir. 1980) (duty of to warn); <u>Eddy v. Colonial Life Ins. Co. of Amer.</u>, 919 F.2d 747, 750 (D.C. Cir. 1990) (fiduciary duty to disclose information); <u>Stolarz v. Rosen</u>, No. 03-cv-3083, 2005 WL 2124545 (S.D.N.Y. Aug. 26, 2005) (ERISA reporting and disclosure requirements).

In re United Mine Workers and In re Bluewater Network squarely control the answer to whether the Court should treat Plaintiffs' claim as an untimely challenge to the Hard Rock Mining Report and the 1990 Report to Congress and require the Court to answer that question in the negative. Like the petitioners in those cases, Plaintiffs here do "not complain about what the agency has done but rather about what the agency has yet to do." In re United Mine Workers, 190 F.3d at 549.

In In re Bluewater Network, the petitioners sought a writ of mandamus to compel the Coast Guard to promulgate long overdue regulations that Congress had ordered by a date certain in response to the Exxon Valdez tragedy. 234 F.3d at 1307. Specifically, the Coast Guard was to promulgate regulations under Sections 4110 and 4116 of the Oil Pollution Act. Id.

The Coast Guard had promulgated only a temporary rule under Section 4110 that had expired at the time the petitioners filed their petition. Id. at 1308-09. The Coast Guard argued that petitioners' arguments amounted to an untimely challenge to the temporary rulemaking. Id. at 1312. With regard to Section 4116, the Coast Guard had promulgated only some of the regulations that the petitioners maintained were required by that section, and the agency argued that the petitioners should have challenged the purportedly incomplete regulations when they were promulgated. Id. at 1309-10, 1314-15.

The D.C. Circuit observed that the agency's earlier, incomplete action rendered the "case somewhat unusual, albeit not difficult." Id. at 1308. Without hesitation, the Court rejected the Coast Guard's attempt to characterize the petition as an untimely challenge to past agency action. Id. at 1313-15. The Court scolded the agency for attempting to stand "clear and long-passed deadlines . . . on their head." Id. at 1314. The Court saw through the Coast Guard's smokescreen and recognized that the petitioners were not challenging the substance of the earlier

regulations, "either for what they did or did not do." Id. Rather, the petitioners sought to compel the Coast Guard's duties that remained unperformed. Id. The Court was guided in large part by its decision in In re United Mine Workers.

In the latter case, a labor union sought a writ of mandamus to compel the Mine Safety and Health Administration ("MSHA") to promulgate a final rule regulating permissible gaseous emissions in diesel exhaust in underground coal mines. In re United Mine Workers, 190 F.3d at 546. The labor union asserted that the agency had missed a statutory deadline. Id. at 547. MSHA had previously promulgated diesel equipment rules, but had not set diesel exhaust Permissible Emission Limits ("PELs"). Id. at 547-48.

The National Mining Association ("NMA") intervened in the case and argued that the mandamus petition amounted to an untimely challenge to the promulgation of the diesel equipment rule. Id. at 548. The Court rejected the NMA's invitation to dismiss the petition as untimely, explaining that the union did not take issue with any aspect of the diesel equipment rule itself. Id. The Court succinctly explained that, "[b]ecause the [petitioner] does not complain about what the agency has done but rather about what the agency has yet to do, we reject the suggestion that its petition is untimely and move to a consideration of the merits." Id. at 549.

This case is indistinguishable from In re Bluewater Network and In re United Mine Workers. As in those cases, Plaintiffs seek to enforce a long-passed statutory deadline. As in those cases, the agencies performed some of their statutory duties, but not all of them. As in those cases, the agencies now seek to characterize an action to compel the performance of the remainder of their statutory duties as an untimely challenge to the agencies' prior partial actions. As in those cases, Plaintiffs do not complain about the content of the Hard Rock Mining Report or the 1990 Report to Congress; rather, they complain about what the agency has yet to do—

study and report the environmental effects of coal mining and beneficiation waste.  As in those cases, this Court should reject the attempts to mischaracterize this action and should conclude that neither summary judgment nor dismissal is appropriate on the bases asserted by Defendants.

### 2.    RCRA Requires Defendants to Study Coal Mining Wastes

The second question presented by Section III.B of Defendants' motion is whether Defendants' failure to perform their statutory duties to study and report the environmental effects of coal mining and beneficiation wastes was based on a reasonable interpretation of RCRA. Defendants ask this Court to defer to them under Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984), and United States v. Mead Corp., 533 U.S. 218 (2001).

As a threshold matter, the Hard Rock Mining Report and the 1990 Report to Congress are not the type of agency work product to which Chevron deference is appropriate. Chevron itself involved a generally applicable agency rule, and, as Defendants admit, Mead provides that Chevron-style deference is appropriate only where the agency action has the force of law.  Mead, 533 U.S. at 221, 231-32; Defendants' Motion at 27.  A report to Congress does not have the force of law; it binds no one and creates no legal obligations.  Consequently, the agencies are due no deference at all in this case.

But, even assuming that Chevron and Mead were applicable here, agencies are only due deference to their interpretations of statutes, i.e., the resolution of ambiguities.  Mead, 533 U.S. at 229.  Here, there is no interpretation to which to defer.  Indeed, EPA expressly admitted that it was incapable of interpreting the statute, or at least that it did not want to.

As noted above, in the Executive Summary to the Hard Rock Mining Report, EPA stated that it

> excluded waste from coal mining and beneficiation, because both EPA and the Department of the Interior play a role in their regulation, and it is not clear

32

> whether Congress intended coal mining to be included within the scope of the
> studies conducted in response to Sections 8002(f) and (p) of RCRA.

Hard Rock Mining Report at ES-2 to ES-3.  Viewed through the lens of Chevron and Mead, that

statement amounts to an assertion by EPA that Sections 8002(f) and (p) of RCRA are

ambiguous, but the agency makes no attempt to fill whatever "gap" there may be in the statutes.

That is, it asserts that there is an ambiguity, but leaves it unresolved.  Defendants' assertions that

it reasonably and permissibly interpreted RCRA in the Hard Rock Mining Report strain credulity

in light EPA's failure to make any interpretation of RCRA at all.[10]  EPA did not say that

Congress did not intend for coal mining and beneficiation wastes to be within the scope of the

studies; it did not say that Congress did intend for them to be studied.  It said that it did not know

what Congress intended.

        Properly construed, Sections 8002(f) and (p) require the Defendants to study and

report the environmental effects of coal mining and beneficiation waste.  The text of Section

8002(f) requires that "[t]he Administrator, in consultation with the Secretary of the Interior, shall

conduct a comprehensive study on the adverse effects of solid wastes from active and abandoned

surface and underground mines on the environment . . . ."  42 U.S.C. § 6982(f).  Then, as now,

coal was mined in both surface and underground operations.  Further, coal was within the

bailiwick of the Secretary of the Department of the Interior when Section 8002(f) was enacted in

1976 due to the existence of the United States Bureau of Mines within the department.  30

U.S.C. §§ 1, 4a, 4e.  When Congress amended Section 8002(f) in 1980, essentially readopting

the consultation requirement, SMCRA was on the books, placing the environmental effects of

coal mining even more squarely on the Secretary of the Department of the Interior.  Congress

required the involvement of the Secretary of the Department of the Interior because it wanted the

---

        [10] Likewise there are no statements in the 1990 Report to Congress that could be
viewed as an interpretation regarding whether coal wastes must be studied.

Administrator to study coal wastes.

Moreover, the legislative history of Section 8002(f) establishes that Congress intended for coal mining and beneficiation waste to be studied.  Congress expected that the Administrator would consult with the Bureau of Mines and the Energy Research and Development Administration, both of which were experts on coal.  H.R. Rep. No. 1491(II), 94th Cong., 2d Sess., reprinted in 1976 U.S. Code Cong. & Admin. News 6323, 6332.  Congress also explicitly stated that its "intent is for EPA to look at all mining waste disposal practices."  Id. (emphasis added).

Section 8002(p), enacted in 1980, requires the study "of solid waste from the extraction, beneficiation, and processing of ores and minerals."  Coal is by definition a mineral. It was that precise reasoning that led EPA to include coal mining and beneficiation wastes among the so-called Bevill wastes when it promulgated 40 C.F.R. § 261.4(b), the rule exempting those wastes from regulation under Subchapter C of RCRA.  45 Fed. Reg. at 76,619.  In the preamble to that rule, EPA expressly "interpreted [the Bevill Amendment] broadly to include coal exploration, mining, cleaning, classification, and other processing activities."  Id.  If any interpretation that the EPA has made of RCRA on this point is subject to Chevron deference, it is the interpretation embodied in 40 C.F.R. § 261.4(b)—a regulation that with the force of law.

Further, EPA has determined that the legislative history reveals that coal mining wastes were Representative Bevill's principle motivation for proposing the Bevill Amendment. 54 Fed. Reg. at 15,319.  In the Notice of Proposed Rulemaking accompanying EPA's regulations on mineral processing wastes, the agency explained that, "[f]rom his statements before the Committee on Interstate and Foreign Commerce, it is apparent that Rep. Bevill offered his amendment primarily to prevent regulatory disincentives for the development of the nation's coal

resources." Id. (quoting Rep. Bevill as stating that "the House [would] not allow EPA to take steps that will discourage the use of coal.") EPA also recognized that, at the committee hearing on the Bevill Amendment, two Congressmen from West Virginia spoke in favor of the amendment because of their concerns about the regulation of large volume coal wastes. Id.

In sum, it is clear from the text, the legislative history, and EPA's statements before and after it submitted the Hard Rock Mining Report, that Congress intended for coal mining and beneficiation wastes to be studied under Section 8002(f), 8002(p), or both. EPA's ambivalence on the issue when it submitted the Hard Rock Mining Report adds nothing to the statutory construction endeavor. Consequently, this Court should conclude that it is neither reasonable nor permissible to interpret Section 8002(f) and (p) to not require the study of coal wastes and should deny Defendants' motion to the extent that it asserts otherwise.

## C.    Plaintiffs Have Standing to Challenge Defendants' Nonfeasance

Plaintiffs have standing under Article III of the United States Constitution, both in their own right and in a representative capacity. Accordingly, this Court has jurisdiction over Plaintiffs' claims and should deny Defendants' motion to dismiss on standing grounds.[11]

To establish Article III standing, a plaintiff must show "(1) an injury in fact that is actual or imminent, not conjectural or hypothetical; (2) an injury that is fairly traceable to the EPA's challenged action; and (3) the likelihood that a favorable decision will redress the member's concerns." Natural Resources Defense Council v. EPA, ___ F.3d ___, ___, 2007 WL

---

[11] Although Defendants observe that the "question of standing involves . . . prudential limitations," they make no argument that Plaintiffs lack prudential standing. Defendants' Motion at 29. That is likely because there can be no question that Plaintiffs have prudential standing to bring an action under RCRA to compel the Administrator to perform a nondiscretionary duty required by that act. The citizen suit provision in RCRA provides that "any person may commence a civil action on his own behalf." 42 U.S.C. § 6972(a). In that way, the citizen suit in RCRA is indistinguishable from the citizen suit provision in the ESA, which the Supreme Court held in Bennett v. Spear had expanded the prudential boundaries of standing to "permit enforcement by everyman." 520 U.S. 154, 164-65 (1997).

1748069 at *4 (D.C. Cir. 2007).  To establish associational standing in a representative capacity,

an organization "must demonstrate that at least one member would have standing under Article III

to sue in his or her own right, that the interests it seeks to protect are germane to its purposes, and

that neither the claim asserted nor the relief requested requires that an individual member

participate in the lawsuit."  Id.  On a motion to dismiss for lack of standing, a court must assume

that the plaintiff states a valid legal claim and must accept factual allegations as true.  Jerome

Stevens Pharmaceuticals, Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253-54 (D.C. Cir. 2005).

### 1.    Plaintiffs' Have Standing to Sue on Their Own Behalf

In their complaint, Plaintiffs allege that they "have been injured by the denial of

information that Defendants are statutorily required to supply from the study and analysis of the

risks associated with coal mining wastes," that Defendants' failure to perform the studies has

forced "them to expend funds and resources to determine the level of any contamination or

danger of contamination from [coal mining] wastes," and that, "[i]f Defendants were ordered to

perform the nondiscretionary duties at issue in this litigation, then Plaintiffs' members injuries

could be redressed by the proper study and analysis of the risks associated with coal mining

wastes as well as increased regulation of the disposal of such wastes in light of those risks."

Plaintiffs' Complaint at ¶¶ 47, 49, & 52.  Plaintiffs further allege (1) that they have a statutory

right to the information that should have been in Defendants' report, (2) that OVEC and CRMW

are the cofounders of the Sludge Safety Project, (3) that the Sludge Safety Project "is a

collaborative effort seeking to document the effects of coal slurry . . . on human health and the

environment, to reform the regulation of the disposal of coal slurry, and to encourage the

adoption of alternative coal beneficiation techniques," and (4) that the "Sludge Safety Project has

difficulty fulfilling its mission because of a lack of information about the chemical makeup of

coal wastes, the amount generated by the coal mining industry, alternatives to current disposal methods, and the extent of its disposal, including into slurry impoundments and underground injection wells." Id. at ¶¶ 10, 32, 34, & 36. Those allegations are sufficient to establish that Plaintiffs are suffering informational injuries as a result of Defendants' continuing nonfeasance that would be redressed by an order of this court.

The D.C. Circuit has explained that

> a denial of access to information can work an "injury in fact" for standing purposes, at least where a statute (on the claimants' reading) requires that the information "be publicly disclosed" and there "is no reason to doubt their claim that the information would help them."

Ethyl Corp. v. E.P.A., 306 F.3d 1144, 1148 (D.C. Cir. 2002) (quoting Fed. Election Comm'n v. Akins, 524 U.S. 11, 21 (1998)). See also Fund for Animals v. Norton, 295 F. Supp. 2d 1, 8-9 (D.D.C. 2006) ("It is well settled that plaintiffs may suffer injury as a result of a denial of information to which they are statutorily entitled."). When a statute requires an agency to make certain information available the public, it creates an enforceable right to that information. See Fed. Election Comm'n, 524 U.S. at 21.

Here, Sections 8002(f) and (p) require that a report of the studies of coal mining and beneficiation waste must be "published" and reported to Congress. 42 U.S.C. §§ 6982(f) & (p). As a result, under Akins, Plaintiffs have a statutorily created right to the information they seek, Defendants' protests to the contrary notwithstanding.

The absence of the information that should have been reported as a result of the coal waste studies continues to cause concrete injuries to Plaintiffs because it causes them to expend time and resources to attempt to obtain the same information and makes their activities more difficult. Such injuries-in-fact give Plaintiffs standing to bring their claims.

When a defendant's actions or inactions "perceptibly impair[]" an organization's

ability to perform its activities, "there can be no question that the organization has suffered injury

in fact.  Such concrete and demonstrable injury to the organization's activities—with the

consequent drain on the organization's resources—constitutes far more than simply a setback to

the organization's abstract social interests." Havens Realty Corp. v. Coleman, 455 U.S. 363, 379

(1982).  The D.C. Circuit has explained that organizations "sustain informational standing"

where they "point to concrete ways in which their programmatic activities have been harmed."

Competitive Enterprise Institute v. National Highway Traffic Safety Admin., 901 F.2d 107, 123

(D.C. Cir. 1990).  The Court reasoned that

> [a]llegations of injury to an organization's ability to disseminate information may
> be deemed sufficiently particular for standing purposes where that information is
> essential to the injured organization's activities, and where the lack of the
> information will render those activities infeasible.  In Action Alliance of Senior
> Citizens v. Heckler, 789 F.2d 931, 936-39 (D.C. Cir. 1986), for example, we
> found that an organization's ability to counsel members on unlawful age
> discrimination in benefit denial was diminished by regulations limiting the flow
> of information about age discrimination. . . . To establish standing on this basis,
> however, petitioners must assert a plausible link between the agency's action, the
> informational injury, and the organization's activities.

Id. at 122-23.

Plaintiffs allege in their complaint that their organizational activities have been

rendered more difficult by the absence of reliable information about coal waste and its disposal.

Under the cases discussed above, that is sufficient to establish sufficient injury for Article III

standing.  Further, Plaintiffs allegations also establish that their informational injuries are fairly

traceable to the Defendants' inaction and that, if the study were conducted and reported, their

injuries would be redressed.  Consequently, Plaintiffs' complaint is sufficient to withstand a

motion to dismiss for lack of standing.

However, as Defendants observe, "[t]he Court is not limited to the allegations of

the complaint" when resolving the subject matter jurisdiction question presented by Defendants'

standing arguments.  Defendants' Motion at 11.  Accordingly, the Court may consider the affidavits appended to this memorandum to determine whether Plaintiffs have standing.  In those affidavits, Plaintiffs' staff and members aver facts sufficient to establish that the organizations have Article III standing on their own behalf.

Vivian Stockman is the Project Coordinator for OVEC and a member of CRMW. See Exhibit B, Affidavit of Vivian Stockman at ¶¶ 4-6.  Ms. Stockman has been a part of the Sludge Safety Project since its inception in 2004.  Id. at ¶¶ 8-9.  She identifies the purposes of the Sludge Safety Project and explains the tremendous resources that OVEC and CRMW have expended through the Project to (1) determine what chemicals are present in coal slurry, (2) identify potential alternative coal cleaning and waste disposal methods, and (3) lobby the West Virginia Legislature to order the West Virginia Department of Environmental Protection to conduct a study of the effects of the underground injection of coal slurry into abandoned coal mines.  Id. at 10, 11, 16, 18.  For example, the Sludge Safety Project's efforts to persuade the legislature to order the underground injection study consumed approximately 70% of the Project's budget for the past two years.  Id. at ¶ 18.  Had the organizations not consumed valuable resources pursuing the information that would have been publicly available had Defendants performed their duties, they could have used those resources to pursue the Sludge Safety Project's educational, organizing, and outreach efforts.  Id. at 21.  Furthermore, in the absence of verifiable scientific information, the organizations' efforts to obtain a moratorium on the construction of new slurry impoundments have been based on anecdotal evidence, which has largely received skepticism from the West Virginia Legislature.  Id. at ¶ 24.  Ms. Stockman also explains how access to an EPA-conducted study on coal mining waste disposal could free up resources to more effectively generate support for changes to the regulation of coal wastes.  Id. at

25, 26, & 27.  Finally, if an EPA study were find that the risks to human health and the environment from coal waste were minimal, then the organizations could refocus their efforts on the structural safety of coal waste impoundments.  Id. at 27.

Cindy Rank is on the Board of Directors of WVHC and currently serves as the Chair of the WVHC Mining Committee.  See Exhibit C, Affidavit of Cindy Rank at ¶ 2.  Among the activities in which the WVHC engages are (1) educational outreaches to individuals and families that live or recreate near coal waste impoundments about the problems associated with coal waste, (2) advocacy to legislative and administrative bodies to encourage more stringent regulation of the harmful effects of coal waste, and (3) organized tours to locations where coal waste impoundments can be observed from areas accessible to the public.  Id. at ¶¶ 6-7, 14.  Those activities have been hampered by the absence of the information that would have been available had Defendants' performed their statutorily mandated duties.  Id. at ¶¶ 6-11, 14.

The affidavits of Ms. Stockman and Ms. Rank elaborate on the facts alleged in Plaintiffs' complaint and illustrate the concrete and demonstrable injuries that Plaintiffs suffer as a result of the absence of the information that Congress required Defendants to provide regarding coal mining and beneficiation wastes.  Those affidavits also establish that those injuries are fairly traceable to Defendants' nonfeasance and that this litigation can redress those injuries, regardless of the results of the study.  For those reasons, this Court should conclude that Plaintiffs have standing to bring this action on behalf of themselves.

## 2.    Plaintiffs Have Standing as Representatives of Their Members

Further, Plaintiffs have standing to bring this action in a representative capacity. There can be no denying that their organizational purposes are germane to the interests that the litigation seeks to protect.  Further, the allegations in the complaint are sufficient to establish that

their members suffer injuries to their legally cognizable interests that can be remedied without their formal participation in this lawsuit.

In their complaint, Plaintiffs allege that their members live near coal waste disposal facilities, that their members use groundwater in those areas for domestic purposes, and are concerned that their groundwater may be contaminated.  Plaintiffs' Complaint at ¶¶ 38-40. Plaintiffs further allege that their members fear that coal waste contains toxic materials are contaminating their surface and ground water; that their members suffer from anxiety caused by the fear of flooding from coal waste impoundments; that their members suffer from economic costs associated with housing, employment, and development due to the uncertainty over the possibility of contamination in the region; and that their members suffer injuries to their recreational interests.  Id. at ¶¶ 41-42, 48, 50-52.  For purposes of this motion to dismiss, those allegations are sufficient to establish that Plaintiffs' members suffer injuries-in-fact.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 183-84 (2000) (holding that "reasonable concerns about the effects" of a challenged action on "recreational, aesthetic, and economic interests" are sufficient injuries-in-fact); Denney v. Deutsche Bank AG, 443 F.3d 253, 264 (2d Cir. 2006) (explaining that, for standing purposes, an "injury-in-fact may simply be the fear or anxiety of future harm").

Furthermore, Plaintiffs' members' injuries are fairly traceable to Defendants' two decades of nonfeasance.  Defendants' failure to study coal mining and beneficiation wastes has left Plaintiffs' members facing an insurmountable information deficit regarding the makeup, volume, and disposal of that waste.  Had Defendants conducted the study and reported the results, Plaintiffs' members would be able to make informed decisions about the use of surface and ground water in the area based on a scientific assessment of the risk.  Further, had

41

Defendants conducted the study, it would have led to the opportunity for increased regulation of coal mining wastes, either by the federal or state governments.  Defendants' failures to conduct the studies at issue in this litigation and to scrutinize whether the regulation of coal wastes as hazardous is warranted have led to the inappropriate treatment of those wastes as nonhazardous. An order from this Court compelling the performance of a study of coal mining and beneficiation wastes will provide the information that Plaintiffs' members lack and will allow them to pursue stricter regulation of coal mining wastes, reducing the impact of waste disposal on their lives.  In sum, Plaintiffs make sufficient allegations about their members' injuries, causation, and redressibility in their complaint to establish that they have representative standing.

To the extent that the Court needs further information to resolve whether Plaintiffs have representational standing, it can review the attached affidavits of Plaintiffs' members.  Those affidavits further particularize the effects of the absence of information about coal mining wastes on their lives.

For example, Julia Bonds, a member of CRMW, was forced to relocate her family in 2000 after a new coal waste impoundment ruined her ground and surface water.  See Exhibit D, Affidavit of Julia Bonds at ¶¶ 2-4.  Before she moved, Ms. Bonds suffered anxiety about whether the impoundment would fail.  Id. at ¶ 8.  In fact, Ms. Bonds could not sleep on nights when it rained for fear that the impoundment would "overflow or burst"; she "would lay awake listening for the snap of trees or any sign at all that would give me time to get my family up the hill to safety."  Id.  Ms. Bonds no longer swims or wades in the rivers or streams in her community because of her observations of pollution downstream from impoundments and her concerns about the health effects of the chemicals in coal wastes.  Id. at ¶¶ 5-7.

Had EPA studied the disposal of coal mining wastes, it would likely have

42

concluded that the storage of billions of gallons of chemical-laden coal slurry in unlined basins above populated communities is an unsafe practice.  In other words, had EPA conducted the study and properly regulated the disposal of coal mining wastes, the impoundment above Ms. Bonds home would not have had the effects on her that it did.  Even if EPA had approved the practice, the information generated by the study would likely have led to closer scrutiny of slurry impoundments by federal and state surface mining regulators.  As a result of the EPA's failure to do the study and the resulting absence of available scientific information regarding coal wastes, federal and state regulators have been provided with political cover to avoid regulating coal waste disposal.  Moreover, as Ms. Bonds avers, if a study revealed that the wastes were benign, she—like many of Plaintiffs' other members—would resume swimming, fishing, and otherwise using the surface and groundwater in her community.  Id. at ¶¶ 12-13.

The other affidavits of Plaintiffs' members tell similar stories.  Pauline Canterberry of OVEC and CRMW suffers anxiety about the safety of the three impoundments near her home.  See Exhibit E, Affidavit of Pauline Canterberry at ¶¶ 1-4.  Among her injuries is her inability to drink or cook with her tap water because it is drawn from the Big Coal River downstream from coal waste impoundments.  Id. at 5.  She no longer fishes in local streams, though she would if she had evidence that coal wastes had not rendered it unsafe.  Id. at 5-7.

Likewise, Mary Miller of OVEC and CRMW lives in ongoing fear of the impoundments near her home.  See Exhibit F, Affidavit of Mary Miller at ¶¶ 1-6.  She abandoned her well water and now pays for city water because of her concerns about contamination from coal mining wastes.  Id. at 8.  Although she no longer wades or fishes in the streams, she would do so if she were persuaded it was safe.  Id. at 9-11. Because the coal companies will not allow anyone to test their waste, she does not know whether the coal waste

43

that spills from the impoundments near her home is toxic or not.  Id. at 7.

    Walter and Carol Young have had similar experiences.  Their affidavits establish their standing.  They are riparian landowners and the impoundment upstream from their home has spilled "blackwater" onto their property.  See Exhibit G, Affidavit of Walter Young at ¶¶ 3-6.  Mr. Young has had difficulty getting state regulators to respond to the spills, in part because coal waste is treated as nonhazardous.  Id. at ¶¶ 4, 6.  Mr. and Mrs. Young have stopped drinking their well water for fear that it is contaminated by the nearby impoundment and do not sleep on rainy nights for fear the impoundment will burst.  Id. at 8-10; Exhibit H, Affidavit of Carol Young at ¶¶ 5-7.  Their injuries would be redressed by success in this litigation.  Id. at ¶ 11.

    Finally, Cindy Rank of WVHC has suffered injuries to her recreational and aesthetic interests as a result of Defendants' nonfeasance.  She use to "splash and play" in the headwater streams of Tenmile Creek in Upshur County, West Virginia, but no longer does because of contamination from leachate from a coal waste impoundment.  See Exhibit C, Affidavit of Cindy Rank at ¶ 12.  Further, the mere sight of that impoundment makes her sick to think that "the pollution it has caused could have been prevented by better regulation."  Id. at ¶ 11.  She avers that "[m]ore information about the toxicity [of] the coal waste could have meant more stringent requirements for disposal and less chance that the leachate [from the Tenmile waste impoundment] would escape into the groundwater and adjacent streams."  Id. at ¶ 11.

    In short, the attached affidavits capture a part of the effects of coal waste disposal on the lives of West Virginians.  Plaintiffs' members have lost their water sources to contamination, have given up swimming and fishing, and, in at least one instance, have had to relocate because of the disposal of coal mining and beneficiation waste.  Twenty years ago, EPA exempted coal waste from regulation as hazardous without any basis, and, because of

Defendants' continuing nonfeasance, coal waste remains poorly regulated today.  If this Court

orders Defendants to perform their duties, then Plaintiffs' members will receive the information

that they need to make informed decisions and, if necessary, to seek stricter regulation of coal

wastes.  In other words, Plaintiffs have standing to bring this suit on behalf of their members

because their members meet the "irreducible constitutional minimum of standing."  <u>Sierra Club</u>

<u>v. Mainella</u>, 459 F. Supp. 2d 76, 91 (D.D.C. 2006) (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny

Defendants' Motion.

Respectfully submitted,

**/s/ Derek O. Teaney**
DEREK O. TEANEY (WVSB # 10223)
Appalachian Center for the Economy and
     the Environment
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 793-9007
Fax:  (304) 645-9008
E-mail: dteaney@appalachian-center.org

**/s/ Jonathan Turley**
JONATHAN TURLEY (DC Bar #417674)
Attorney and Director, Shapiro
     Environmental Clinic
George Washington University Law School
2000 H ST., N.W.
WASHINGTON, D.C. 20052
(o) 202-994-7001
(f) 202-994-9811
Email: jturley@law.gwu.edu

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that on August 8, 2007, I electronically filed the foregoing using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

Mary Whittle
Trial Attorney
Environmental Defense Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
Tel: (202) 514-0286
Fax: (202) 514-8865
Email: mary.whittle@usdoj.gov

**/s/ Derek O. Teaney**
*Counsel for Plaintiffs*

# EXHIBIT A

Case 1:07-cv-00667-JDB    Document 12-2    Filed 08/08/2007    Page 2 of 18

# COAL WASTE IMPOUNDMENTS

## Risks, Responses, and Alternatives

Committee on Coal Waste Impoundments

Committee on Earth Resources

Board on Earth Sciences and Resources

Division on Earth and Life Studies

National Research Council

NATIONAL ACADEMY PRESS
Washington, D.C.

Coal Waste Impoundments: Risks, Responses, and Alternatives

http://books.nap.edu/catalog/10212.html

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# Executive Summary

On October 11, 2000, near Inez, Kentucky, a breakthrough occurred in which a 72-acre surface impoundment of waste materials of the Martin County Coal Corporation released approximately 250 million gallons of slurry into a nearby underground coal mine. The slurry flowed through the mine and into nearby creeks and rivers, flooding stream banks to a depth of 5 feet. Although the spill caused no loss of human life, environmental damage was significant, and local water supplies, taken from the rivers, were disrupted for days. This incident caused Congress to request the National Research Council to examine ways to reduce the potential for similar accidents in the future. To conduct this study, the National Research Council appointed the Committee on Coal Waste Impoundments. The committee held a total of 10 meetings between March and July 2001, eight of which included a town meeting to gain input from citizens of local communities.

The charge to the committee includes three major components. First, the committee was to examine engineering practices and standards currently being applied to coal waste impoundments and to consider options for evaluating, improving, and monitoring the barriers that retain coal waste impoundments. Second, the committee was charged with evaluating the accuracy of mine maps and exploring ways to improve surveying and mapping of underground mines to delineate more accurately how underground mines relate to current or planned slurry impoundments. The third task was to evaluate alternative technologies that could reduce the amount of coal waste generated or allow productive use of the waste. The committee also examined alternative disposal options for coal slurry.

It is important to recognize that this charge specifically directs the committee to focus its analysis on the engineering and characterization of coal waste impoundments. The committee was not asked to consider other factors that are related to potential impacts of disposing of coal waste in an impoundment, or any other disposal option. For example, these factors might include potential long-term effects on water quality; land-use issues,

Copyright © National Academy of Sciences. All rights reserved.

This executive summary plus thousands more available at http://www.nap.edu

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

including long-term stewardship of closed impoundments; and economic and cost-benefit analyses of alternatives. The committee also was not asked to evaluate the risks of individual impoundments, examine the qualifications and training of inspectors, or comment on coal mining policy issues not directly related to impoundments. Although important, such issues are well beyond the charge to this committee. Furthermore, a comprehensive analysis of these issues would require considerably more time than was available for the present study.

Advances in mining technology have increased productivity at the expense of quality of the run-of-the-mine product, both in terms of included impurities and a greater proportion of fine-grained coal. This is particularly true for the coal from eastern coal fields, and upgrading of the product to meet requirements of power plants and other users is now a common practice. The treatment of the raw coal can produce as much as 50 percent waste as coarse included rock and as fine-grained coal and mineral matter. Coal waste slurry is one of the refuse streams and is composed mainly of fine coal, small particles of rock, and clay suspended in water. Coal waste slurry is usually disposed of by pumping it into an impoundment, where particles are allowed to settle. Most impoundments in Appalachia utilize the natural topography to form the storage basin that will contain the slurry. This is often accomplished by constructing an embankment in a valley or watershed to complete the basin structure used for storage. Impoundments are often located in steeply sloping valleys.

Coal waste slurry facilities have been involved in several accidents since the 1972 Buffalo Creek incident, where a coal waste impounding structure collapsed, killing 125 people, injuring 1,100, and leaving more than 4,000 homeless. The majority of the incidents involve failure in the basin area. Inaccurate mine maps and inadequate characterization of the basin area most likely contributed to at least some of these incidents. This report, in an effort to identify potential causes of failure, evaluates current practice in site characterization, basin placement, and embankment construction, maintenance, and monitoring. It concludes with a discussion of alternative methods of coal use and waste disposal. Technical terms used in the text are defined in the glossary (Appendix C).

## ENGINEERING STANDARDS, BARRIER STABILITY AND MONITORING

The Mining Enforcement and Safety Administration developed standards for impoundments and refuse piles after the 1972 Buffalo Creek

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

Coal Waste Impoundments: Risks, Responses, and Alternatives
http://books.nap.edu/catalog/10212.html

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

incident. One of the purposes of the Federal Mine Safety and Health Act of 1977 was to establish mandatory standards to protect the health and safety of miners. This charge is important in assessing the Mine Safety and Health Administration's (MSHA's) regulatory responsibility and authority associated with potential impoundment breakthroughs and failures that do not directly affect the health and safety of miners but may affect persons, communities, or ecosystems downstream. On the other hand, the Office of Surface Mining's (OSM's) legislative and regulatory direction under the Surface Mining Control and Reclamation Act of 1977 (SMRCA) to protect society and the environment from the adverse effects of surface coal mining operations, complements the intent of the Federal Mine Safety and Health Act.

The committee examined the regulations by MSHA and OSM and its state delegate programs that directly relate to the design, construction, operation, and closure of refuse impoundments, as well as to alternative refuse disposal techniques. The committee also examined other federal statutes that may relate to refuse impoundments or alternatives (e.g., the Clean Water Act). The regulatory structure that covers many aspects of the design, construction, and operation of coal waste impoundments is extensive. The MSHA and OSM regulatory language addresses in detail the engineering and stability aspects of the embankment; however, there is little reference either to the basin area or to requirements of the engineering design for other areas of the facility. The impoundment operator and professional engineer are responsible for providing information about underground mine workings, including the depth and extent of the workings. However, no regulation or standard industry practice instructs or guides the engineer in this task, and there is no procedure for an independent verification of the information submitted. In addition, there is no regulation requiring an evaluation of the breakthrough potential of impoundments. However, in practice, MSHA and OSM appear to have the jurisdiction to require an evaluation of breakthrough potential through indirect regulatory language. The committee concludes that while the regulatory review of a proposed impoundment is detailed with respect to the embankment, the regulatory review of the impoundment basin has been less rigorous. The authority for review of the basin characterization and design appears to be covered only in general language authorizing investigation of all relevant issues with respect to the impoundment. **The committee recommends that MSHA and OSM should have clear authority to review basin design.** It is not evident to the committee whether specific legislation to authorize more detailed examination of basin issues is required, or whether these issues can be handled by additional rulemaking under existing authority.

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

Coal Waste Impoundments: Risks, Responses, and Alternatives
http://books.nap.edu/catalog/10212.html

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

The committee examined in particular the elements of design, operation, and reclamation of coal refuse impoundment systems in the Appalachian coal region. The principles that govern the design of structures, which were promulgated in response to the Buffalo Creek disaster, are well understood and fully documented. An embankment built to contain coal mine waste is similar to an embankment built to contain mine waste from other extractive industries. Reviews of failure modes in other extractive industries are relevant to identifying potential failure modes of coal waste impoundments. Given the fact that some modern dams in other extractive industries have failed, the committee concludes that it is essential that MSHA and OSM stay current by ensuring that design criteria reflect the latest experience from all segments of the mining industry. Although the committee has not identified any deficiencies, it is a matter of due diligence that MSHA and OSM and industry employ the best available current technology. **The committee recommends that MSHA and OSM continue to adopt and promote the best available technology and practices with regard to the site evaluation, design, construction, and operation of impoundments.** For example, MSHA and OSM should commission periodic reviews of existing technical procedures and practices, with particular attention to the basin. Results of the reviews should be disseminated to industry. Based on the outcome, MSHA and OSM may need to revise guidelines to establish minimum expectations and levels of investigation for site characterization, design, construction, operation, and closure of coal refuse impoundments.

Embankments can fail in a variety of ways, including slope instability, liquefaction, and foundation failure. Seepage through embankments can lead to failure by internal erosion. Overtopping of an embankment can cause substantial erosion of the crest, which, if left uncontrolled, will work progressively downward, releasing water and coal refuse downstream. While continued vigilance concerning design, construction, and operation of embankments is clearly warranted, the committee concludes that the largest uncertainties remain in the characterization of the basin area and, therefore, in the mitigation of risks associated with the breakthrough potential. The potential for underground coal mine workings to be near an impoundment is a factor in the design of new and in modifications to existing coal waste impoundments in Appalachia. The relative elevations of local drainage and slurry height, with respect to underground mines, can be a critical design issue. The stream channel at the base of the impoundment basin defines the approximate level of local drainage. Coal seams and mines that do not crop out above the level of the stream channel are termed below-drainage; whereas, those that crop out along the valley wall above the stream channel are termed above-drainage. Existing impoundments with above-drainage

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

mine workings, where the slurry elevation does not exceed the level of the coal mine workings, can relatively easily incorporate mitigative measures for these workings in their design. Above-drainage coal mine workings in existing impoundments, where the slurry elevation exceeds the level of the mine workings, are the most challenging in the design and operation of a facility.

If the outcrop coal barrier is of insufficient width, or the overburden above the mined area is too thin, impounded water can break into a mine. Conversely, an inundated mine under high hydraulic head can introduce a large volume of water into the impoundment. Should a blow-out occur elsewhere in the watershed, above the pool level, an inflow of substantial amounts of water into the impoundment can result. This, in turn, may result in overtopping of the embankment or damage to the principal and emergency spillways. Synergistic reactions among geologic and hydrogeologic conditions can compound the instabilities created by any one of the failure modes. Currently, no federal regulations address the width of outcrop barrier that should be left during underground coal mining. OSM has studied the problem of outcrop barriers but has released no conclusions to date. **The committee recommends that MSHA and OSM jointly pursue the issue of outcrop coal barrier width and overburden thickness and its competence and develop minimum standards for them.**

If slurry from an impoundment leaks into active or abandoned mine workings or may do so, bulkheads or seals may be constructed to preclude the water from escaping into the outside environment. Many mitigative measures can be designed using established procedures; however, bulkheads designed to support high hydrostatic pressure present a different kind of problem. **The committee recommends that MSHA review its current practice and develop guidelines for the design of bulkheads intended to withstand hydraulic heads associated with slurry impoundments.** The bulkhead should be constructed from material that can withstand water action without deterioration in the presence of the various chemicals in the impoundment water. Furthermore, the bulkhead should be suitably anchored in competent, unfractured strata. If such an area is not available, pressure grouting may be needed. Deterioration of the anchoring strata can be a major structural problem where the bulkhead is keyed into water-sensitive, clay-bearing strata. The size, integrity, and strength of the surrounding coal pillars, roof, and floor are critical to successful sealing. Generally, seals constructed for ventilation cannot withstand water pressure.

The committee concludes that selecting the appropriate mitigative measures relies strongly on reliable basin characterization. **The committee recommends that MSHA and OSM develop and promulgate guidelines**

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

Coal Waste Impoundments: Risks, Responses, and Alternatives
http://books.nap.edu/catalog/10212.html

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**for the site evaluation, design, construction, and operation of basins.** They should be comparable in scope to the guidelines used in embankment design.

Monitoring is a critical component in the construction and operation of coal slurry impoundments. Measurements are commonly made to detect surface displacements, internal movement, pore pressure, groundwater level, surface water discharge, and subsurface movement. Procedures in place for monitoring the embankment, which include visual inspection and instrumentation, appear to be performing as envisioned in the regulations MSHA implemented. For monitoring to be successful, it should be applied to all potential failure modes. The committee believes that there are opportunities for additional continuous monitoring that may offer timely warning in case of impending failure of an embankment or basin. **The committee recommends that MSHA and OSM consider requiring additional continuous monitoring in specific instances and evaluate automation of monitoring instruments.**

## SITE CHARACTERIZATION

Key to assessing the potential for breakthrough of coal slurry into underground mine workings is knowing the extent of those workings with respect to the ground surface in the impoundment basin area. The committee examined several aspects of the topic of site characterization, including geology, hydrogeology, the accuracy of surface and mine maps, and methods for delineating the extent of underground mine workings in situations where maps are nonexistent or inaccurate. A particular problem is old surveys and maps, some of which have been lost or destroyed. If unknown mine workings are present, the impoundment could suffer unexpected structural failure. In areas where impoundments are constructed near known or suspected underground mines, vertical and horizontal barrier distances between the mined area and the impoundment may not be accurate. Current regulations require closed-loop mine surveys, but surveys for many older mines were not closed. Furthermore, underground mine surveys may have been based on a foreman's notes or sketches that lack a reference point or a recognized coordinate system that would allow accurate location. These shortcomings are more common in small mines or room-and-pillar mines where a number of short panels were driven and extracted. **Therefore, the committee recommends that MSHA work with OSM and state agencies to establish standards for mine surveying and mapping. These should include the following:**

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

Coal Waste Impoundments: Risks, Responses, and Alternatives
http://books.nap.edu/catalog/10212.html

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

- **Determining surface coal outcrop locations by aerial topographic measurements, where adjacent to existing or proposed refuse impoundments,**
- **Implementing a coordinated and assertive approach to collecting and archiving mine maps,**
- **Scanning paper copies of mine maps into electronic data files upon receipt,**
- **Setting standards for minimum closure error for all underground closed-loop surveys and that a closed-loop survey be maintained within a standard distance (to be determined by MSHA),**
- **Recording the depth of the last cut taken to a level of accuracy to be determined by MSHA,**
- **Using state plane coordinates or latitude and longitude, and bottom-of-seam elevations as the map base reference,**
- **Listing appropriate coordinate transformation equation(s) on the mine map,**
- **Adding a qualifying statement to accompany any coordinate transformation that is based upon the alignment of surface features,**
- **Improving and maintaining the location of surface controls,**
- **Determining which mine permit documents should be retained, in what form, and for how long,**
- **Avoiding the use of coal seam names as the sole basis for determining the vertical location of an abandoned mine.**

When no mine maps can be found or there is reason to doubt their accuracy, additional investigation to locate underground mine workings is warranted. This can be expensive and time consuming. Because of the time and expense and remaining inherent uncertainty associated with extensive drilling, remote sensing and geophysical methods have been employed to search for abandoned coal mines. The objective of geophysical surveys is to determine the physical characteristics of a three-dimensional volume of earth material, including the presence of voids. Since no geophysical technique is capable of performing optimally under all geologic and topographic conditions, multiple geophysical techniques may be necessary to reduce the probability for error to an acceptable level. Drilling is still necessary to confirm and calibrate interpretations of geophysical and remote sensing data. The absence of evidence of a mine is not evidence of absence of a mine, and there are many opportunities for error in the modeling and geophysical surveys needed to detect voids. The committee concludes that geophysical

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

Coal Waste Impoundments: Risks, Responses, and Alternatives
http://books.nap.edu/catalog/10212.html

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

techniques can be useful in coal mine void detection, especially the use of seismic surface waves, seismic reflection, ground-penetrating radar, and electrical resistivity methods. The committee also concludes that geophysical techniques have been underutilized in the coal-mining industry and could benefit from additional research. **The committee recommends that demonstration projects using modern geophysical techniques be funded, and that the results be widely conveyed to the mining industry and to government regulatory personnel through workshops and continuing education.** Continuing education could include the opportunity to attend short, courses and seminars that present the latest technology along with case histories to support its use.

## ALTERNATIVE TECHNOLOGIES

Coal waste impoundments are one of the waste disposal options of the present system of mining and preparing coal for energy production. To assess thoroughly other alternatives, the entire system of mining, preparation, refuse disposal, transportation, and power generation should be explored through an in-depth life-cycle assessment, including cost assessment, with the goal of optimizing the system to generate less fine coal waste while maintaining the performance and economics of the system. However, benefits may be difficult to realize because of differences in interests and perceptions between the mining industry and the utility industry, and because of the resistance to change embedded in these mature industries. **The committee recommends that the total system of mining, preparation, transportation, and utilization of coal and the associated environmental and economic issues be studied in a comprehensive manner to identify the appropriate technologies for each component that will eliminate or reduce the need for slurry impoundments while optimizing the performance objectives of the system.** The committee concludes that a similar analysis of the waste use and disposal technologies that make up the coal system would have value. **The committee recommends incorporating life-cycle assessment of the costs and environmental impacts of the alternatives to evaluate them on a more objective, comprehensive basis. In addition, a detailed analysis of the economic and environmental impact of the various policy alternatives should be performed.**

The opportunities for reducing slurry volume include mining alternatives and coal processing alternatives. However, modern methods of surface and underground coal mining offer a limited possibility for quality control during mining. Slurry volume can be reduced by improving fine coal

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

recovery, minimizing the mass of solids for disposal, and dewatering. Many dewatering technologies are currently available for specific applications, though none is likely to be universally applicable. The committee believes that equipment vendors' current research and development will lead to improvements in these technologies and that operators of coal waste impoundments should monitor them carefully.

Slurry refuse can be used directly for power generation, either in conventional boilers or in advanced combustion and gasification technologies. Some of these technologies can reduce cleaning requirements for coal. However, the use of low quality coal feed will increase the amount of waste generated at the power plant. The committee concludes that technologies for utilization of fine coal waste for electricity generation in conventional coal-fired power plants are available. These technologies offer near-term opportunities for the reduction of fine coal waste disposed of in impoundments. However, the coal produced is more expensive than cleaned coal, as a result of capital and operating costs of additional equipment, and, in the case of coal water slurry, the additional cost of transportation. To compare technologies fully, the avoided costs of slurry impoundments must be included in the analysis.

Fluidized-bed combustion and gasification show promise for recovering the heat content of fine coal waste while avoiding some of the operational problems that limit use of coal fines in conventional pulverized coal-fired boilers. The committee concludes that the burning of fine coal waste in advanced combustion technologies, such as fluidized-bed combustion and gasification, is an alternative that shows considerable long-term promise. Atmospheric fluidized-bed units are already in use for combustion of fine coal waste slurries from both preparation plants and old slurry impoundments, but they have not gained wide usage. Pressurized fluidized-bed technologies offer improved efficiency over atmospheric technologies but have not been utilized in full-scale applications for burning fine coal waste. Gasification technologies are also promising for coal water slurries, because they operate more efficiently, and because emerging technologies can utilize the water from the slurry as a steam source required for the gasifier. Further research is needed on the use of fine coal waste slurries as feeds, and incentives may be useful if these technologies are to be widely incorporated for fine coal waste combustion. Even though coal combustion wastes from power plants are already being used for a number of purposes, safe handling of coal combustion waste from these advanced combustion technologies should be studied further.

Methods are available for the disposal of coal slurry other than in impoundments, including both surface and underground options. Alternative

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

surface methods include incised ponds, slurry cells, combined refuse piles, and co-disposal of fine and coarse refuse. In many instances, these methods are influenced by topography, geology, and mining and coal preparation characteristics, and, therefore, their application is site specific.

Incised ponds, which are similar to slurry impoundments but without an embankment, are designed to accept any form of coal waste including slurry. This method of surface disposal is most common in the Midwest where area surface mining is practiced on flat topography. Area surface mining produces long end-cuts and inclines, which are usually allowed to fill with water to form a permanent lake. These excavations are at or below the level of surface drainage and do not present a danger of sudden failure if used for slurry disposal.

Slurry cells are designed to impound less than 20 acre-feet of slurry. The advantage of this method over conventional cross-valley impoundments is that each cell is small and self-contained and can be designed according to the strength properties of the coarse refuse. The main disadvantage in steep terrain is the limited availability of flat land to construct the cells. Another disadvantage is that slurry cell operations are not compatible with a high coal preparation production rate.

Combined refuse piles consist of fine refuse from a static thickener that has been mechanically dewatered and combined with coarse refuse. Mechanical dewatering to yield the required moisture level is frequently a problem. In addition, the dewatered material is difficult to handle and compact. Combined refuse is expensive because of the high cost of mechanical dewatering and the potential need for chemical additives to stabilize the combined refuse. This method is best suited to flat land.

Co-disposal involves the combination of fine refuse from the static thickener with coarse refuse. This method requires less total storage volume than separate fine and coarse disposal methods, and the refuse stabilizes more quickly than typical slurry. Co-disposal has been used primarily in sparsely populated areas with low annual rainfall. Questions remain about its suitability for steep hills with high annual rainfall.

If an effective dewatering approach, such as paste thickening, is used, the resulting waste can be disposed of by thickened high-density residue stacking. Although used in other extractive industries, this process has seen limited use in the coal industry for the disposal of fine coal refuse. Three considerations—land availability, steep terrain, and cost—hamper applying unsupported thickened high-density residue stacking to fine coal refuse disposal. This method is best suited to areas where the slope of the land is less than 5 percent. The lower throughput rate of deep cone thickeners

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

compared with that of standard thickeners may significantly affect the economic feasibility of the method.

For the underground options, two primary methods for injecting fine coal refuse into underground mines are controlled flushing, where the underground workings are accessible, and blind or uncontrolled flushing, where the underground workings have been abandoned or have caved in. However, several issues are both important and independent of the method of slurry injection. For example, it is essential to have an adequate supply of water. This is especially true when water is not being recaptured from the underground workings. Additional issues include surface ownership, permits, surface layout, and surface drainage. Filling above-drainage mine workings with slurry may increase hydraulic head on the coal barriers and result in a blow-out, making evaluation of mine workings above a surrounding stream valley critical. The accuracy of mine maps must be ascertained, and the underground barriers must be assessed for adequacy to contain the slurry. Mines below the surrounding natural drainage level offer more secure underground disposal sites.

The committee concludes that although there are alternatives to disposing of coal waste in impoundments, no specific alternative can be recommended in all cases. Acceptable alternatives are highly dependent upon regional and site-specific conditions. Also, the alternatives that have been identified are in varying stages of technological development and implementation. One of the factors limiting implementation to this point has been the costs associated with the various alternatives. Additional research is needed to develop these alternatives further and to evaluate the economics of these processes. **The committee recommends that a screening study be conducted that (1) establishes ranges of costs applicable to alternative disposal options, (2) identifies best candidates for demonstration of alternative technologies for coal waste impoundments, and (3) identifies specific technologies for which research is warranted.** Input from MSHA and OSM regarding regulatory issues will be valuable to such a study. **The committee recommends that the use of economic incentives be explored as a way of encouraging the development and implementation of alternatives to slurry impoundments.** The development of incentives should be based on the full range of the portfolio of technologies as well as the economics of the technologies. The incentives should be linked directly to the reduction in slurry production or the utilization of slurry.

One method for reducing the volume of material in older slurry impoundments is to recover or remine the fine coal. Older impoundments contain significant amounts of coal refuse with recoverable energy value. However, as processing technologies and the capacity of dewatering

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

Coal Waste Impoundments: Risks, Responses, and Alternatives
http://books.nap.edu/catalog/10212.html

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

equipment have improved, the proportion of coal with high energy value being deposited in slurry impoundments has decreased. In many cases, the finer slurry materials being disposed of today with less recoverable and marketable coal are placed over the more amenable, profitable, and recoverable slurry. Typically, if an impoundment contains at least 1 million tons of in-situ slurry, a recovery rate of at least 30 percent of a marketable fine coal product (300,000 tons) from the slurry could prove to be a profitable venture. The -committee concludes that as advances are made in the use of low value coal or coal water slurry, remining of slurry impoundments can be an attractive source for fuel supply.

## ADDITIONAL RECOMMENDATIONS

In its deliberations, the committee identified several issues that cut across elements of the statement of task and some related issues that warrant additional study.

MSHA currently uses two systems to classify coal waste impoundments. One system classifies impoundments as high, medium, or low hazard, based upon the magnitude of the potential consequences of failure of the embankment structure. If communities and structures are immediately downstream, the embankment would be classified as high hazard, regardless of its likelihood to fail. A second system addresses the potential for the unintentional release of water or slurry from impoundments into active or abandoned mines. These ranking systems are based on the proximity of the basin to underground workings as well as the potential downstream impacts if a basin were to fail. The second classification comes closer to the standard definition of risk as the product of hazard (the likelihood of failure) and consequences (such as loss of life, environmental damage). The committee concludes that using different hazard classification methodologies for embankments and basins is inappropriate. **Therefore, the committee recommends that: (1) MSHA and OSM review activities related to risk assessment for existing impoundments (including both embankments and basins) to ensure that they are consistent and that they distinguish appropriately between hazard and consequence assessment in the methodologies adopted; and (2) MSHA and OSM establish a single, consistent system, which should be used to assign both embankments and basins to risk categories.** The ranking should be based on the appropriate combination of hazards and consequences. The committee believes that this can be accomplished using qualitative risk assessment techniques.

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

A consistent risk assessment system would allow decisions to be based on their relative risks. **The committee recommends that MSHA and OSM oversee a thorough assessment of potential mitigation measures for those impoundments that fall in the highest risk category and should determine which mitigation measures should be applied to reduce this risk to an acceptable level.**

The committee also concludes that the design process for impoundments would be improved by a more formal risk analysis. Proposed new impoundments should also be assigned to risk categories, based on a combination of hazards and consequences, as was suggested for existing impoundments. **To maximize the potential for risk reduction, the committee recommends that all impoundment designs be accompanied by a risk analysis utilizing qualitative methods.** Examples of such methods include Potential Problem Analysis and Failure Modes and Effects Analysis.

The committee believes there is a limit to risk tolerance, for both existing and new impoundments. When risk is high, and when mitigation, either through more reliable characterization or barrier construction is impossible, of limited precedent, or so expensive that it is infeasible, then a substantial change in operation of the impoundment is warranted. This may range from minimizing slurry fluidity to ceasing operations. If an impoundment fails risk-assessment criteria and if risk cannot be mitigated it should be phased out or alternatives considered.

In collecting information concerning the design of impoundments and the process by which the design is reviewed by regulatory authorities, the committee heard reports that the review process is undesirably lengthy, commonly exceeding 2 years. In addition, it appears that review times have lengthened considerably in recent years. The committee concludes that timely review is an essential component of an effective regulatory process. An efficient and coordinated regulatory review process can be of substantial benefit to both the applicant and the jurisdictional agencies. A well-coordinated technical review process can ensure that the health and safety of both the miners and the public, and the protection of the environment are ensured in a sensible and streamlined way. **Therefore, the committee recommends that the review process for both new permits and existing permits be overhauled to include the following elements:**

- **A formal joint process that would coordinate the currently fragmented and inefficient collection of reviews into a single process.**

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

Coal Waste Impoundments: Risks, Responses, and Alternatives
http://books.nap.edu/catalog/10212.html

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

- **Sufficient staff for engineering and other reviews in the agencies that participate in the joint process so that the time required to complete the review can be reduced significantly.**

   In its review of information about the impacts of uncontrolled releases of water and slurry from impoundments, the committee found that only very limited information was available concerning the quantities of trace elements present in the slurry and associated water. A common theme at the town meetings was the concern about the quality of ground and surface water. While a detailed review of the environmental impacts of coal waste impoundments was beyond the scope of this study, the committee identified this area as one needing further study. As **a result, the committee recommends that research be performed to identify the chemical constituents contained in the liquid and solid fractions of coal waste, and to characterize the hydrogeologic conditions around impoundments.**

   Public concern regarding emergency response and evacuation plans was another recurring theme in public comments made to the committee. Some residents were unaware of emergency evacuation plans; others had seen evacuation plans but disagreed with the logic behind the evacuation routes and would not have used the plan in the event of an emergency. Conversely, coal industry and regulatory agency representatives stated that these plans are being developed and shared with the public through the various community contacts (e.g., local fire departments, police, health care providers). The lack of realistic communication constitutes a fundamental barrier to the industry's ability to make stakeholders aware of the risk associated with coal refuse impoundment construction, operation, and closure and of steps taken to mitigate that risk. The committee concludes that communication concerning coal refuse impoundment risk and emergency response between the industry and the local communities could be improved substantially. The committee suggests that the industry take steps through the appropriate emergency response agencies to address these problems.

## SUMMARY

   The conclusions and recommendations offered above reflect the committee's judgments concerning ways to improve the design process for coal waste impoundments, ways to improve mapping of mines and the characterization of sites of existing and future impoundments, ways to improve the assessment and mitigation of risks associated with impoundments,

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

and ways to assess options for coal waste slurry. The committee believes that implementation of the recommendations will substantially reduce the potential for uncontrolled release of coal slurry from impoundments, particularly through the mechanism of breakthrough into nearby underground mine workings. In addition, the committee believes that viewing the designs of embankment and basins as well as the entire process of handling and burning coal as systems of interlinked components that operate together is an appropriate way to balance alternatives for creating, handling, and disposing of wastes and to understand and mitigate the impacts of failure of any element in these systems. The safe operation of these systems is a shared responsibility of government and industry that depends on effective engineering design, construction, and operation in addition to appropriate monitoring. With the recommended improvements in each of these areas, the potential for incidents like that in October 2000 at Inez, Kentucky, can be reduced.

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

Coal Waste Impoundments: Risks, Responses, and Alternatives
http://books.nap.edu/catalog/10212.html

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright © National Academy of Sciences. All rights reserved.
This executive summary plus thousands more available at http://www.nap.edu

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WEST VIRGINIA HIGHLANDS
CONSERVANCY; OHIO VALLEY
ENVIRONMENTAL COALTION, and
COAL RIVER MOUNTAIN WATCH,

     Plaintiffs,

v.                                              CIVIL ACTION NO. 07-0667(JDB)

STEPHEN L. JOHNSON, Administrator,
U.S. Environmental Protection Agency; and
DIRK KEMPTHORNE, Secretary, United
States Department of Interior,

     Defendants.

## AFFIDAVIT OF VIVIAN STOCKMAN

I, Vivian Stockman, state and affirm as follows:

1.     I live in Roane County, West Virginia, near the town of Spencer.

2.     I began volunteering for the Ohio Valley Environmental Coalition ("OVEC") in 1995.

3.     OVEC is a nonprofit corporation whose mission is to organize and maintain a diverse grassroots organization that is dedicated to the improvement and preservation of the environment through education, grassroots organizing and coalition building, leadership development, and media outreach. The organization works throughout West Virginia.

4.     In 1998, OVEC hired me as a part-time staff member.

5.     From 2000 to present, I have been a full-time paid staff member. I hold the position of Project Coordinator.

Ex. B
1 of 5

6. I am also a member of and volunteer for Coal River Mountain Watch ("CRMW"), and have been for approximately five years.

7. CRMW is a nonprofit membership organization in southern West Virginia that is dedicated to the establishment of social, economic, and environmental justice in the southern coalfields of West Virginia. A local leader in environmental and community issues related to the impacts of coal mining, CRMW works to keep communities intact and to improve the quality of life in those communities.

8. OVEC and CRMW, along with the concerned citizens of Mingo County, cofounded the Sludge Safety Project in 2004, a collaborative effort seeking to document the effects of coal slurry—a waste product of coal cleaning—on human health and the environment, to reform the regulation of the disposal of coal slurry, and to encourage the adoption of alternative coal cleaning techniques that do not generate coal slurry as a waste product.

9. I have been directly involved with the Sludge Safety Project since its inception.

10. The purposes of the Sludge Safety Project include identifying the chemical constituents in coal slurry, identifying the effects of coal slurry on human health and the environment, building awareness of coal slurry impoundments and underground injection sites, and helping citizens to protect themselves from the effects of coal slurry contamination.

11. Through the Sludge Safety Project, OVEC and CRMW have expended approximately 1,000 hours of staff and volunteer time to answer what should be the simple question of what is in coal slurry. Those hours have been spent reviewing scientific and other literature about coal cleaning and reviewing public records of the state environmental protection agency.

12. Frankly, our efforts to date to identify the chemical constituents of coal slurry in

2

Ex B
2 of 5

West Virginia have been largely in vain. The government has little valuable data, and coal companies have been secretive and greatly restrict citizen access to their coal cleaning and waste disposal facilities.

13.  OVEC and CRMW founded the Sludge Safety Project in response to their members' concerns about the chemicals used to clean coal and the metals that leach from coal fines in slurry and their concerns about the safety of coal sludge dams and impoundments.

14.  Our concerns are based on, among other things, anecdotal reports from coal preparation plant workers regarding the toxicity of chemicals used to clean coal and of illnesses of similar workers who routinely handle those chemicals.

15.  Further, citizens in the community of Rawl, West Virginia, are suffering from what may be a statistically significant increase in various diseases that have been linked to the chemicals believed to be in coal slurry. Those citizens' well water is believed to have been contaminated with coal mining waste as a result of the injection of coal slurry into abandoned underground mines.

16.  OVEC and CRMW have also expended time and resources through the Sludge Safety Project to identify alternative methods of coal cleaning and of coal waste disposal in order to advocate for the use of those alternatives. For example, OVEC and CRMW have both contributed the time of summer interns to contact experts and review the scientific literature in order to identify potential alternatives.

17.  Although the Sludge Safety Project has identified a handful of alternative methods of coal cleaning and coal waste disposal, because of our limited time and resources, we are far from confident that we have identified all of the potential alternatives.

18.  This past legislative session, the Sludge Safety Project was able to persuade the

3

*Ex B*
*3 of 5*

West Virginia Legislature to direct the West Virginia Department of Environmental Protection to study the effects of the underground injection of coal slurry. Over the past two years, the Sludge Safety Project's efforts related to the proposed study consumed approximately 70% of the project's budget.

19.    Although the state's study of the underground injection of coal slurry will generate valuable data, it will not fill the coal mining waste information deficit. It will look only at six injection sites and must be completed in less than one year. Further hampering the study is the legislature's failure to provide additional resources to the agency to conduct the study.

20.    OVEC and CRMW expect to contribute more time and resources to the Sludge Safety Project to oversee the state agency's study.

21.    Had they not had to consume so much time and money just to try to identify the chemical composition of coal slurry, to identify alternative cleaning and disposal methods, and to lobby the legislature to force the state agency to study the underground injection of mining wastes, OVEC, CRMW, and the Sludge Safety Project could have used those resources to further their educational, organizing, and outreach efforts.

22.    Every purpose of the Sludge Safety Project has been frustrated by the dearth of information regarding the composition of coal cleaning waste and its disposal.

23.    Our efforts to persuade local lawmakers to scrutinize the disposal of coal slurry in multi-billion gallon impoundments have been made quite difficult by our lack of solid information regarding the risks of coal mining and cleaning waste to human health and the environment.

24.    The Sludge Safety Project's arguments to the legislature in favor of a moratorium on the construction of new sludge impoundments have been based largely on anecdotal evidence.



Our volunteers have found legislators to be skeptical of such evidence without science to back it up.

25.    If the Sludge Safety Project had access to an EPA-generated study of coal mining waste and disposal, then it could forego dedicating further resources to obtaining the basic information that it needs to educate the public and the legislature about the effects of the disposal of coal slurry in impoundments and underground injection wells on human health and the environment.

26.    Instead, it could dedicate resources to drumming up public support for changes to the regulation of the disposal of coal mining and cleaning wastes.  If an EPA study were to reveal that coal mining and cleaning wastes are hazardous and that current disposal practices are inadequate to protect human health and the environment, then the Sludge Safety Project would have the information that it needs to make a compelling argument in favor of stricter regulation.

27.    On the other hand, if an EPA study were to reveal that the effects of coal mining and cleaning wastes are relatively benign, then the Sludge Safety Project could refocus its resources on the structural safety of the dams on coal slurry impoundments.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on  this 3rd day of August, 2007.

Vivian Stockman

Ex B
5 of 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WEST VIRGINIA HIGHLANDS
CONSERVANCY; OHIO VALLEY
ENVIRONMENTAL COALTION,
and COAL RIVER MOUNTAIN
WATCH,

               Plaintiffs,


      v.                                 CIVIL ACTION NO. 07-0667(JDB)

STEPHEN L. JOHNSON,
Administrator, U.S. Environmental
Protection Agency; and DIRK
KEMPTHORNE, Secretary, United
States Department of Interior,

               Defendants.


## AFFIDAVIT OF CINDY RANK

I, Cindy Rank, state and affirm as follows:

1. I live at HC 78 Box 227, Rock Cave, West Virginia.

2. I have been a member of the West Virginia Highlands Conservancy ("WVHC")

since 1979. I was President from October 1988 to 1994, and currently serve on the Board

of Directors. Since 1994, I have also served as Chair of the WVHC Mining Committee.

3. WVHC is a nonprofit membership organization located in West Virginia.

Established in 1967, WVHC is one of the state's oldest environmental advocacy

organizations and for the past four decades has been a leader in citizen efforts to protect

West Virginia's people, land and water resources from the effects of coal mining. Its

*Ex C*
*1 of 6*

headquarters is located in Charleston, West Virginia, and most of its approximately 1,800 members reside in West Virginia.

4. I have also been a member of the Ohio Valley Environmental Coalition ("OVEC") for many years and I am ever so pleased that my membership has supported in some small way the Sludge Safety Project that OVEC was instrumental in starting.

5. As a member of these organizations, I am concerned about the protection of human and other natural resources during and after coal mining activities and particularly with the possible health and environmental problems caused by the disposal of coal waste.

6. As a member and current Chair of the West Virginia Highlands Conservancy Mining Committee, I advocate for the strong enforcement of environmental laws that will best protect human and other natural resources during and after activities associated with coal mining and our use of coal. That advocacy includes commenting on proposed regulations and educating WVHC members who live and recreate near or drive by coal waste facilities about the potential problems associated with coal waste. It is impossible to adequately inform or assist people who suspect their homes and families are being harmed by the nearby coal waste impoundments or underground injection sites without a basic understanding of the toxicity and volumes of the waste and the potential alternative disposal methods. That information was to be the focus of studies by Environmental Protection Agency ("EPA") years ago, but those studies have not been done.

7. WVHC has engaged in a variety of administrative, legislative, and legal actions to encourage/force better coordination of environmental laws as they address aspects of the mining and use of coal. We are often confounded in our efforts when agencies attempt to avoid their lawful duties by passing the buck to some sister agency. For example, the

2


Ex C
2 of 6

Army Corps of Engineers attempts to use general nationwide permits to rubber stamp mining permits issued by the WV Department of Environmental Protection ("WVDEP") without independent review and evaluation. Also EPA concurs with surface mining regulations proposed by the Office of Surface Mining ("OSM") that undercut Clean Water Act goals of maintaining and restoring the integrity of the waters of the United States. Agencies responsible for the Mountaintop/Valley Fill Environmental Impact Study ("EIS") allowed OSM to undercut the original intent of the EIS. In the matter of coal waste, the EPA has for years ignored its authority – and duty – to study the toxicity of that waste. Rather, the agency has excluded mining wastes, without proper consideration, from regulation as hazardous under RCRA, presuming that some other federal agency will pick up its slack. Such dereliction of duty causes WVHC and its members to expend a great deal of personal energy and invest inordinate amounts of the time and personal finances of its volunteer Board of Directors to fulfill its mission and commitment to its members to educate the public and to hold regulatory agencies accountable.

8. My concerns about coal mining waste, and the concerns of WVHC, were further heightened when we learned that results of sampling performed in conjunction with the Mountaintop/Valley Fill EIS found excessive levels of selenium in stream segments below some valley fills in West Virginia. Until that time, no one suspected that potentially toxic levels of selenium could be poisoning surface and groundwater that our members use in their daily lives. That discovery prompts questions such as what similar and additional toxic metals might also be found in slurry/sludge waste from coal preparation plants, but are—at present—unidentified and unregulated? We worry that our members might

3

$Ex\ C$
$3\ of\ 6$

unknowingly be exposed to toxic chemicals that could be controlled if EPA had acted sooner.

9. Families have been forced to take their concerns about water contamination caused by coal waste to the West Virginia state legislature. Bottles of awful looking water from wells and taps, pictures of children with rashes, and personal testimony about any number of other health issues have finally convinced the legislature to order regulatory agencies to begin studies of coal refuse and slurry disposal programs. Had EPA studied the toxicity of those waste products in the 1980s as required, better regulation might now be in place and might protect members of OVEC and WVHC who believe they have been harmed by water that became contaminated only after underground injection wells or slurry impoundments were located nearby. Well water may be replaced by city water for some communities, but others are too far away from city water lines. And city water can never replace the mountain springs, groundwater, or clear running streams that are home to rich ecosystems and playgrounds for kids growing up in the hills.

10. Of particular concern to WVHC and myself are two refuse impoundments in the Sago-Tenmile area of the Buckhannon River in Upshur County. Both impoundments have contributed to numerous problems including fish kills, water quality degradation of the Buckhannon River itself, and increased costs to our members who use water provided by the Buckhannon water system. Our members' use and enjoyment of the River and the public water that is drawn from the river have been impaired. More careful regulation of the disposal of toxic waste may have prevented at least some of the damage that has been and is being done to the ground and surface waters essential to this area and to our members who live there.

4



11. Because we do not know whether or not these impoundments contain toxic material that qualifies for regulation under the hazardous waste provisions of RCRA, the Conservancy is frustrated in fulfilling its goal of holding regulatory agencies accountable for enforcing adequate control measures that protect the water and other natural resources our members use and enjoy near these impoundments. When we confront legislators and administrators with our concerns about disposal in impoundments, we lack the science that we need to persuade them to more stringently regulate coal mining and cleaning waste.

12. In the mid 1980s, WVHC came to the aid of the Zirkle family and others in the Upshur County communities of Tennerton, Tenmile, and Queens. Calling together and acting with other organizations in a newly formed Buckhannon-Tygart River Coalition, WVHC was partially responsible for curtailing additional strip mining at the 2,000 acre, acid-producing mine site originally known as the Island Creek Tenmile operation. Strip mining at the site has not occurred at the site since the mid-1990s. However, the coal sludge dam is still there, receiving sludge from the ongoing treatment at the reclaimed areas. The waste disposal site remains a source of groundwater contamination as well as acid, iron, orange, and black seepage along the roadway and into Laurel Run and Tenmile Creek. More information about the toxicity about the coal waste could have meant more stringent requirements for disposal and less chance that the leachate would escape into the groundwater and adjacent streams. I am sick every time I see the sludge impoundment and think how the pollution it has caused could have been prevented by better regulation.

13. I often visit friends who live in Tenmile, but I no longer enjoy the once shaded headwater streams, nor do I dare splash and play in them as I once did. Waste leaching



from the sludge dam has so contaminated those streams that I do not believe contact with them to be safe.

14. As part of my work with the Conservancy I also take groups of students and other interested citizens to view the Tenmile refuse impoundment to witness first hand some of the major upstream activities that impact their source water. It is very sad to go to Tenmile. What were once beautiful free flowing trout streams are now very large treatment sites and sludge fills. Had coal mining wastes been given the scrutiny that the law requires, regulators would not have allowed the disposal of waste in these streams, or the disposal of waste in unlined impoundments. Stream critters no longer entertain me and I certainly never step in the water anymore. Even first time visitors to the area seem to share my dismay, disappointment, and deep sadness when they ask their disbelieving questions. Most will inevitably ask what is in the black goop of a lake they're looking at. I cannot really tell them much but coal and cleaning agents and treatment chemicals, and we're not sure just how toxic it is.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 4th day of August 2007.

Cindy Rank

6

Ex C
6 of 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WEST VIRGINIA HIGHLANDS
CONSERVANCY; OHIO VALLEY
ENVIRONMENTAL COALTION, and
COAL RIVER MOUNTAIN WATCH,

       Plaintiffs,

    v.                           CIVIL ACTION NO. 07-0667(JDB)

STEPHEN L. JOHNSON, Administrator,
U.S. Environmental Protection Agency; and
DIRK KEMPTHORNE, Secretary, United
States Department of Interior,

       Defendants.

## AFFIDAVIT OF JULIA BONDS

I, Julia Bonds, state and affirm as follows:

1. I live at 5577 Coal River Road, P.O. Box 135, Rock Creek, West Virginia, 25174.

2. I used to live in Mar Fork Hollow at Packsville, West Virginia. I lived beside the Little Marsh Fork River there.

3. I have been a member of Coal River Mountain Watch ("CRMW") for about 8 years. CRMW, with approximately 500 members, has a mission to establish social, economic, and environmental justice in the southern coalfields of West Virginia, to keep communities intact, and to improve the quality of life in these communities.

4. When I lived in Packsville, downstream from Brushy Fork, we had an artesian well. After a new impoundment was put in behind my home the well water got worse and worse on a daily basis. At first there was only sulfur smell to it, but each day the smell and the taste continually got worse. We became very concerned about the effects of the impoundments on our water. We moved in January of 2000. The effects of the impoundments on our well were a main reason that we left our home.

5. I was an avid swimmer as a child. I stayed in the river in the summer. I would swim in the river downstream from impoundments in Montcoal and Sundial. After I found out about the

Ex D
1 of 3

one at Marsh Fork and what pollutants we believe to be in the impoundments, I stopped swimming in the streambecause I was afraid for my health.

6. I have found coal fines on the banks of the stream. I often wonder why the sand had black specks in it. I stopped swimming in the rivers when I found out about the coal mining wastes being put into the water upstream from me in about 1997/1998.

7. I used to enjoy walking along the river banks, but it is not safe to do that anymore. I have seen fish with sores on them. I would not eat the fish out of this river, nor would I let my family do so.

8. When I lived in Packsville, I was concerned about failing impoundments. If I still lived there I would constantly be worrying about them. I moved from my home to get away from the impoundments and what they were doing and could do to my family. When it rained, I could not sleep for fear that the rain would cause the impoundments to overflow or burst. I would lay awake listening for the snap of trees or any sign at all that would give me time to get my family up the hill to safety.

9. Before we moved, my family and I used to walk the streams and catch crawdads. Once the impoundment was built behind my home in Packsville, we noticed fewer and fewer crawdads on the Brushy Fork because of the impoundment.

10. I have noticed at the bridge at the mouth of Birch Hollow where the Birch Hollow Stream meets the Little Marsh Fork that there is a marked distinction in the quality of the two streams. The rocks are black on Little Marsh Fork, but the Birch Hollow Stream was clear, the rocks were not discolored, and there were crawdads still there. It is very hard to find crawdads on the Brushy Fork side of Little Marsh Fork.

11. There is a huge difference between now and when I was a child. You do not have to get into the water to tell the difference. I have lived here all my life and can readily see the changes. I know that the slurry impoundments are really degrading these streams.

12. If the Environmental Protection Agency were to conduct a study and if that study were to show that the slurry in these impoundments is safe, then I would return to swimming again. Swimming in this river was one of my favorite things to do; it is such a shame that I and all of the children here these days are missing out on something so enjoyable. I would love to be able to feel safe walking the banks of the river again. I would also like to have well water again

13. I would like to be able to have well water again. If I had confirmation about the effects of coal mining waste on the local groundwater, I might be able to do so. Further, I would like to be able to eat the fish that my grandson catches in the river. If there was I would have loved to have not moved from my home. I would like to be able to eat the fish that my grandson catches in the river.

2

Ex D
2 of 3

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 23 day of July 2007.

Julia Bonds

Ex D
3 oF 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**WEST VIRGINIA HIGHLANDS
CONSERVANCY; OHIO VALLEY
ENVIRONMENTAL COALTION, and
COAL RIVER MOUNTAIN WATCH,**

        **Plaintiffs,**

    **v.**                        **CIVIL ACTION NO. 07-0667(JDB)**

**STEPHEN L. JOHNSON, Administrator,
U.S. Environmental Protection Agency; and
DIRK KEMPTHORNE, Secretary, United
States Department of Interior,**

        **Defendants.**

### AFFIDAVIT OF PAULINE CANTERBERRY

I, Pauline Canterberry, state and affirm as follows:

    1. I live in the town of Sylvester, West Virginia. My mailing address in P.O. Box 304, Whitesville, WV, 25209.

    2. I am member of the Ohio Valley Environmental Coalition ("OVEC"). I have been a member since 2000. OVEC, with approximately 1,500 members, has a mission to organize and maintain a diverse grassroots organization dedicated to the improvement and preservation of the environment through education, grassroots organizing and coalition building, leadership development, and media outreach. OVEC has focused on water quality issues and is a leading source of information about water pollution in West Virginia. It is also a founding member of the Sludge Safety Project, a collaborative effort seeking to document the effects of coal slurry—a waste product from coal cleaning—on human health and the environment, to reform the regulation of the disposal of coal slurry, and to encourage the adoption of alternative coal cleaning techniques that do not generate coal slurry as a waste product.

    3. I have been a member of Coal River Mountain Watch ("CRMW")since 2000. I have been on the Board of Directors of CRMW for approximately the last three years. CRMW, with approximately 500 members, has a mission to establish social, economic, and environmental justice in the southern coalfields of West Virginia, to keep communities intact, and to improve

Ex E
1 of 2

the quality of life in these communities. CRMW is also a founding member of the Sludge Safety Project.

4. I live near three high-risk impoundments. If one of those impoundments were to fail, it could cost me my life. I am very concerned about an impoundment breaking. I have been told that one of the impoundments near my home has over 7 billion gallons of coal slurry in it. It would demolish the entire valley if that impoundment were to fail. There are a lot of times when I go to bed thinking that if one were to break I wouldn't be able to be warned in time to get away to survive. If one breaks there is no escape out of here. I wish that there were other ways to dispose of mining waste besides in huge impoundments or abandoned coalmines.

5. One of my main concerns is the river that flows through here, because a leak or spill from the impoundments near my home would like cause slurry to reach the Big Coal River. My domestic water comes from the Big Coal River, downstream from the impoundments. I do not drink the water because of what may be in it from the impoundments. I will use it to clean, but I won't drink it. I buy bottled water for drinking. Because of my concerns about pollution from mining wastes, I do not fish in the streams near my home, and I would never eat a fish caught in those streams. In the future if the impoundments stopped discharging pollution and I knew it was absolutely safe, I would like to fish and drink water from the stream again.

6. I'm concerned about the underground injection of coal slurry. I used to have a well for drinking water, like many of the people up and down this valley. I would much rather use well water. Well water used to be much better than the Public Service District water. Today, I would not use well water unless I were certain that the water was not polluted from the underground injection of coal slurry. We have no idea how much slurry has been put underground. I wouldn't feel safe if I were using the ground water now.

7. The EPA should do a study because I don't know what chemicals the coal companies are using to clean the coal or what effects those chemicals have on the human body. If I knew for certain that the water was safe, I would rethink refraining from drinking, fishing in, or otherwise using the water in streams near my home. I don't think we should have above ground impoundments at all anymore. I don't think we should have this awful mess in the State of West Virginia.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 25th day of July 2007.

Pauline Canterberry

Ex E
2 of 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WEST VIRGINIA HIGHLANDS
CONSERVANCY; OHIO VALLEY
ENVIRONMENTAL COALTION, and
COAL RIVER MOUNTAIN WATCH,

Plaintiffs,

v.                                                  CIVIL ACTION NO. 07-0667(JDB)

STEPHEN L. JOHNSON, Administrator,
U.S. Environmental Protection Agency; and
DIRK KEMPTHORNE, Secretary, United
States Department of Interior,

Defendants.

## AFFIDAVIT OF MARY MILLER

I, Mary Miller, state and affirm as follows:

1. My address is P.O. Box 124 Sylvester, West Virginia. I have lived in Sylvester for about 52 years. Elk Run is a tributary of the Big Coal River and Elk Run Coal Company has mining operations in this area. Elk Run is just south of our home. The stream is about a half mile from my home.

2. I am a member of the Ohio Valley Environmental Coalition ("OVEC") and Coal River Mountain Watch ("CRMW"). I have been a member of OVEC for about five years. I have been a member of CRMW for nine years. OVEC and CRMW are founding members of the Sludge Safety Project.

3. OVEC, with approximately 1,500 members, has a mission to organize and maintain a diverse grassroots organization dedicated to the improvement and preservation of the environment through education, grassroots organizing and coalition building, leadership development, and media outreach.

4. CRMW, with approximately 500 members, has a mission to establish social, economic, and environmental justice in the southern coalfields of West Virginia, to keep communities intact, and to improve the quality of life in these communities.

Ex F
1 of 2

5. I live near three coal slurry impoundments. One is directly behind my house, the second is up the road about eight or nine miles, and the third is a little past that. ~~They are all on top of the mountain behind my house.~~ I understand that, if one of those impoundments were to break, the water would be in Sylvester in 14 minutes.

6. Memories of the Buffalo Creek disaster—where a failed coal impoundment killed over ~~100~~ 125 people—still scare me. I go to bed at night and I don't know if I will get up or not. There is no alarm system to alert us if a slurry impoundment fails. We live in fear here. ~~If~~ there are other ways to dispose of coal waste, ~~the~~ I think that the coal companies should use them rather than subjecting the people who live near the impoundments to ongoing fear.

7. A study of coal mining waste needs to be done. Neither I nor my neighbors know what they are putting into these sludge impoundments, but we have a right to know. When we get a black water spill into our river, my neighbors and I need to know what has been discharged into our streams. The coal company's won't let anyone test the slurry. We don't know what is going into these impoundments.

8. We are on city water now because we are concerned about coal mining waste contaminating our well water, either from flawed slurry impoundments or from the underground injection of slurry into abandoned coalmines.

9. I am worried about the chemicals in the rivers that might be coming from coal slurry impoundments. I do not fish in the streams near my home, eat the fish from those streams, or have any contact at all with the water because of those concerns.

10. People like me who live near these impoundments should be notified of what is in the river and if it is safe or not. If EPA were to study coal mining waste, then it might become characterized as hazardous and treated more carefully.

11. I would use the water if it were safe. It would change my mind as far as drinking water. I would still be a little wary, but if it is proven to be safe then I will use the river again. The people should ~~not~~ be afraid to drink the water and eat the fish from the rivers and streams because they don't know what is in the water.

12. Coal mining waste has taken away from my children and grandchildren the ability to enjoy the river. It's really changed our lives here.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 3¹/ day of July 2007.

Mary Miller

Ex F
2 of 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


**WEST VIRGINIA HIGHLANDS
CONSERVANCY; OHIO VALLEY
ENVIRONMENTAL COALTION, and
COAL RIVER MOUNTAIN WATCH,**

   **Plaintiffs,**


   **v.**                                    **CIVIL ACTION NO. 07-0667(JDB)**

**STEPHEN L. JOHNSON, Administrator,
U.S. Environmental Protection Agency; and
DIRK KEMPTHORNE, Secretary, United
States Department of Interior,**

   **Defendants.**

## AFFIDAVIT OF WALTER YOUNG

I, Walter Young, state and affirm as follows:

1. I am from Delbarton, West Virginia. I live on Pigeon Creek, about 3 miles south of Delbarton.

2. I have been a member of Ohio Valley Environmental Coalition ("OVEC") for several years. OVEC, with approximately 1,500 members, has a mission to organize and maintain a diverse grassroots organization dedicated to the improvement and preservation of the environment through education, grassroots organizing and coalition building, leadership development, and media outreach.

3. There is a refuse impoundment about 1,600 feet upstream from us. We can look right at it from our home. This spring, we have had a couple of blackwater—or slurry—spills into the creek already.

4. The WVDEP has investigated the spills and plainly linked them to this mining company, but that is about a far as you can get with them.

5. I own about 1,000 feet of creek bank, and to the center of the creek I believe. There was a big blackwater spill around the end of June 2006. It left black gooey stuff all over the

*Ex G*
*1 oF 2*

creek and my property. I asked the coal company to clean it off because it was on private property and they put it on there. They told me that the rain will wash it away.

6. There was no effort to clean up the spill. It was impossible to stand on the edge of the creek bank because there was black gooey stuff all over the place. I called the WVDEP to report the spill. The DEP would not make the coal company clean up the spill. They told me that when the water rose again it would clean it off.

7. We used to go out and wade in the creeks. I don't do that anymore. My son and I used to fish in the creek a lot when he was growing up. We do not do that much anymore because of the pollution that the impoundments have caused. He'll see if he can catch a fish every now and then, but neither he nor I eat them if he does catch one.

8. I do not know what effect the mining waste is having on our drinking water because we cannot get any accurate tests on it. We still have well water, but I do not allow my family to drink it. We buy bottled water to drink.

9. Everyone in this valley is scared to death about that impoundment, especially when there are heavy rains. We all just watch the creek to see what it will do. We had a flood in April 2007 where the water got into some people's homes.

10. My wife and I stay up when it rains. There have been times when we were awake for several nights in a row for fear of not surviving if the impoundment were to give way. Every time it rains hard we will not go to sleep. For example, in April 2007 we were up because the creek was about to cover the road in front of the house. The impoundment is not just dangerous when it is raining; it is dangerous all the time. It is made of nothing but slate rock. That thing is a hazard, dangerous, and it is polluting the earth.

11. I am deeply concerned that the use of massive impoundments to store coal mining waste is not safe. EPA should do a study on the disposal of coal mining wastes in impoundments and alternatives. I feel that they are hazardous to us and our health and should be treated like they are. If the EPA were to conclude that the impoundments are safe, then I would start to use the creek more. I would use my well to drink again. I would feel much safer living so close to an impoundment. But I doubt that EPA could conclude that coal mining waste is nonhazardous. If EPA were to study mining waste, it would have to treat this material like it is hazardous; because it is.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this _3rd_ day of _August_ 2007.

_Walter Young_
Walter Young

Ex G
2 of 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WEST VIRGINIA HIGHLANDS
CONSERVANCY; OHIO VALLEY
ENVIRONMENTAL COALTION, and
COAL RIVER MOUNTAIN WATCH,

Plaintiffs,

v.

CIVIL ACTION NO. 07-0667(JDB)

STEPHEN L. JOHNSON, Administrator,
U.S. Environmental Protection Agency; and
DIRK KEMPTHORNE, Secretary, United
States Department of Interior,

Defendants.

## AFFIDAVIT OF CAROL YOUNG

I, Carol Young, state and affirm as follows:

1. I am from Delbarton, West Virginia. I live on Pigeon Creek, about 3 miles south of Delbarton.

2. I have been a member of Ohio Valley Environmental Coalition ("OVEC") for several years. OVEC, with approximately 1,500 members, has a mission to organize and maintain a diverse grassroots organization dedicated to the improvement and preservation of the environment through education, grassroots organizing and coalition building, leadership development, and media outreach.

3. I live about 1,600 feet downstream from a coal waste impoundment, which I can see from my home. This spring, blackwater spills from the impoundment contaminated our creek.

4. We used to go out and wade in the creeks. I do not do that anymore. My son used to fish in the creek a lot when he was growing up. But because of the pollution from the impoundments, he does not do that much anymore. Every now and then he will fish in the creek to see if he can catch one, but neither he nor I would eat any fish from the creek because of the contamination from mining waste.

Ex H
1 of 2

5.  We do not drink our well water because we are unsure about how badly it has been contaminated by coal mining waste.  We buy bottled water to drink.

6. Like the rest of my community, I am scared of the impoundment, especially when there are heavy rains.  We all just watch the creek when it rains to see what it will do.

7.  I stay up when it rains at night.  Sometimes I have gone stayed up all nigh for several nights in a row because I was afraid the impoundment would break and I would not survive the flood.

8. I believe that the slurry impoundments are hazardous to us and our health and should be treated that way.  If the government were to study coal waste impoundments and tell us that is is safe, I would drink my well water again, use the creek more, and feel much safer living so close to one.


I declare under penalty of perjury that the foregoing is true and correct. Executed on this 3 rd day of Aug. 2007.


Carol Young

Ex H
2 of 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WEST VIRGINIA HIGHLANDS
CONSERVANCY; OHIO VALLEY
ENVIRONMENTAL COALTION, and
COAL RIVER MOUNTAIN WATCH,

        Plaintiffs,

      v.                          CIVIL ACTION NO. 07-0667(JDB)

STEPHEN L. JOHNSON, Administrator,
U.S. Environmental Protection Agency; and
DIRK KEMPTHORNE, Secretary, United
States Department of Interior,

        Defendants.

PROPOSED ORDER

       Upon consideration of Federal Defendants' Motion to Dismiss Plaintiffs'

Complaint, Plaintiffs' Memorandum in Opposition to Federal Defendants' Motion to Dismiss,

and Defendants' Reply thereto, it is this _____ day of _____, 2007:

       ORDERED that Federal Defendants' Motion to Dismiss is denied.

                                      _____

                                      Hon. John D. Bates
                                      United States District Judge