# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

WEST VIRGINIA HIGHLANDS
CONSERVANCY, et al.,

        Plaintiffs,

        v.

STEPHEN L. JOHNSON, Administrator
U.S. Environmental Protection Agency, et
al.,

        Defendants.

Civil Action No.  07-0667 (JDB)

## MEMORANDUM OPINION

The Resource Conservation and Recovery Act, 42 U.S.C. §§ 6902 et seq., (hereinafter

"RCRA") was passed by Congress to establish a "comprehensive federal program to regulate the

handling and disposal of solid wastes."  Defs.' Mot at 3.  The act requires the Environmental

Protection Agency ("EPA") and the Department of the Interior ("DOI") to take certain actions to

develop an extensive federal management scheme for handling potentially hazardous waste.

Plaintiffs bring this action against the Administrator of the EPA and the Secretary of DOI

claiming that they, and their respective agencies, have failed to perform the nondiscretionary

duties imposed on them by RCRA.  Specifically, plaintiffs allege that defendants have never

undertaken the study of coal mining wastes requested by Congress and, accordingly, have failed

to determine whether such wastes should be regulated as "hazardous" under Subtitle C of RCRA.

Defendants have moved to dismiss the complaint.  They argue that the lawsuit is untimely and

that the Court lacks jurisdiction over the subject matter of the complaint.  They also maintain that

plaintiffs lack standing to bring this challenge.  That motion is now fully briefed and ripe for

resolution.  Upon careful consideration, and for the reasons set forth below, the Court will grant

defendants' motion.

## BACKGROUND

"Coal mining, beneficiation, and processing generate large amounts of waste, including

overburden and coal slurry."  Compl. ¶ 12.  Overburden consists of the "earthen material

removed in order to gain access to a coal seam."  Id. ¶ 13.  Coal slurry is the waste generated by

the beneficiation, or cleansing, of coal.  Id. ¶ 14.  By plaintiffs' count, "[i]n West Virginia today,

there are at least 111 impoundments holding back billions of gallons of coal mining and cleaning

waste."  Pls.' Opp'n at 1.  Those impoundments are created by "constructing embankments from

coarse coal refuse across valleys, creating unlined basins behind the embankments to hold slurry

and other liquid and semi-liquid coal wastes."  Id. at 1-2.  Unfortunately, impoundments have

occasionally been known to fail.  In 1972, a coal waste impoundment in West Virginia

"catastrophically failed, releasing 132 million gallons of coal mining waste. . . . The resulting

flood was the most destructive in West Virginia history: 125 people lost their lives, 1,100 were

injured, and 4,000 rendered homeless."  Id. at 2.  More recently, an impoundment failed in

Kentucky in 2000, releasing "250 million gallons of coal slurry" into the environment.  Id.  Aside

from the disastrous effects of total impoundment failure, so-called "'blackwater' spills from coal

waste impoundments are frequent, with damaging effects on surface water quality."  Id.

Plaintiffs are West Virginia Highlands Conservancy, Inc. ("WVHC"), Ohio Valley

Environmental Coalition ("OVEC"), and Coal River Mountain Watch ("CRMW").  WVHC is a

non-profit organization with 2,000 members devoted to "conservation and wise management of

West Virginia's natural resources."  Compl. ¶ 9.  OVEC, for its part, is a 1,000 member non-profit organization dedicated to "organiz[ing] and maintain[ing] a diverse grassroots organization [for] the improvement and preservation of the environment through education, coalition building, leadership development, and media outreach."  Id. ¶ 10.  In addition, OVEC is a founding member of the Sludge Safety Project, which is "a collaborative effort seeking to document the effects of coal slurry . . . on human health and the environment, to reform the regulation of the disposal of coal slurry, and to encourage the adoption of alternative" coal cleansing methods.  Id. Finally, CRMW is a non-profit organization that is "dedicated to the establishment of social, economic, and environmental justice in the southern coalfields of West Virginia."  Id. ¶ 11. CRMW is also a founding member of the Sludge Safety Project.  The constituent members of CRMW, the argument goes, "are harmed by the lack of information about the chemical makeup of coal slurry, the amount of it generated by the coal mining industry, and the extent of its disposal into slurry impoundments and underground injection wells."  Id.

    In 1976, "Congress enacted RCRA . . . to establish a comprehensive federal program to regulate the handling of solid wastes."  Envtl. Def. Fund v. EPA, 852 F.2d 1309, 1310 (D.C. Cir. 1988).  Under Subtitle C of RCRA, "Congress directed EPA to develop criteria to identify hazardous wastes and authorized the agency to list particular wastes as hazardous according to § 3001(a) criteria."  Id.  The criteria that factor into hazardous status are: ignitability, corrosivity, reactivity, and EP toxicity, which is "defined as the leaching of toxic residues into surrounding liquid."  Id. (quoting 40 C.F.R. §§ 261.20 - 261.24).  Subtitle C contemplates a "cradle to grave" regulatory plan, which "requires EPA to promulgate regulations to govern the treatment, storage, and disposal of these wastes."  Id. (quoting 42 U.S.C. § 6924).  Subtitle D, by contrast, governs

the handling of solid wastes that do not qualify as hazardous.  "Under Subtitle D, states use federal financial and technical assistance to develop solid waste management plans in accordance with federal guidelines."  Id.

When it first enacted RCRA, Congress recognized that the "'information on the potential danger posed by mining waste is not sufficient to form the basis for legislative action.'"  Id. (quoting H.R. Rep. No. 1491, 94th Cong., 2d Sess. 15).  Thus, 42 U.S.C. § 6982(f), more commonly referred to as § 8002(f) of RCRA, directs the EPA to "conduct a detailed study of mining wastes to evaluate 'the potential danger to human health and environmental vitality.'"  Id. RCRA also directed the Administrator of EPA to consult with the Secretary of the Interior while preparing the § 8002(f) study.  Despite Congress' instructions, EPA pushed forward with mining waste regulation during the period between 1978 and the fall of 1980 without first conducting the § 8002(f) study.  At the time, EPA proposed several regulations governing hazardous waste under Subtitle C.  Under those proposed regulations, "certain smelting and refining waste streams satisf[ied] the . . . criteria for hazard [and] were 'listed' under Subtitle C."  Envtl. Def. Fund, 852 F.2d at 1311.

Before EPA's proposed regulations went into effect, however, Congress passed the Solid Waste Disposal Act of 1980, Pub. L. 96-482, 94 Stat. 2334, which added to RCRA the so-called "Bevill Amendment," 42 U.S.C. § 6921(b)(3).  The Bevill Amendment included § 8002(p), which "expanded the scope of EPA's study of mining industry wastes."  Id.  In addition to directing EPA to consider several additional criteria in its study of mining wastes,[1] the Bevill

---

[1] As initially enacted, RCRA § 8002(f) required EPA's study to include:
(1) the sources and volume of discarded material generated per year from mining;
(2) present disposal practices;

Amendment "suspended regulation of mining processing wastes under Subtitle C until at least

six months after the agency had completed and submitted [the] study to Congress."  Id.  Congress

also required EPA to issue a regulatory determination on mining wastes within six months of

delivering its report.  Following a public comment period, EPA was directed either to propose

regulations for each type of mining waste under Subtitle C or to explain why such regulation was

"unwarranted."  Id.  Thus, the effect of the Bevill Amendment was to strip EPA of authority to

regulate mining wastes under Subtitle C until it performed the following steps: (1) conduct a

detailed study of mining wastes that takes into account the appropriate statutory criteria; (2)

publish the results of that study to Congress; and then (3) within six months of publishing its

report to Congress -- and following an opportunity for public comment -- issue a regulatory

determination as to regulation of mining wastes under Subtitle C.  Congress instructed EPA to

complete its § 8002(p) study by not later than October 16, 1983.

As plaintiffs point out, "[i]n response to the 1980 amendments to RCRA, on November

19, 1980, EPA promulgated an interim final regulation without notice and comment.  That rule

categorically excluded 'solid waste from the mining, beneficiation, and processing of ores and

minerals (including coal)' from the definition of 'hazardous waste.'"  Pls.' Opp'n at 5 (quoting 40

---

> (3) potential dangers to human health and the environment from surface runoff of
> leachate and air pollution by dust;
> (4) alternatives to current disposal methods;
> (5) the cost of those alternatives in terms of the impact on mine product costs; and
> (6) potential for use of discarded material as a secondary source of the mine product.
>
> 42 U.S.C. § 6982(f).  The Bevill Amendment also required EPA to "'conduct a detailed and comprehensive study on the adverse effects on human health and the environment, if any, of the disposal and utilization' of these wastes and to investigate any 'documented cases in which danger to human health or the environment has been proved.'"  Envtl. Def. Fund, 852 F.2d at 1311 (quoting § 8002(p)).  EPA was also directed to "investigate the impact of alternative disposal methods on the utilization of the nation's natural resources."  Id. (citing § 8002(p)(7)).

C.F.R. § 261.4(b)(7)).  In relevant part, the interim regulation stated that because "coal is

arguably a 'mineral or ore' under Section 3001(b)(3), wastes from the extraction, beneficiation

and processing of coal are excluded from RCRA Subtitle C regulation in today's amendment."

45 Fed. Reg. 76,619.  The interim rule was designed to tide over the regulated community while

EPA purportedly undertook to conduct the § 8002(p) study required by RCRA and the Bevill

Amendment.  Meanwhile, DOI established a permanent regulatory program concerning mining

wastes through the Office of Surface Mining Reclamation and Enforcement ("OSMRE").  In its

regulations, OSMRE indicated that "any noncoal . . . mine waste defined as 'hazardous' under

[RCRA] . . . shall be handled in accordance with the requirements of subtitle C of RCRA."  See

48 Fed. Reg. 44,006, 44,030, 44,032 (1983).  As for coal, OSMRE explained that "OSM and

EPA have undertaken a joint study under Subtitle C of RCRA.  Until that study is completed,

OSM has no responsibility for regulating coal mine waste under Subtitle C or RCRA."  48 Fed.

Reg. 44,027.[2]

EPA missed the statutory deadline for the 8002(p) study imposed by Congress.

Consequently, the agency was sued and judicially compelled to "complete the studies mandated

by sections 8002 (f) and (p) of RCRA with respect to extraction and beneficiation wastes by

December 31, 1985, and to take final action on the proposed reinterpretation by September 30,

1986."  Defs.' Mot. at 6; see also Concerned Citizens of Adamstown v. EPA, Civ. No. 84-3041

(D.D.C. Aug. 21, 1985).  Thus, on December 31, 1985, EPA submitted a "Report to Congress on

Wastes from the Extraction and Beneficiation of Metallic Ores, Phosphate Rock, Asbestos,

---

[2] Although it is not entirely clear, plaintiffs observe that "[p]resumably, OSMRE was
referring to the studies under Sections 8002(f) and (p) of RCRA that were due by October 21,
1983."  Pls.' Opp'n at 6.

Overburden from Uranium Mining and Oil Shale" (hereinafter "Hard Rock Mining Report").

Defs.' Mot. Ex. A.

That report is the focal point of this lawsuit.[3]   Significantly, EPA expressly excluded any

study of coal mining waste from the Hard Rock Mining Report:

> The Agency excluded wastes from coal mining and beneficiation, because both EPA
> and the Department of the Interior play a role in their regulation, and it is not clear
> whether Congress intended coal mining to be included within the scope of the studies
> conducted in response to Sections 8002 (f) and (p) or RCRA.

Id. Ex. A at 7-8.  In addition, the Hard Rock Mining Report concluded that primary responsibility

for regulation of coal mining waste rested with DOI pursuant to the Surface Mining Control and

Reclamation Act ("SMCRA") of 1977.  Indeed, EPA stated that "the Secretary of the Interior,

with concurrence from the Administrator of EPA, is responsible for promulgating regulations

that effectuate the purposes of Subtitle C of RCRA with respect to coal mining waste or

overburden."  Id. Ex. A at 1-9 (internal quotation omitted).

Following a public comment period, EPA issued its regulatory determination concerning

extraction and beneficiation wastes on July 3, 1986.  See 51 Fed. Reg. 24,496 (1986).  It

determined that "regulation of mining waste under Subtitle C of [RCRA] is not warranted at this

time."  Id.  Although EPA was "concerned about certain actual and potential mining waste

problems," it concluded that those concerns were best addressed under Subtitle D: "[EPA]

therefore plans to develop a program for mining waste under Subtitle D of RCRA."  Id.  The

agency's decision to exclude all mining extraction and beneficiation wastes from Subtitle C

---

[3] As defendants point out, the Hard Rock Mining Report "discussed extraction and
beneficiation wastes but did not address processing wastes, which were the subject of EPA's
proposed reinterpretation of the Bevill Amendment" issued on October 2, 1985.  Defs.' Mot. at
6-7.

regulation was challenged and upheld by the D.C. Circuit in Envtl. Def. Fund v. EPA.  See 852 F.2d at 1313-15.

Several years later, EPA "completed the rulemaking process for amending the Bevill exclusion with respect to processing wastes with final rules published on September 1, 1989, see 54 Fed. Reg. 36,592, and January 23, 1990, see 55 Fed. Reg. 2,322."  Defs.' Mot. at 8.  In its report to Congress, EPA limited "the Bevill exclusion for mineral processing wastes to 20 specific" wastes, including coal processing wastes.  Defs.' Mot. at 8, Ex. B at 2-3.  On June 13, 1991, EPA issued its regulatory determination that "regulation under Subtitle C of RCRA is inappropriate for all 20 of the special wastes [including coal processing waste] that were studied."  56 Fed. Reg. 27,300.  The agency indicated that it "plann[ed] to address 18 of the wastes [including coal processing waste] under Subtitle D, possibly in the program being developed for mining wastes."  Id.  Once this processing wastes final regulatory determination was issued, EPA believed it had finally satisfied its statutory and judicial obligations under §§ 8002(f) and (p).

Plaintiffs take a different view, however.  They complain that EPA has effectively left the wastes from extraction and beneficiation of coal both unstudied and unregulated in contravention of Congress' direct instructions.  By omitting coal extraction and beneficiation from the Hard Rock Mining Report, plaintiffs argue, EPA flouted a requirement of the Bevill Amendment.  And because of that omission, EPA's 1986 regulatory determination "neither expressly nor implicitly discussed whether continued exemption of coal mining wastes from such regulation was warranted."  Pls.' Opp'n at 7.  Consequently, as plaintiffs would have it, EPA has never revisited its 1980 interim "decision to categorically exclude coal mining wastes from regulation as

hazardous." Id. at 5; see also 45 Fed. Reg. 76,619.  To make matters worse, "OSMRE never promulgated the regulations to effectuate Subtitle C that EPA told Congress justified its failure to study or report the environmental effects of coal mining wastes."  Pl.'s Opp'n at 7.  Nor has either agency ever undertaken to regulate coal mining under Subtitle D.  As a result, "EPA and OSMRE each point the finger at the other when asked who must regulate coal mining wastes . . . [and] the studies of coal mining and beneficiation wastes that Congress required remain unperformed." Id. at 8.  Through this lawsuit, plaintiffs seek to compel EPA to finally conduct -- with the Secretary of the Interior's consultation -- that study, issue a fresh report to Congress, and publish a regulatory determination regarding coal extraction and beneficiation wastes.  Compl. at 10-11.  Defendants, in turn, ask that the suit be dismissed for lack of jurisdiction based on timeliness and standing grounds.

## STANDARD OF REVIEW

"[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see Leatherman v. Tarrant Cty. Narcotics and Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979).  Therefore, the factual allegations must be presumed true, and plaintiff must be given every favorable inference that may be drawn from the allegations of fact. Scheuer, 416 U.S. at  236; Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  However, the Court need not accept as true "a legal conclusion couched as a factual allegation," nor inferences that are unsupported by the facts set out in the complaint. Trudeau v. Federal Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting

Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Under Rule 12(b)(1), the party seeking to invoke the jurisdiction of a federal court -- plaintiffs here -- bears the burden of establishing that the court has jurisdiction. See US Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000); see also Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"); Pitney Bowes, Inc. v. United States Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C. 1998). "'[P]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge, 185 F. Supp. 2d at 13-14 (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)). Additionally, a court may consider material other than the allegations of the complaint in determining whether it has jurisdiction to hear the case, as long as it still accepts the factual allegations in the complaint as true. See Jerome Stevens Pharmaceuticals, Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997); Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir.1992).

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court is mindful that all that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. ___, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); accord Erickson v. Pardus, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007) (per

curiam).  "A Rule 12(b)(6) motion tests the legal sufficiency of a complaint."  <u>Browning v.</u>

<u>Clinton</u>, 292 F.3d 235, 242 (D.C. Cir. 2002).  Thus, the complaint's "[f]actual allegations must be

enough to raise a right to relief above the speculative level, on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)." <u>Bell Atl. Corp.</u>, 127 S. Ct. at 1965

(citations omitted).

<b><u>DISCUSSION</u></b>

This case presents a thorny threshold issue concerning the proper characterization of

defendants' regulatory activities.  As plaintiffs would have it, they are seeking to compel agency

action unreasonably withheld for over twenty years -- that is, they aim to challenge what the

agency has <u>not</u> done.  Defendants, however, see it differently.  According to them, plaintiffs are

in fact attempting to challenge final agency <u>decisions</u> made over two decades ago; not

surprisingly, defendants therefore maintain that the appropriate time period for this action has

long since passed.  There is some merit to both sides of this dispute.  The Court need not resolve

this preliminary question, however, because under either formulation the ultimate result is the

same.[4]

---

[4] Plaintiffs contend that defendants have requested an inappropriate standard of review at various points.  For instance, plaintiffs maintain that defendants' "statute of limitations argument must be treated as a motion for failure to state a claim" rather than as a motion to dismiss for lack of subject matter jurisdiction. Pls.' Opp'n at 8.  That is correct insofar as plaintiffs' complaint is characterized as a challenge to agency action.  It is not correct, as demonstrated below, regarding plaintiffs' preferred characterization because the Court concludes that § 2401(a) is in fact jurisdictional; thus, a motion pursuant to Rule 12(b)(1) is appropriate.  Plaintiffs also maintain that because defendants make reference to materials outside of the complaint -- namely, the Hard Rock Mining Report and EPA's 1990 Report to Congress -- this Court should regard a portion of defendants' motion as one for summary judgment.  But "[i]n determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  <u>Howard v.</u> <u>Gutierrez</u>, 474 F. Supp. 2d 41, 47-48 (D.D.C. 2007) (citing <u>Stewart v. Nat'l Educ. Ass'n</u>, 471

I.        **Agency Action**

Defendants' position is straightforward.  According to them, "EPA undisputedly

conducted the required studies and submitted the required reports to Congress on December 31,

1985 and on July 31, 1990."  Defs.' Mot. at 26.  Additionally, they maintain, "DOI consulted

with EPA on the required studies."  Id.  From their perspective, both agencies fulfilled their

statutory obligations with respect to the RCRA § 8002(f) and (p) studies.  Plaintiffs' lawsuit,

then, amounts to nothing more than "a collateral challenge to EPA's interpretation of RCRA and

the manner in which the agency has chosen to comply with the statute," that should be dismissed

for failure to state a claim because untimely.  Id.

The choice to omit coal extraction and beneficiation wastes from the 1985 report,

defendants argue,[5] was deliberate: the Hard Rock Mining Report "did not include coal mining

wastes because EPA determined that those wastes are subject to SMCRA . . . and the agency did

not interpret RCRA § 8002 as mandating the inclusion of coal mining wastes."  Id. at 26-27.

That determination, EPA insists, was an appropriate exercise of discretion by the Administrator,

particularly in light of Congress' statement in § 8002(f) that he may "review . . . actions of other

Federal agencies concerning such wastes with a view toward avoiding duplication of effort and

the need to expedite such study."  42 U.S.C. § 6982(f).  According to defendants, plaintiffs had

_____

F.3d 169, 173 (D.C. Cir. 2006)).  Here, plaintiffs incorporated the Hard Rock Mining Report in their complaint by reference, and the Court could likely take judicial notice of both reports published to Congress.  In any event, however, there are no disputed facts in this case and the issues of law would be resolved in the same fashion under any of the aforementioned standards of review.

[5] Plaintiffs initially appeared to argue that EPA also failed to study coal processing wastes.  See Compl. ¶ 18.  The agency rather plainly, however, conducted such a study and issued a report to Congress in 1990.  See 56 Fed. Reg. 27,301.

the opportunity to "challenge EPA's interpretation of the mining wastes the agency was required

to study under RCRA § 8002 (f) and (p) and chose not to." Id. at 27-28.  As defendants would

have it, plaintiffs presumably could have raised their objections to the exclusion during the

public comment period following publication of the Hard Rock Mining Report or judicially

challenged EPA's 1986 regulatory determination as arbitrary and capricious.  But the available

window of time to raise such challenges has now manifestly expired.  RCRA specifically

provides that a petition for review of EPA's actions "shall be filed within ninety days" of such

action in the D.C. Circuit.  42 U.S.C. § 6976(a)(1).[6]

In response, plaintiffs argue that they do not seek to "'complain about what the agency

has done but rather about what the agency has yet to do.'" Pls.' Opp'n at 30 (quoting In re United

Mine Workers, 190 F.3d 545, 549 (D.C. Cir. 1999)).  In support of that proposition, they cite the

D.C. Circuit's opinions in In re Bluewater Network, 234 F.3d 1305 (D.C. Cir. 2000), and In re

United Mine Workers.  The Court is not entirely persuaded that those cases are on point,

however.  Indeed, both cases involve instances where the agencies plainly left non-discretionary

statutory obligations fully unperformed.  As explained below, this case does not present such a

patent deadline violation.

To begin with, In re Bluewater Network involved the Coast Guard's rather explicit

refusal to promulgate regulations statutorily mandated by the Oil Pollution Act, which required

the Coast Guard to establish certain regulations governing the minimum standards for oil-tanker

---

[6] Indeed, EPA's determination not to regulate any mining wastes under Subtitle C was in fact challenged in Envtl. Def. Fund.  As noted above, the D.C. Circuit concluded that EPA's decision to exclude such wastes from Subtitle C regulation was not arbitrary and capricious. Envtl. Def. Fund, 852 F.2d at 1313.

pressure monitoring devices.  See 234 F.3d at 1308.  The Coast Guard, however, merely

promulgated a temporary two-year rule that expired in 1999 and thereafter steadfastly refused to

issue permanent regulations.  The petitioners filed suit with the D.C. Circuit to compel the

agency to conduct a rulemaking to fulfill its statutory obligations.  The Coast Guard responded

that "its 1997 temporary, and now-expired, rulemaking" was the agency's final action on the

topic such that "petitioners [could not] now, over two years after the 1997 rulemaking, attempt to

circumvent . . . [the] jurisdictional 90-day filing by fashioning their petition as one for

unreasonable delay."  Id. at 1312.  Unsurprisingly, the D.C. Circuit rejected that argument out of

hand.

        But there are important differences between In re Bluewater Network and the situation

here.  Significantly, in In re Bluewater Network the temporary 1997 regulations at issue

"explicitly stated the Coast Guard's intention to defer implementation of permanent [regulations]

and to delay rulemaking on . . . requirements."  Id. at 1314.  When the temporary regulations

expired, however, the Coast Guard flatly declined to conduct additional rulemaking to develop

permanent regulations.  And in response to the petitioners' subsequent challenge, the agency

insisted that the filing period for judicial review concerning its failure to issue permanent

regulations in fact began to run when it promulgated temporary regulations.  Id.  That proposition

is obviously untenable, and the D.C. Circuit rejected it.  Indeed, the court stated that "the

agency's 'we-will-not-promulgate-regulations' position is a blatant violation of the Act."  Id.  But

this case does not involve such a clear-cut violation of RCRA.  In fact, EPA performed a study

on mining extraction and beneficiation wastes as ordered by Congress.  Although the agency

excluded coal wastes from that analysis, it provided an explanation for doing so, albeit an

-14-

unsatisfactory one in plaintiffs' view.  And EPA's final regulatory determination to exclude

mining wastes from Subtitle C regulation altogether was held to be a permissible construction of

RCRA by the D.C. Circuit in Envtl. Def. Fund.  That is a far cry from the Coast Guard's outright

refusal to abide by Congress' demands.

More importantly, unlike in In re Bluewater Network, defendants here are not attempting

to tie the filing period expiration date to any unrelated agency action.  As defendants would have

it, RCRA's 90-day clock began to tick on July 3, 1986 when EPA issued its final regulatory

determination excluding mining wastes from Subtitle C regulation.  To be sure, plaintiffs are

correct that the determination itself was silent on the issue of coal wastes.  But it was also a direct

by-product of the Hard Rock Mining Report -- and its accompanying public comment period --

that explicitly excluded coal wastes from study.  Put another way, the Hard Rock Mining Report

was very much a part of the regulatory decision-making process.  And contrary to In re Bluewater

Network, there is no suggestion here that EPA's determination on this point was anything but

final.  Indeed, that determination was challenged in court as final agency action with respect to

extraction and beneficiation regulation.  There is no reason to believe that plaintiffs could not

have lodged a complaint challenging EPA's exclusion of coal mining wastes from the § 8002 (f)

and (p) study -- as they have done in this lawsuit -- back in 1986.

Similarly, In re United Mine Workers does not advance the ball much for plaintiffs.  In

that case, the National Mining Association intervened to argue that the plaintiff's "petition is

tantamount to an untimely challenge to the [Mine Safety and Health Administration's] . . . diesel

equipment rules."  190 F.3d at 548.  The petitioner admittedly did not file a challenge to those

rules within the time period provided by the Mine Act.  Id.  The D.C. Circuit brushed aside the

intervenor's argument, however, because it concluded that the petitioner's real challenge concerned "diesel exhaust [permissible exposure limits]" and not the agency's related diesel equipment rules. Id. Although the two issues were "plainly related" to one another, the agency "disavowed any intention to consider new [permissible exposure limits] . . . during its diesel equipment rulemaking, stating that [they] would be reexamined as part of [the] omnibus air quality rulemaking." Id. (citing 54 Fed. Reg. 40,958). Thus, the petitioner's failure to challenge the diesel equipment rulemaking in timely fashion did not preclude it from seeking to compel agency action on permissible exposure limits because the former took no action with respect to the latter.

In this case, however, EPA's exclusion of coal from the Hard Rock Mining Report relates directly to the challengeable agency action: the 1986 regulatory determination. Indeed, EPA's explanation of its decision not to study coal extraction and beneficiation waste amounts to a conclusion that such a study was not in fact required by § 8002 (f) and (p). The 1986 regulatory determination's silence on the issue of coal mining wastes is consistent with that conclusion. It seems that EPA was empowered to make such a decision. After all, the applicable portions of RCRA do not explicitly direct EPA to "study coal mining wastes." And although coal is indeed "arguably a mineral or ore," as the EPA put it, § 8002(p) apparently provides some room for EPA to exclude studying certain materials to "avoid[] duplication of effort" by other federal agencies.[7]

---

[7] Plaintiffs engage in a lengthy discussion regarding whether EPA's determination that it need not study coal deserves Chevron deference; they argue, naturally, that it does not. See Pls.' Opp'n at 32-35. That contention is beside the point for our purposes. This Court is not reviewing whether EPA's interpretation is worthy of any deference or whether it was arbitrary and capricious. Instead, the pertinent question here is whether the agency acted at all. Plaintiffs' invitation to the Court to "conclude that it is neither reasonable nor permissible to interpret Section 8002(f) and (p) not to require the study of coal wastes," id. at 35, is better suited to a

In any event, by the time that the 1986 regulatory determination was issued, it was evident that EPA had decided not to regulate coal mining waste -- or, for that matter, any mining wastes from extraction or beneficiation -- under Subtitle C of RCRA.  Unlike In re United Mine Workers, the agency here did not direct Congress or other interested parties to await the results of an additional study or rulemaking proceeding.  Instead, the coal exclusion and other provisions of the Hard Rock Mining Report -- subject to any changes prompted by the public comment period -- were incorporated into EPA's final regulatory determination.  In a very direct sense, the Hard Rock Mining Report was part of the process that resulted in the 1986 determination.  That was not the case, however, in In re United Mine Workers, where the only agency action at issue expressly indicated that the agency took no position on permissible exposure limits but instead directed interested parties to a related proceeding.

Admittedly, EPA's actions here are not exactly a model of regulatory lucidity.  It would have been clearer had EPA explicitly stated in its 1986 regulatory determination that it was excluding coal mining wastes from regulation under Subtitle C.  As it is, the only statement from EPA concerning the treatment of that waste came in the form of EPA's decision to omit it from the Hard Rock Mining Report.  The resulting ambiguity has created the present controversy. Nevertheless, the Court concludes that defendants' position that plaintiffs' complaint is in fact a challenge to its 1986 final agency action is a permissible, even if not compelling, characterization.  Construed as such, it is evident that plaintiffs' complaint is untimely and must be dismissed.  As noted above, RCRA requires that any petition for review of a decision by the

---

challenge on the merits -- not to mention the fact that it demonstrates plaintiffs' willingness to contemplate that EPA did, in fact, take action in this instance.

Administrator concerning regulations must be filed within ninety days of publication.  See 42

U.S.C. § 6976(a)(1).  It is undisputed here that plaintiffs have failed to file their challenge within

that allotted time-frame -- they are over twenty years late.  Accordingly, if viewed as a challenge

to EPA's final regulatory determination issued in July 1986, plaintiffs' complaint must be

dismissed.

## II.  Agency Inaction

As plaintiffs frame the case, on the other hand, they are challenging what the agency has

failed to do for over twenty years in direct contravention of Congress' plain directive to "study

and report the environmental effects of coal mining and beneficiation waste."  Pls.' Opp'n at 12.

They style their complaint as an action to compel agency action unlawfully withheld or

unreasonably delayed pursuant to the APA.  See 5 U.S.C. § 706(1).  Thus, plaintiffs argue that

EPA never took any regulatory action on this question that could be the subject of judicial review

within RCRA's 90-day filing limit.  But defendants have an answer to this characterization as

well.  Even assuming that plaintiffs' claim is properly conceptualized as a challenge to agency

inaction, defendants argue that it is nevertheless untimely pursuant to the six-year limitations

period contained in 28 U.S.C. § 2401(a).  Moreover, defendants maintain that § 2401(a) is no

ordinary statute of limitations; instead, it has jurisdictional dimensions such that once the six-

year period has lapsed, a court is stripped of subject matter jurisdiction.  As explained below,

defendants appear to be correct.

At the outset, a brief discussion of the nature of 28 U.S.C. § 2401(a) is in order.  In

relevant part, § 2401(a) provides: "every civil action commenced against the United States shall

be barred unless the complaint is filed within six years after the right of action first accrues."

The United States, of course, enjoys sovereign immunity from suit without its consent.  See, e.g.,

United States v. Mitchell, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may

not be sued without its consent and that the existence of consent is a prerequisite to

jurisdiction.").  Section 2401(a) is one such Congressional waiver of sovereign immunity.  It

applies to "all civil actions whether legal, equitable, or mixed."  Kendall v. Army Bd. for Corr. of

Military Records, 996 F.2d 362, 365 (D.C. Cir. 1993).  As another judge from this District aptly

put it, "Section 2401 is a general catchall statute that applies to all civil actions against the

government."  Felter v. Norton, 412 F. Supp. 2d 118, 124 (D.D.C. 2006).

        In private civil litigation, a motion "to dismiss for lack of subject matter jurisdiction

cannot rest upon an assertion that an action is barred by the statute of limitations because the

expiration of the limitations period is an affirmative defense and not a bar to jurisdiction."  Id. at

122 (citing Gordon v. Nat'l Youth Work Alliance, 675 F.2d 365, 360 (D.C. Cir. 1982)).  But

when a party seeks to sue the United States pursuant to a waiver of sovereign immunity, the

expiration of the limitations period has traditionally "been construed as a bar to jurisdiction, and

thus a proper subject for a motion to dismiss under Rule 12(b)(1)."  Id.  Moreover, when a statute

of limitations has been regarded as jurisdictional, "it has acted as an absolute bar [that cannot] be

overcome by the application of judicially recognized exceptions . . . such as waiver, estoppel,

equitable tolling[,] . . . fraudulent concealment, the discovery rule, . . . and the continuing

violations doctrine."  Id. (collecting cases).  Significantly, the D.C. Circuit has previously held

that "[u]nlike an ordinary statute of limitations, § 2401(a) is a jurisdictional condition attached to

the government's waiver of sovereign immunity, and as such must be strictly construed."

Spannaus v. U.S. Dep't of Justice, 824 F.2d 52, 55 (D.C. Cir. 1987) (emphasis added).  The

pressing issue in this case, to which the Court will turn momentarily, is whether subsequent

decisions by the Supreme Court and the D.C. Circuit have undermined or reinforced that

authoritative statement in Spannaus.

      But an initial question here is when plaintiffs' cause of action accrued.  As defendants

correctly point out, the "statutory deadline for publishing a report of the section 8002 mining

waste studies was October 21, 1983."  Defs.' Mot. at 15.  Technically speaking, then, plaintiffs'

claim ripened on that date when EPA failed to issue a report -- after all, at that time it was

evident that EPA had not performed a nondiscretionary duty by the specific time set by Congress.

See Center for Biological Diversity v. Hamilton, 453 F.3d 1331, 1335 (11th Cir. 2006)

(explaining that a cause of action "accrues on the day following the [statutory] deadline").  But

the resulting lawsuit arising out of the failure to meet the initial deadline imposed by Congress in

fact set a new deadline for EPA: December 31, 1985.  And on that date, EPA issued the Hard

Rock Mining Report that expressly disavowed studying coal.  Arguably, then, plaintiffs' cause of

action accrued on that date.  In any event, the specific accrual date makes no difference in this

case because under any formulation -- absent the application of the continuing violation doctrine

discussed below -- it is beyond dispute that the six-year limitations period expired well before

plaintiffs instituted the present action.

      Defendants maintain that the:

> only elements necessary to plaintiffs' causes of action against the federal defendants
> are: (1) that EPA had a duty to publish the mining waste study under RCRA §
> 8002(f) and (p) by October 21, 1983; (2) that DOI had a duty to consult EPA on the
> study; and (3) that EPA did not publish the study by that date.

Defs.' Mot. at 15.  It follows, according to defendants, that "the remedy that Congress provided

for EPA's alleged failure to fulfill its statutory duty was to permit any person to 'invoke the aid of the court' at any time between October 21, 1983 and October 21, 1989. In that 'ample time,' plaintiffs did nothing." Id. at 16.[8] For their part, plaintiffs do not seriously dispute most of defendants' account. Instead, they argue that an agency's persistent nonfeasance in the face of a statutory deadline constitutes a continuing violation of federal law. Each day after the congressional deadline that the agency continues to flout its regulatory obligations, the argument goes, a fresh violation has occurred. Thus, according to plaintiffs, "an action to compel a recalcitrant government agency to perform its statutorily mandated duties is not time-barred if it is brought more than six years after the expiration of the statutory deadline." Pls.' Opp'n at 13.

Plaintiffs cite to considerable authority to support their position. In addition to four district court opinions from around the country, they maintain that the D.C. Circuit also adheres to their view. The primary case on which they rely is The Wilderness Society v. Norton, 434 F.3d 584 (D.C. Cir. 2006), which warrants a brief background discussion owing to its significance to this action. There, the plaintiff was an environmental organization suing the National Park Service for failing to perform various wilderness evaluations by the specific deadlines imposed by Congress, all of which had lapsed more than six years prior to the institution of the lawsuit. After engaging in a thoughtful discussion of the case law concerning § 2401(a) and equitable tolling, the district court held that the plaintiff's claims were time-barred and that the continuing violation doctrine did not apply. See The Wilderness Society v. Norton, 2005 WL 3294006 at *6 (D.D.C. Jan. 10, 2005).

_____

[8] The Court substitutes the later judicially-crafted deadline of December 31, 1985 for the statutory deadline of October 31, 1983.

The district court first acknowledged that the force of the legal precedents prohibiting the equitable tolling of statutes of limitations against the United States has "been eroding over the last decade." Id. at *5. Reviewing the operative cases, Judge Collyer noted that in Irwin v. Dep't of Veteran Affairs, 489 U.S. 89 (1990), the Supreme Court stated that "making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver." Id. at 95. The breadth of Irwin's reach was taken up by the D.C. Circuit in Chung v. U.S. Dep't of Justice, 333 F.3d 273 (D.C. Cir. 2003). There, the Circuit concluded that the Supreme Court announced a "general rule" in Irwin "establishing a presumption in favor of equitable tolling in 'suits against the Government,' subject to one qualification." Id. at 277. That qualification, in turn, was that "the type of litigation at issue must not be so peculiarly governmental that there is no basis for assuming customary ground rules to apply." Id. Put another way, to apply equitable tolling in the same fashion as in private litigation, "the injury to be redressed [must be] of a type familiar to private litigation." Id. For instance, "[a] petition for review of an informal agency rulemaking," the court opined, "would not likely meet the test" to employ equitable tolling. Id.

Building on that final passage from Chung,[9] Judge Collyer concluded that the plaintiff's claim in The Wilderness Society was "in the nature of 'mandamus.'" 2005 WL 3294006 at *6.

_____

[9] Plaintiffs here take issue with Judge Collyer's reliance on Chung. That case, they claim, "put a gloss on Irwin that had not previously been there." Pls.' Opp'n at 25. And that gloss was subsequently removed by the Supreme Court in Scarborough v. Principi, 541 U.S. 401 (2004), they argue, because the Supreme Court stated that "it is hardly clear that Irwin demands a precise private analogue." 541 U.S. at 422. Although that is not exactly the devastating hammer that plaintiffs make it out to be, this Court has no occasion to address the import of Chung or Scarborough. As discussed below, more recent binding decisions have obviated the need to analyze those prior decisions.

And mandamus relief against the government, the court found, "is a quintessentially

governmental matter without an analogous private action." Id.  Accordingly, the court held that

"the statute of limitations in 28 U.S.C. § 2401(a), as applied to these specific allegations, is

'jurisdictional and hence not subject to judicial malleation.'" Id. (quoting Chung, 333 F.3d at

276).  Thus, the claims based on the Park Service's failure to act were dismissed for want of

subject matter jurisdiction.

      On appeal, the D.C. Circuit affirmed that dismissal, but on alternative grounds.  The court

based its holding on the lack of Article III standing rather than the jurisdictional nature of §

2401(a).  In fact, in dictum the court questioned Judge Collyer's holding on that point:

> Although we need not reach a final determination on this issue because we find TWS
> lacks standing as to its statutory claims, the Society appears to be right in its
> contention that the District Court erred in dismissing the counts under the Wilderness
> Act and the specific enabling statutes as time-barred under 28 U.S.C. § 2401(a).

The Wilderness Society, 434 F.3d at 588.  Referencing In re United Mine Workers and In re

Bluewater Network, the D.C. Circuit explained that "[t]his court has repeatedly refused to hold

that actions seeking relief under 5 U.S.C. § 706(1) to 'compel agency action' . . . are time-barred

if initiated more than six years after an agency fails to meet a statutory deadline." Id.  Because

the plaintiff "claims that [the Park Service] has chronically failed to undertake various legal

obligations with respect to the identification and management of 'wilderness' in the National

Park System," the plaintiff's complaint "alleges continuing violations by the Government." Id. at

589 (emphasis added).  The court concluded that "[u]nder these circumstances, it is unlikely that

[plaintiff's] complaint would be held by this court to be time-barred by 28 U.S.C. § 2401(a)." Id.

      It seems that the D.C. Circuit explicitly contemplated that the doctrine of continuing

violations could toll the statute of limitations contained in § 2401(a).  The court was curiously silent on the precise question of whether § 2401(a) is indeed jurisdictional -- not to mention the import of its own precedents, including Spannaus and Chung -- but application of a judicially-recognized exception to a statute of limitations is inconsistent with the conclusion that it is jurisdictional.  See Felter, 412 F. Supp. 2d at 122 ("Traditionally, when a statute of limitations has been deemed jurisdictional, it has acted as an absolute bar and could not be overcome by the application of judicially recognized exceptions . . . such as . . . the continuing violations doctrine.").  Despite the fact that the D.C. Circuit's treatment of this topic in The Wilderness Society was admittedly dictum, plaintiffs urge that the court's "statements on the statute of limitations should be dispositive of Defendants' motions to dismiss."  Pls.' Opp'n at 14.  The "statements regarding applicability of the continuing violations doctrine," plaintiffs maintain, "are the type of judicial dicta that this Court should follow unless obviously wrong."  Id. at 23.  And because plaintiffs insist that it is clear where the D.C. Circuit stands on this matter, they suggest that this Court should decline to follow the Eleventh Circuit's lead in holding that "28 U.S.C. § 2401(a) bars actions to compel mandatory agency action if more than six years have passed since the deadline for action."  Id. at 20; see Citizens for Biological Diversity, 453 F.3d at 1335-36 ("Because section 2401 unambiguously imposes a six-year statute of limitations, our refusal to extend the application of the continuing doctrine comports with principles of sovereign immunity.").

Plaintiffs' position might have been more persuasive if not for two very recent opinions from the Supreme Court and the D.C. Circuit, respectively.  First, in John R. Sand & Gravel Co. v. United States, -- U.S. --, 128 S. Ct. 750 (2008), the Supreme Court addressed whether 28

U.S.C. § 2501, the statute of limitations for matters brought before the Court of Federal Claims, is jurisdictional. 128 S. Ct. at 753-54. The Court explained that "[s]ome statutes of limitations . . . seek not so much to protect a defendant's case-specific interest in timeliness as to achieve a broader system-related goal, such as facilitating the administration of claims, . . . [or] limiting the scope of a governmental waiver of sovereign immunity." 128 S. Ct. at 753 (citations omitted). Such statutes of limitations, the Court noted, "sometimes referred to . . . as 'jurisdictional,'" are "more absolute" and may "forbid[] a court to consider whether certain equitable considerations warrant extending a limitations period." Id. Long-standing Supreme Court precedent regarded § 2501 as "setting forth this . . . more absolute[] kind of limitations period." Id. at 753-54.

The primary question presented in John R. Sand was whether, as the petitioner argued, intervening decisions, including Irwin, had undermined that assessment of § 2501 as jurisdictional. The Court wasted no time in rejecting that proposition. 128 S. Ct. at 755 ("We cannot agree with petitioner that the Court already has overturned the earlier precedent."). Moreover, the Court flatly declined the opportunity to reconsider its prior determinations in the case at bar. Thus, the Court reaffirmed that § 2501 is jurisdictional and that notions of equitable tolling do not apply to it.

John R. Sand is relevant to this case for two reasons. To begin with, § 2501 and § 2401(a) contain highly similar language. Section 2501 provides, in relevant part: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. That phrasing in § 2501 is nearly identical to § 2401(a) ("every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action

first accrues"). Moreover, both statutes are Congressional waivers of sovereign immunity that effectively serve the same purpose; the only difference between them is that § 2501 deals with cases in the Court of Federal Claims, a narrow subset of claims against the United States addressed more generally in § 2401(a). The Supreme Court's determination that § 2501 is jurisdictional strongly suggests the same conclusion with respect to § 2401.

Moreover, John R. Sand helps to reconcile conflicting case law within this Circuit. In P & V Enters. v. U.S. Army Corps of Eng'rs, 466 F. Supp. 2d 134 (D.D.C. 2006), another judge of this court held that "the 'rebuttable presumption of equitable tolling' applies to lawsuits governed by the six-year limitations period of § 2401(a)." Id. at 149. Critically, however, that decision was founded on two grounds that are no longer valid. First, the court expressly relied upon Irwin's holding with respect to § 2501, noting that § 2401(a) "is not substantially different from the language of 28 U.S.C. § 2501." Id. Because tolling could apply to § 2501, the court reasoned, it could apply to § 2401 as well. But John R. Sand now forecloses that line of argument: § 2501 is unquestionably jurisdictional and equitable tolling doctrines have no effect on the application of the limitations period.

More importantly, the district court in P & V Enters. also relied upon the government's concession that "Irwin may well have overturned the precedent that [§] 2401(a) is jurisdictional in nature." Id. at 148. That concession, in turn, was motivated by the D.C. Circuit's pronouncement in Harris v. FAA, 353 F.3d 1006, 1013 n.7 (D.C. Cir. 2004), that intervening Supreme Court decisions may have called the continuing vitality of Spannaus into question. But very recently, the D.C. Circuit has re-affirmed Spannaus. Tellingly, it did so when deciding P & V Enterprises on appeal. There, the court affirmed "the dismissal of P&V's facial challenge to

the 1986 rule for lack of subject-matter jurisdiction, rather than for failure to state a claim." <u>P & V Enters. v. U.S. Army Corps of Eng'rs</u>, -- F.3d --, 2008 WL 425523 at *5 (D.C. Cir. Feb. 19, 2008). Significantly, the court explained that it "has long held that section 2401(a) creates 'a jurisdictional condition attached to the government's waiver of sovereign immunity.'" <u>Id.</u> (quoting <u>Spannaus</u>, 824 F.2d at 55). Accordingly, the D.C. Circuit dismissed the case as time-barred.[10]

Plaintiffs are ultimately correct that the D.C. Circuit's position on whether § 2401(a) is jurisdictional is apparent. They are simply incorrect, however, on what that position actually is. Indeed, the court of appeals has adopted an approach directly contrary to plaintiffs' asserted position. In their brief, plaintiffs state that "<u>Spannaus</u> need not be, and indeed cannot be, read to hold that 28 U.S.C. § 2401(a) presents a question of subject matter jurisdiction." Pls.' Opp'n at 28. The D.C. Circuit expressly disagreed only a month ago in <u>P&V Enters.</u>. Consequently, this Court is compelled to hold that § 2401(a) is jurisdictional.[11] As a result of that conclusion, the entire basis for plaintiffs' argument that their complaint is timely -- that the continuing violations doctrine tolled the limitations period -- is not legally viable.

The Court is cognizant that this holding may leave plaintiffs with no judicial avenue at this time to compel EPA and DOI to take actions that plaintiffs believe are mandated by

---

[10] Interestingly, the D.C. Circuit noted that neither party on appeal "challenged this circuit's precedent" and therefore it "need not question . . . prior authority." <u>P & V Enters.</u>, 2008 WL 425523 at *5. The court, accordingly, explained that it also "has no occasion to address potential implications of recent Supreme Court decisions." <u>Id.</u> One of the recent Supreme Court decisions referenced was <u>John R. Sand</u>. <u>Id.</u> n. 2.

[11] Naturally, given the binding authority from the D.C. Circuit on this question, and the firm support from the Supreme Court in <u>John R. Sand</u>, plaintiffs' reliance on the contrary holdings of district courts is unavailing.

Congress.  But that does not preclude plaintiffs from filing a petition for rulemaking with the

agencies themselves.  They can also bring this alleged two-decade long violation to Congress'

attention.  Finally, plaintiffs are free to ask the D.C. Circuit to reconsider its case law.  But it is

not this Court's role to ignore binding D.C. Circuit and persuasive Supreme Court cases issued

within the past two months.  Even viewed as a challenge to agency action unreasonably withheld,

then, plaintiffs' claim fails for lack of subject matter jurisdiction because it is untimely.

Accordingly, the Court will grant defendants' motion to dismiss.[12]

---

[12] Defendants also assert that plaintiffs lack Article III standing to bring this lawsuit.
Although the Court need not decide this question, it appears likely that plaintiffs have standing.
Where, as here, there are multiple plaintiffs, "if constitutional and prudential standing can be
shown for at least one plaintiff, [the court] need not consider the standing of the other plaintiffs
to raise that claim." Mountain States Legal Found. v. Glickman, 92 F.3d 1228, 1232 (D.C. Cir.
1996) (citing Watt v. Energy Action Educ. Found., 454 U.S. 151, 160 (1981)).
    Plaintiffs advance two grounds to establish standing: informational and associational
standing.  "Informational standing arises 'only in very specific statutory contexts' where a
statutory provision has 'explicitly created a right to information.'" Am. Farm Bureau v. EPA, 121
F. Supp. 2d 84, 97 (D.D.C. 2000) (quoting Animal Legal Defense, Inc. v. Espy, 23 F.3d 496, 502
(D.C. Cir. 1994)).  Here, plaintiffs argue that they have a statutory right to the information that
was -- or should have been -- contained in EPA's report to Congress, and that their organizational
goals have been, and continue to be, harmed by the absence of coal mining information because
they must expend their own resources in an attempt to determine whether such wastes are
dangerous.  Pls.' Opp'n at 36-37.  The Court is not convinced, however, that plaintiffs can
demonstrate a cognizable injury in fact.  RCRA §§ 8002(f) and (p) do "not seek to protect
plaintiffs from lack of information about mining wastes." Defs.' Reply at 12.  Put another way,
RCRA does not "explicitly create[] a right to information." Am. Farm Bureau, 121 F. Supp. 2d
at 97.  The information generated by the congressionally-mandated reports was to be used to aid
EPA in determining whether to regulate mining wastes under Subtitle C of RCRA.  There is
nothing to suggest that Congress intended the public to be legally entitled to any particular
information.
    Plaintiffs' claim to associational standing in a representative capacity, however, fares
better.  Associational standing requires an organization to demonstrate "that at least one member
would have standing under Article III to sue in his or her own right, that the interests it seeks to
protect are germane to its purposes, and that neither the claim asserted nor the relief requested
requires an individual member participate in the lawsuit." Natural Res. Defense Council v. EPA,
489 F.3d 1364, 1370 (D.C. Cir. 2007).  Plaintiffs have alleged in their complaint that "their
members live near coal waste disposal facilities, that their members use groundwater in those

## CONCLUSION

For the foregoing reasons, the Court concludes that plaintiffs' complaint must be dismissed as untimely.  If the complaint is regarded as a challenge to final agency action, it must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim.  In the alternative, if the complaint is more properly regarded as an action to compel agency action unreasonably withheld, it must be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.  A separate Order accompanies this Memorandum Opinion.

/s/
_____
JOHN D. BATES
UNITED STATES DISTRICT JUDGE

Date: March 21, 2008

---

areas for domestic purposes, and are concerned that their groundwater may be contaminated." Pls.' Opp'n at 41.  Moreover, they assert that coal impoundments have contaminated neighboring surface water and spilled "blackwater" onto the property of some members.  Id. at 44.  Indeed, "[p]laintiffs' members have lost their water sources to [coal] contamination, have given up swimming and fishing, and, in at least one instance, have had to relocate because of the disposal of coal mining and beneficiation waste."  Id. at 44.  Indeed, plaintiffs back up these allegations with supporting affidavits from five of their members.  See id. at 42-44.

    Those allegations are sufficient to demonstrate that at least some of plaintiffs' members would have Article III standing to bring this suit.  As the Supreme Court has held, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.'"  Friends of the Earth v. Laidlaw Envtl. Services, 528 U.S. 167, 183 (2000).  If EPA were to conduct a study on coal mining wastes and then determine that they should be regulated under the strict cradle-to-grave requirements of Subtitle C, contamination from coal impoundments might be sharply curtailed.  In sum, plaintiffs have adequately alleged associational standing in a representative capacity.  See Natural Res. Defense Council, 489 F.3d at 1371 ("These are the kinds of harms that the Supreme Court in Laidlaw determined were sufficient to show injury-in-fact because the member-affiants use or live in areas affected by the PCWP sources, and are persons 'for whom the aesthetic and recreational values of the area [are] lessened by the challenged activity.'") (citations omitted).